**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| HEARTLAND ACADEMY COMMUNITY CHURCH, et al., | ) ) |
| Plaintiff(s), | ) ) |
| vs. | )   Case No.   2:01CV00060 ERW |
| MICHAEL WADDLE, et al., | ) ) |
| Defendant(s). | ) |

**MEMORANDUM AND ORDER**

**STATEMENT OF FACTS**

In the United States of America, citizens are prepared to forfeit the exercise of some natural rights for the promise of the protection of laws, which are expected to be executed fairly and impartially, so the weak and the strong stand on even ground in the treatment by lawfully installed officials. This is a case where some public officials used and abused their public offices, not in accordance with their oaths to uphold the Constitution of the United States of America, but instead to violate the rights of those they were sworn to protect.  The recitation of the facts of this case, which was tried over seventeen days, has burdened the file with considerable volume.  Because the findings and conclusions are so significant in the lives of so many people, it is important to review the facts as reported by many, most with interests to be protected, measuring credibility,  as observed from the witness stand, against a plethora of documentary evidence including video-taped events.

The statement of facts will begin with testimony of a young man who, on October 30, 2001, was at the Heartland Christian Academy when buses arrived to remove all "program students."[1]

---

[1]  Program students are those that live in dormitories or group homes on Heartland property.  Most are placed there by their parents or legal guardians.  On October 30, 2001, some were there upon placement by juvenile courts.  The students were at Heartland because they had histories of alcohol or drug abuse, sexual abuse, physical abuse, because they had flunked out or dropped out of school, because they had juvenile records for antisocial behavior, because they were beyond control of those attempting to exercise the role of custodian and because, in many cases, the next placement, if the Heartland experience was unsuccessful, was, most likely,  the penitentiary.  One hundred and thirteen students were removed from Heartland on October 30,

Ovidiu Boghean, originally from Romania, graduated from Heartland in 2002, and continues to reside there. He is a professional pilot. His parents worked at Heartland and lived on a farm about twelve miles away from the school. At around 2:00 p.m. on October 30, 2001, he received a call while at the airplane hangar from Elisa Bock,[2] who requested that he report to the School to operate a television camera. Upon his arrival at 2:15 p.m., he was advised of rumors that police officers were coming to the campus. Police officers arrived at 3:00 p.m. Mr. Boghean carried the camera, shooting intermittently for approximately two and one-half hours, making two tapes which ran for sixty-five minutes (Pl. ex. 93 OB, 93 SR and 93 SUM). The edited summary was not received in evidence. These tapes show what cannot adequately be described in words to capture the expressions and speech of students removed, and the chaotic way the removal was executed. In cross-examination, he was asked about his editorial comments that are recorded on the tapes. He described his comments as, "[t]his is the United States of America; this is wrong; this should not be happening." He describes what he was thinking at the time, and it summarizes concisely and about as well as words can describe the scene at the Heartland Christian Academy on October 30, 2001.

This case is not only about the mass removal of students from Heartland Christian Academy on October 30, 2001. It is about care and treatment of children at Heartland. It is about fear of some because Heartland exists. It is about courage of many and the perfidious behavior of others, operating under the color of law, to deprive scores of their rights as guaranteed by the Constitution of the United States of America, necessitating the issuance of injunctive relief and a declaratory judgment to prevent what will predictably happen if that relief is denied.

## I.   THE MISSION OF HEARTLAND

Heartland Christian Academy is a school offering education from kindergarten through twelfth grade. It began in 1995. There was a boys' dormitory in Lewis County at the time of the mass

---

2001 and placed in the protective custody of the Second Judicial Circuit Juvenile Office and the Forty-First Judicial Circuit Juvenile Office.

[2] Ms. Bock is a house parent, a part-time teacher and is in charge of the Television Department at Heartland. That department also does video productions. On the afternoon of October 30, 2001, she contacted Mr. Boghean and Mr. Rutherford, instructing them to prepare to make video images during the mass removal of the children to assure the children would be safe.

removal on October 30, 2001.  It has since been moved to Knox County.  Boys and girls are now housed on alternate floors in the dormitory in Knox County.  Residential group homes are located in Shelby County.  The School is also located in Shelby County.  Staff homes are located in Lewis and Shelby Counties.  There is a "respite home," designed for individual students who are not thriving in the dormitory setting, allowing a child to be put into a single-family dwelling in a family environment for a period of weeks or months.  Many students work on the dairy farm located in Lewis County.  Some are heavily involved in Future Farmers of America and 4H activities.  They are encouraged to show animals at the county fairs.  A public steak house restaurant is located in Knox County.  The convenience store, gas station, laundry and Solid Rock Café are located in Shelby County.  Commercial enterprises are owned by a corporate "for profit" entity.  All of the improvements have been built since 1996.  Buildings are heated with geo-thermal technology.  The plan is to build an environmentally friendly sustainable community.  A Bible College has been added since October 30, 2001.  On October 30, 2001, all of the children were taken from Shelby County where the School is located.  For the purposes of this opinion, unless specifically otherwise designated, all of the entities will be called ("Heartland").

Before October 30, 2001, the School had two hundred and twenty students consisting of one hundred and twenty program children and one hundred residential children who reside with families. Children come to Heartland by parent, guardian and juvenile court placement.  Services are provided to children from birth to eighteen years of age.  Frequently, children arrive from other failed placements.  Children come from "all over the United states," Eastern Europe, Mexico, and Asia. The Christ-centered mission is to help troubled youth become productive citizens.  Children are not locked-down or fenced in; they are "loved," and sometimes that includes "tough love."  Heartland started as a recovery center for  adult drug abusers who were offered residential treatment.  A natural progression involved the care of children for people in treatment.  Heartland Childrens' Home followed.  Heartland is financed by Charles and Lori Sharpe.  No funding is accepted from local, state or federal governments.

Charles Sharpe is founder and pastor of Heartland, founder and president of CNS International Ministries, Inc., and a member of its board of directors.  He is also founder of Ozark National Life Insurance Company which has its headquarters in Kansas City, Missouri.  He and his,

Lori Sharpe, live in a group home located on Heartland property with fourteen girls.  One is eleven years old and the others are teenagers.  Teenage girls have lived in his home for four years.  Some have babies.  Some of the babies were born while the girls were living in his house.  Presently, there is a two-year old child living there.  Carissa Garnel and Carol Lundstedt provide part-time help in managing the household.  Mrs. Sharpe is manager of the Womens' Recovery Center, and administers the group homes and the Girls' Dormitory.  She has held various positions at Heartland over the last five or six years.

Mr. Sharpe describes, in part, the mission of Heartland:

Q.   Mr. Sharpe, why did you start Heartland?

A.   I believed and I do believe that if we don't do something about our youth, that America is going to become a weak nation in the next 50 years.  I've lived 76 years, and I've watched America's youth go from where it was when I was a kid to where it is today.  And my wife and I both had very humble beginnings, but we made some money and we decided we was going to spend our money on youth.  And so that's -- We just want to see if we can help change our young people into a real life.

Q.   And you've talked about the -- There's been talk about the kinds of kids that you bring to Heartland, and Mr. Dunne pointed out that you don't say "no."  What -- What is your approach? Can you describe for the Court your approach in attempting to change and develop the young people that come into your ministry?

A.   Our first objective is to let the kids know that we truly love them and that they need to love instead of hate and be full of anger.  We direct them, of course, to Christ. We're Christian people, and we believe that that's the first way that these kids can get to have an understanding of love and appreciation, and so that's where we start. That's our -- Loving the kids at whatever the cost is our fundamental beginning and then beginning to get them into some structure of going to school.  Almost all of our kids when they come to Heartland, I mean nearly all of them have dropped out of school or are flunking out.  They're usually two to three years behind in school.  So we get them back in school and we start giving them just some -- some thoughts about life that they've never had before.  And, of course, it's a very, very difficult situation because these kids, many of them, are -- have been in gangs, and they're really -- they're -- they're traumatized to the very limit.  So we love them.  We just keep loving them.  The one thing they do know is we love them.

Q.   And then you said that the other part of it is the structure.

A.   Yes.  We have to bring structure in[.]

4

Q.    And what are the elements of structure that you give to these kids?

A.    Well, we start off by they have to go to bed. Most of these kids stayed up all night or almost all night. Then they couldn't get up the next morning. They have to go to bed. They have to get up at a certain time. They have to eat at a certain time which is something they've never done. Many of our young people have never sat down at a table and never had a meal with a family; not ever. This is their testimony. They never -- They was never -- There was no structure in their life. We tell them they have to go to school and they have to -- they have to have some activity, and many times we do physical exercise with them to get them so they're -- build up their bodies. We just go -- It's just a continual thing as like a family. We give them a family structure as much as we possibly can.

Q.    And how many people make up -- Roughly, how many people make up this family or community at Heartland?

A.    Well, we have about a hundred thirty to forty students that live there, and we have well over a hundred adults there, and every person, we're very close. I mean very close. We many times eat together. We go to school. When we go home, for instance, my wife and I have 14 -- I believe 13 or 14 kids in our home that live with us. We go to church together. We eat together. We sleep together. We go to church; everything. We do everything together and it's 24 hours a day, seven days a week.

Q.    There's been discussion during your [cross] examination about memos and policies and communication. For the people in the Heartland Community, how many occasions are there for formal interaction in the course of a week?

A.    Oh, many.

Q.    Okay. And, again, can you give the Court the kind of activities the community as a community formally participate in the course of a week?

A.    Well, we have church three times a week. The young people have a service of their own which is the fourth time but that only includes the young people. We have many meetings; staff meetings, teachers meetings. We have interaction constantly. It's completely different than a normal, you know, setting because we're a very tight-knit group because we got these kids that are in such bad shape that we have to just focus on it all the time. Can't do anything else but just live with them.

Dr. Gilbert Kliman, a child psychiatrist employed by Heartland, also provided a description

of the Heartland program:

> Heartland, it appears to me, has set up a system that depends upon developing very close and highly structured attachments between house parents and children, and administration and children, and school and children. It integrates the house care, administrative care, and educative care into a spiritual package so that a homogeneous and highly networked system of influence and support occurs creating strong attachments on the part of the children and, ultimately, in many cases leading to spiritual activities, conversions and immersion of the children in what for them is a new disciplined and moral way of life.

Mr. and Mrs. Sharpe have made very substantial investments of their financial and personal resources in Heartland.   Mr. Sharpe describes the personal and financial commitment he and Mrs. Sharpe have made to Heartland and the impact of the mass removal on the Heartland program:

> Q.    Mr. Sharpe, approximately how much have you and your wife invested in Heartland?
>
> A.    Between fifty and sixty million dollars.
>
> Q.    Now has your investment in Heartland just been financial?
>
> A.    No.
>
> Q.    In what other respects have you invested?
>
> A.    Well, it's our life.
>
> Q.    What, in your opinion, was the impact upon Heartland of the October 30th removal?
>
> A.    It was devastating.
>
> Q.    And in what ways do you believe it was devastating?
>
> A.    Well, the -- the -- the damage to the children in some cases will never ever be recovered, in quite a number of them I would say, particularly that we never did get back.
>
> Q.    And what about -- And what do you believe has been the impact on Heartland itself and its mission?
>
> A.    It has been hampered immensely.

Q.   In what ways?

A.   Well, the flow of kids coming to us, children, was cut probably three-fourths; certainly more than a half.

Q.   Is the size of Heartland's program now where you expected it to be?

A.   No.  We're about -- just over half of the place that we thought we would be at this time.

Q.   Do you believe the Heartland youth program can survive another removal of its boarding students?

A.   Absolutely not.

Submission is a big part of the Heartland program to break down resistance to get the children to "focus on the right thing."   The first approach at Heartland is to let new students know that they are truly loved and to direct them to Jesus Christ.  The kids at Heartland are loved at all costs. Children with many sad stories come to Heartland.  There, they are put on a new road.  There is a public steak house, grocery store and convenience store at Heartland.  The grocery store and restaurant are operated, in part, by the students.

Mail and telephone restrictions are implemented based on experiences from other drug and alcohol abuse treatment programs.  Parents decide the identity of individuals with whom their children may communicate.  Cameras in the possession of children are not permitted to prevent them from being used to capture images of an inappropriate sexual nature.  Additionally, on two or three occasions, children have taken photographs of bruises inflicted by another child, followed by a false claim to parents of abuse by Heartland staff members, with the stated belief if the child could get the photo to someone outside Heartland, the child could be released.  As a result, cameras are not allowed in the possession of students without approval.

David Melton is legal counsel for Ozark National Life Insurance Company, Heartland Ministries, and CNS International Ministries, Inc. (a 501 Tax Exempt Company).  He offered additional testimony concerning the mission of Heartland.  He is deeply involved in the operations of the Heartland enterprise, and is very knowledgeable about its activities.  He testified that Heartland is a city of refuge that was established to help troubled youth become productive citizens.  Heartland

Community Church is located on the Heartland campus. Church services are conducted in the school gymnasium on Sunday morning, Sunday evening, Wednesday evening, and, twice a week, prayer services are observed. The gymnasium is also the site for various youth activities. Average weekly church attendance is between five hundred and six hundred persons. Mr. Melton describes many of the children in the Heartland program as having failed in other placements. Many have been involved in criminal activity including crimes against persons, offenses involving alcohol and drug abuse, and self-destructive behavior. Many children coming to Heartland are "street wise." Controlling their behavior during the first three to six months is challenging. It is a highly structured environment with little contact between boys and girls. Forms of punishment, in addition to swats, include the wearing of jail-type jump suits, having hair cut short, having food substituted, for example to Heartland stew,[3] and not permitting second helpings. Swatting is implemented as the final option. Swats are administered as a child bends at the waist placing both hands on a chair while being fully clothed. Counseling occurs before swatting to identify the reason swats are necessary, so the punishment is associated with the particular activity being discouraged. A person of the same gender as the person receiving swats must be present. Mike Peterson, a person of imposing size, is available to assist in restraining a child who resists receipt of swats. Mr. Melton presents himself as being very well informed and prepared in steadfastly representing Heartland interests, including the interests of children at Heartland.

Rebecca Flood offers insight into some of the challenges Heartland staff faces in its mission. She married Jason Flood in January 2002. She was formerly known as Becky Gilmore. She moved to Heartland on May 27, 1998, entering the Heartland program as a student, rebellious and disrespectful of her parents. Other junior staff members who have been through the Heartland program include Heather Clark and Brenda McNabb. Ms. Flood's annual salary is $15,000.00 plus provision of housing. Her husband is currently a staff member in the Boys' Dormitory. In October 2001, he was removed from child care services because of child abuse allegations involving O.M. This matter will be thoroughly discussed, subsequently. Ms. Flood was a dormitory staff employee on October 30, 2001. That employment started in the Spring of 2001. Prior to that duty, she worked

---

[3] Heartland stew is a mixture of salmon, rice, and beans, described as being nutritious but not apparently a cuisine of choice.

in the child day care center for two years, and before that she worked on the farm with the calf crew.

Ms. Flood reports that some of the girls at Heartland have problems concerning drug and alcohol addiction; some have been sexually abused; some have violently acted out and are out of control; and some were physically abused by their parents. Some students engage in self-destructive behavior such as cutting themselves. Some are suicidal. Two or three girls room together in the dormitory. Sometimes, with particular girls, restrictions are placed on their communication with individuals adversely affecting their behavior, including parents. Generally, girls are allowed no contact with parents for the first thirty days of their placement, and at the conclusion of that period they are allowed to make one ten-minute phone call each week in the presence of a discipleship group leader. The group leader makes no notes of conversations unless the student is cussing or "something like that." Parents dictate the identity of persons who may receive calls from the girls for one year. The girls are permitted to write letters which are screened by Ms. Flood, Amy Wilson, and Becky Powell for expressed cussing, disrespect for the intended recipient of the letter, or for expressions that are very negative. Expressions of hatred for Heartland or of mistreatment at Heartland are forwarded to supervisors.

Ms. Flood has received bruises and had a broken blood vessel while administering discipline. She knows that Carol Lundstedt suffered a broken rib when she was knocked down while trying to stop a child from running through a door. She never saw an instance of a child being injured when she was working in the Dormitory. She never made any hotline calls and she was never named as a perpetrator in any complaint. She was never disciplined for mistreating any girl and has never been reprimanded. She is familiar with the filing of incident reports. Their purpose is to identify who was involved in an incident, where the incident occurred, what happened, and what discipline was administered. She was told when she first started working at the Day Care Center at Heartland in 1998, that she was a mandated reporter under the law and had a duty to call the "hotline" if she suspected that a child had been abused or neglected. She believes that the mass removal adversely impacted the children. Ms. Flood is not permitted to administer discipline without approval of Carin Patchin, who is the wife of Rob Patchin, grandson of Charles Sharpe who has management responsibilities at Heartland.

Mr. Sharpe explained the requirements of parents on admission of their child. Parents must

9

sign an agreement upon admission of their child agreeing, among other things, to the control of outgoing and incoming mail. Mail and telephone restrictions are implemented based on experiences from other drug and alcohol abuse treatment programs. Parents decide the identity of individuals with whom the children may communicate. Manuals for the Boys' Dormitory (Pl. Ex. no 112) and the Girls' Dormitory (Pl. Ex. no. 113) set forth the procedures to be observed concerning communications' restrictions for admitted children. Over 90% of the children coming to Heartland do not want to come there. Generally, admitted children are manipulative and will do almost anything to leave. They do not like the restrictions upon the freedom they have been accustomed to observing. They frequently tell others that Heartland does not feed them, does not love them, and will report almost anything to get released.

Staff members may inspect all mail because the associations of previous drug, alcohol, and sexual environments of children must be eliminated. Specific efforts are made to break the cycle that makes the admission necessary. Children frequently ask for items they should not have. The limitations are put in place to change behavior to give them a more positive outlook. It is believed that unless a rebellious attitude is broken, prospects for change are grim. In their telephone calls each week to parents, they must address parents respectfully without manipulation and argument.

Parents sign an agreement when they bring a child to Heartland agreeing to pay for the services performed for the child. If the parent has no money, no payment is expected or received. No child has ever been turned away from Heartland and no legal action has ever been taken to collect money for the care of a child. Children admitted to Heartland are expected to graduate from high school. Parents are told not to bring their children to Heartland unless they expect the child to graduate. Any debt is excused if the child graduates. Parents are told they will be expected to pay six hundred dollars for each month the child was at Heartland if the child is removed by them before graduation. Parents are not told that there is no expectation that Heartland will actually attempt to collect if the child is removed before graduation. Heartland personnel do not want to baby-sit children while their parents take a vacation.

Since its beginning, fifty-four students have graduated from Heartland. Mr. Sharpe claims a better than eighty-five percent success rate with children admitted at Heartland, although he admits that one student has had a "run-in" with the law since graduating. Heartland maintains close contact

10

with the students after graduation.

## II.    THE MANURE PIT INCIDENT

An event literally reported around the world occurred in late March or April 2001, at a manure pit and manure platform where  animal waste is collected from a large dairy herd owed and operated by Mr. Sharpe's for-profit enterprises.  Students at Heartland are regularly assigned routine jobs with the dairy operation.  Rob Patchin conceived the idea that students expressing dissatisfaction with school attendance should be taken to the manure pit or the manure platform, and be instructed to wade into the manure at a depth that remains in dispute.  The discipline was promoted under the title of "School Appreciation Days."  Facts that are not in dispute are that the manure at the location had a foul odor; that its presence on the skin was unpleasant; that no physical injuries occurred from the practice; that in each instance when the practice was executed, it proved an efficacious means of re-channeling the students view of school attendance; and that Mr. Sharpe was not aware that this practice was being conducted.  When he learned of it, he characterized it as being "dumb as a rock." From this point in the Opinion, any exposure to manure by Heartland students will be referred to as The Manure Pit Incident.

The Manure Pit Incident was the cause of frenetic intrusion into every aspect of Heartland's existence.  Before this incident, Heartland was a curiosity in a rural area because of the construction of many new buildings; the development of a very large farming operation; opening of a state of the art school; existence of an alcohol and drug treatment care; and regular Christian worship services. When children were discovered wading in manure, the story was reported, among other places, in the New York Times.  This episode redefined the way Heartland was perceived by law enforcement, the Division of Family Services, juvenile officers in the Second and Forty-First Judicial Circuits, and neighbors and residents in the area.   This formerly benign entity, having primarily a local identification, overnight took on a role of a suspicious undefined separated group, in the age of other now identifiable dangerous causes, making it a target for intrusive inquiries.

In late March or early April, a few teenagers in the Heartland program were required to wade into the manure pit.  Mr. Sharpe first learned of Mike Waddle, Juvenile Officer of the Second Judicial Circuit, in April, 2001.  Mr. Waddle became actively involved in the Manure Pit Incident investigation that followed.   Mr. Waddle graduated with a Bachelor of Science Degree in Criminal Justice.

Immediately thereafter, he became employed by the Missouri State Probation and Parole Board as a probation and parole officer. Four or five years later, in 1988, he was hired as a juvenile officer for the Second Judicial Circuit Juvenile Office. He is currently a board member and treasurer of the Missouri Juvenile Justice Association, a member of the Northeast Missouri Peace Officers' Association, and a member of the Northeast Missouri Juvenile Officers' Association. He is a gubernatorial appointee to the Juvenile Justice Advisory Group, and a member of the National Coalition for Juvenile Justice. He receives annual training from the Missouri Juvenile Justice Association in the Spring and Fall at its conferences. At least annually, he receives training at the National Council for Juvenile and Family Court Judges' meetings. He has received training in the past from the Department of Justice in child abuse and neglect investigations. He is training to become certified as a Juvenile Court Administrator. Most of the volume opinion concerns the actions and intent of Mr. Waddle, for reasons which will become apparent.

Heartland presented to Mr. Waddle his first experience with a significant population of juveniles with serious behavioral and emotional problems. Before April 2001, Mr. Waddle was generally aware of Heartland, but he had never been on the property and no Second Judicial Circuit Juvenile Office personnel had ever conducted any investigation at Heartland. No Heartland personnel had ever been suspected of any activity that would call for action by his Office. Mr. Waddle first went to Heartland with a family support group where a father was involved in the Men's Recovery Program. On April 30, 2001, he was notified by Lewis County Sheriff, David Parrish, of a child abuse allegation concerning the exposure of children to a manure pit at Heartland. Before April 2001, he only knew that a school was located on the Heartland property and that a religious ministry was practiced there. He was not aware, before April 2001, that Heartland was established to treat children who abused drugs, those with serious emotional problems, or that some children were placed there involuntarily. In March 2001, he was not aware that corporal punishment was practiced there. Mr. Waddle knows that it is lawful in Missouri for unlicensed facilities to operate residential child care facilities. Licensed facilities must comply with health and fire codes and maintain minimum standards for staff. Corporal punishment is not permitted in licensed facilities. Mr. Waddle has no objection to licensed child care facilities being located in the Second Judicial Circuit, and he believes that all residential facilities should be licensed. Before learning of Heartland, Mr. Waddle had no

experiences with religious schools in conjunction with residential facilities having students with serious behavioral and emotional problems.  He did not know at that time that other juvenile officers in the state of Missouri had been placing children there under court order, but now believes that other juvenile officers from other circuits should notify him before children are placed there.  Before April 2001, no one came to him and voiced any objections about Heartland.

Cindy Ayers has been the Chief Juvenile Officer of the Forty-First Judicial Circuit since 1992. Deputy juvenile officers are Tammy Shoemaker, Vicki Sweet, Larry Carmer, and Daniel Waller.  Ms. Ayers is familiar with Heartland, as she attended the Groundbreaking Ceremony at Heartland in approximately 1996.  The Heartland School Building and some of the Group Homes are physically located in the Forty-First Judicial Circuit.  In Heartland's history, the Forty-First Circuit Judicial Office has taken three formal actions involving Heartland, all in 2001.  The first, on April 3, 2001, involved removal of an infant from the Group Home occupied by Mr. and Mrs. Sharpe.  K.M.F.'s mother, D.C., was a sixteen year old boarding student at Heartland.  On April 2, 2001, Ms. Ayers learned that the child's mother wanted K.M.F. returned to her.  Ms. Ayers learned later that a consent to adopt the child had been executed by D.C., who had abandoned K.M.F. at Heartland when she was pregnant with her second child and was unable to care for K.M.F.  Ms. Ayers was aware that K.M.F.'s father had lawful custody of her, but she made no effort to contact the father.  Mr. Steve Raymond, Shelby County Prosecuting Attorney, advised, upon request, that the Forty-First Circuit Juvenile Office was the appropriate agency to take custody of K.M.F.   Ms. Ayers applied for and received a court order to remove K.M.F. from the Sharpe home.  The Sharpes, in talking to Ms. Behrens of the Lewis County Sheriff's Office, reported that they would not voluntarily release K.M.F. without a court order.  Accompanied by seven other Shelby and Knox County officials, Ms. Ayers went to the Sharpe home, presented the court order to Mrs. Sharpe, and received custody of K.M.F. without resistence. Mr. Raymond filed felony criminal charges against both Charles and Lori Sharpe for failure to return K.M.F. when D.C. demanded custody.  The charges were later dismissed by a successor prosecutor.

In a subsequent Division of Family Services' investigation, pursuant to a hotline report, the child abuse or neglect report against the Sharpes in the K.M.F. matter was unsubstantiated.  Mr.

Raymond was very upset over the Out-of-Home Investigator's "unsubstantiated" conclusion.[4]  Ms. Ayers expressed the view, at that time, that "Heartland is becoming its own city and stretches into three counties, Knox, Lewis and Shelby (Pl. ex. 42)."   She observed that there were people everywhere, there were people from foreign countries, and there was a rehabilitation center located there.  She also observed prevalent new construction.

On April 9, 2001, Ms. Ayers and Brenda Wright of the Division of Family Services sent a memorandum to area law enforcement agencies inviting them to a meeting to gain coordination of counties and get information to develop a plan concerning Heartland.  Ms. Ayers believed that Heartland officials had not worked well with her in the K.M.F. matter.  The meeting lasted one and one-half hours.  No one from Heartland received an invitation.  Ms. Ayers recalls the attendees at the April 16, 2001 meeting as herself, sheriffs from the three counties, Mr. Waddle, Ms. Wright, Pam McGowan, from the Missouri Division of Family Services, and Mr. Raymond, the Shelby County prosecuting attorney.  Ms. Wright expressed the view that she wanted to assist families that left Heartland.  The issue of run-a-ways and jurisdiction implications were discussed.  When asked if anyone expressed concern about the Heartland program, Ms. Ayers had "no recollection." Immediately after the April 16, 2001 meeting, there was no attempt to consult with Heartland personnel.

When Ms. Ayers circulated the memorandum calling for the meeting (Pl. ex. 1), the notice of the meeting came as a surprise to Mr. Waddle.  At that time, he had little information concerning Heartland.  Before the meeting, he was aware of what he considered a disproportionate share of run-a-ways from Heartland, although he had received no complaints from sheriffs about such run-a-ways. Mr. Waddle does not remember the identity of all persons at the meeting, but recalls that those attending included Ms. Ayers; Brenda Wright; Jerrie Jacobs-Kenner; Ms. McGowan; Mr. Raymond; Donna Rohrbach, a Division of Family Services supervisor from Lewis County;  probably someone from the Shelby County Sheriff's Office; probably someone from the Adair County Division of Family Services' Office; himself; and perhaps someone from the  Knox County Sheriff's Office. The primary

_____

[4]  A "substantiated" child abuse or neglect report within the Division of Family Services is a determination by that agency's investigator that probable cause exists to believe that abuse or neglect has occurred.

conversation at the meeting, according to Mr. Waddle, was Mr. Raymond's expressed dissatisfaction with the Division of Family Services because of the inability of its personnel to make a finding of probable cause in their investigations. Mr. Raymond expressed the belief that the Division of Family Services has a lesser burden in making its finding than the Associate Circuit Judge when considering a probable cause finding. He believed that when he filed charges against Mr. and Mrs. Sharpe concerning K.M.F., as mentioned, and proved probable cause that a crime had been committed, the Division of Family Services should have made a probable cause finding of child abuse. Ms. McGowan expressed an opposite view and remained unconvinced by Mr. Raymond, who expressed the view that he had prepared an "open and shut" case against the Sharpes.

The Office of Out-of-Home Investigations, located within the Division of Family Services of the Department of Social Services, conducts investigations of child abuse in residential facilities. Mr. Tim Carter conducted out-of-home investigations at the time of the meeting of April 16, 2001. At that meeting, Division of Family Services' personnel and juvenile office personnel expressed dissatisfaction with Mr. Carter's performance. There was expressed belief that there were instances when he should have made substantiated findings of child abuse when unsubstantiated findings were made. Mr. Waddle recalls no discussion at the meeting related to any investigations at Heartland. There was a recognition that since Heartland was an unlicensed facility, the Division of Family Services did not have available all of the remedies as with licensed groups. With licensed organizations, the Division of Family Services is lawfully enabled to negotiate to bring the facility into compliance with their requirements.

Ms. Ayers believes that Mr. Waddle did not contact her from April 16, 2001, until criminal charges were filed against five staff members at Heartland alleged to be involved in the Manure Pit Incident on June 26, 2001, except at a May 9, 2001 meeting. Between April 16, 2001 and June 28, 2001, Ms. Ayers contacted no one at Heartland about having a meeting. She has no recall of being involved in a conference call with Mr. Waddle about removal of the children from Heartland or of Heartland ceasing operations on or about June 28, 2001. Upon a review of Plaintiff's Exhibit 46,[5]

---

[5] The memorandum references a conference call with Mike Waddle which "[d]iscussed consideration of protective custody, logistics and staffing at Truman State and possibility of local prosecutors seeking injunction to *cease operation*." (Emphasis added).

a four page Division of Family Services memorandum,  Ms. Ayers testified that she still had no recall of a conference call on June 29, 2001, concerning her contacting Mr. Raymond about seeking an injunction to close down Heartland.

Ms. Ayers does recall that the subject of an injunction was discussed at the meeting on May 9, 2001, attended by Mac Abernethy,  Jerrie Jacobs- Kerner,  Anita Williams, Donna Rohrbach, and Mr. Waddle.  The primary focus of this meeting was the out-of-home investigations of Tim Carter of the Division of Family Services.  Injunctive relief at this meeting was discussed in the context of possible future problems.  There was a discussion that Heartland was growing too fast and they needed to slow down the number of children entering there.  An injunction could "stop it" until it stabilized, to prevent new children from coming in.  Ms. Ayers made it clear in her trial testimony that seeking an injunction was not on her agenda.  At this meeting, she says there was no talk about using an injunction to close the school.

In late April 2001, Mr. Waddle learned that the Mr. and Mrs. Sharpe had been criminally charged for failure to return a child placed with them when its rightful custodian demanded custody (the K.M.F. matter).  He did not participate in that investigation.  He learned this information from Mr. Raymond at the April 16, 2001 meeting.  Mr. Waddle acknowledges that there was talk about the possibility of seeking injunctive relief against Heartland at that meeting.  He recognized that there was some concern that Heartland was growing too fast, it was expanding into the counties of Shelby, Lewis, and Knox, that it was isolated, and seemed to be developing into its own community.  At this meeting, he says there was no discussion about removing children at Heartland.

When initially questioned as to whether there was any discussion about the use of injunctive relief against Heartland, Mr. Waddle first said that was mentioned in the context of caring for children.  When specifically asked, "is it your testimony that you never participated in a conversation with anyone about seeking injunctive relief for the purpose of Heartland ceasing operations," Mr. Waddle responded, "I had that conversation as one of the potential remedies, yes, as a last resort, and that was always in the context of those conversations."  He believes that such a conversation occurred after the April 16, 2001 meeting.  It was agreed at the April 16, 2001 meeting that in the future, there would be more sharing of information.  Mr. Waddle departed from the meeting with no agenda towards Heartland.  On the same day, at a subsequent meeting attended by Mr. Waddle; Ms. Jacobs-

Kenner; Ms. Rohrbach; Ms. McGowan; Ms. Wright; Ms. Ayers; Linda McDaniel, Division of Family Services supervisor from Lewis County; and perhaps someone from the Adair County Division of Family Services' Office; the questioned competence of Mr. Carter to do out-of-home investigations was further discussed.

Ms. Ayers had little knowledge about the Manure Pit Incident at the time the news about it was released in late June, 2001, in a radio broadcast. She then discovered that criminal charges had been filed related to the Manure Pit Incident around the first of July. On July 5, 2001, Ms. Ayers reviewed the Lewis County Sheriff's report concerning the Manure Pit Incident with some friends. She was concerned about the welfare of J.J., a Shelby County juvenile at Heartland, who was developmentally disabled and was involved in the Manure Pit Incident. He lost a shoe in the pit and was crying. She decided to seek removal of J. J. from Heartland upon advice from Kyle Kendrick of the Division of Family Services, who had concluded that J.J. had been abused. J.J .'s mother was opposed to any action to remove him from Heartland. However, after Ms. Ayers advised the child's mother of facts she had learned concerning J.J. , his mother removed him from Heartland (Pl. Ex. 31). Later, J.J. returned to Heartland.

Mr. Waddle first went to Heartland premises during the Manure Pit Incident investigation on April 30, 2001, at the request of Sheriff David Parrish, former Second Judicial Circuit deputy juvenile officer for Lewis County under the supervision of Mr. Waddle. Mr. Waddle believes it is possible that he and Sheriff Parrish had conversations during the week of April 23, 2001, about possible child endangerment at Heartland resulting from the Manure Pit Incident. He and Sheriff Parrish had earlier met at the Sheriff's Office in Monticello, Missouri, where Sheriff Parrish told him that he had learned that a child, likely a girl, had been put into a manure pit, that there may have been more than one child involved, and that several people who were at the manure pit at the time were upset.

It is Mr. Waddle's practice in conducting child abuse allegations  to physically remove the child to a neutral location for an interrogation, e.g., the courthouse or Division of Family Services' Office. His investigations are frequently conducted jointly with law enforcement personnel. A "risk of harm assessment" is made on a case-by-case basis to determine if a child should be removed from a custodial setting without consent of the parent or responsible person.

In the initial investigation of the Manure Pit Incident, Mr. Waddle, Sheriff Parrish, and

17

possibly Deputy Juvenile Officer Jamie Goodwin, contacted Ron Osbon at the Boys' Dormitory at Heartland. Thereafter, they visited the Girls' Dormitory. Mr. Osbon made arrangements for a juvenile female, M.I.K., to be interviewed by the Second Judicial Circuit Juvenile Office personnel and Sheriff Parrish or his deputies. They took her to the LaBelle, Missouri police station. She was not advised that she was not required to accompany the officers. Mr. Osbon had stated that M.I.K. had stood in the manure pit where she had been subjected to raw animal waste, cow urine, and cow feces.

Staff members were asked to get M.I K. ready to be taken by Mr. Waddle, Sheriff Parrish, and Mr. Goodwin. They were not asked to contact M.I.K.'s parents. Mr. Waddle had concluded that as the child's custodian, Heartland had authority to release her. At that time, there was no belief by Mr. Waddle that M.I K.was in protective custody. She was questioned by Mr. Waddle, Kris Chamley with the Division of Family Services, and Sheriff Parrish. The interview was not limited to the Manure Pit Incident, but included questions about her personal history, conflicts with her parents, past psychological problems, medical history, the scope of her medications, and disciplinary practices at Heartland. The questioning began at 5:00 p.m. and M.I.K. was taken into protective custody at 6:20 p.m. The Missouri Division of Family Services took protective custody of her.[6] She was taken to the Bruce Normile Juvenile Justice Center in Kirksville, Missouri, which is located in Adair County. Her parents were then contacted and they took custody of her the next day.

Thereafter, Mr. Waddle filed a juvenile court petition against Heartland alleging child abuse. He concluded that the incident was harmful to M.I.K., it was emotionally distressing, and it was abusive. He also learned from M.I.K. that other "problematic" forms of discipline were practiced at Heartland. Thus, Mr. Waddle wanted to interview other juveniles.

After questioning M.I.K., Sheriff Parrish and Mr. Waddle went to view the manure pit. Sheriff Parrish described it as being very dark, resembling sewage with an overwhelming stench. He recalls seeing insects at the site. He took exception to the suggestion that the children who were

---

[6] Missouri Supreme Court Rule 111.01 provides, in part, that a juvenile may be taken into protective custody by a law enforcement officer, a physician or a juvenile officer. It provides, in part, "[w]hen a juvenile is . . . delivered to a juvenile officer, the juvenile may immediately telephone the juvenile's custodian and counsel. Thereafter, the juvenile shall be allowed to telephone the juvenile's custodian and counsel at reasonable intervals."

there were doing farm chores, based upon his personal farming experience.  The Court agrees with his analysis that the children were not there to do farm chores.  Sheriff Parrish was very angry when he saw the pit.  He testified that some of the children interviewed were "very matter-of-fact about it and I was surprised by that.  I'm not sure they even recognized what had been done to them."  He then said, "[s]ome of the kids were, I think, very, very hurt by it."  Sheriff Parrish took some photographs.  Mike Peterson and other staff members were questioned.  Mr. Peterson was taken to the LaBelle Police Station for his interrogation.  Sheriff Parrish and Mr. Waddle learned from the staff that the Manure Pit Incident had occurred a month or so before and the practice of exposing juveniles to the Manure Pit had been discontinued weeks before.

On May 1, 2001, six male juveniles were transported to the LaBelle Police Station by Mr. Rob Patchin where they were interrogated.  Mr. Waddle conducted four of these interviews.  Sheriff Parrish and Jamie Goodwin conducted the other two interviews.  The children were asked about subjects other than the Manure Pit Incident.  One of the boys told Mr. Waddle, "Pastor Charlie will be talking about you guys in church again."  Mr. Waddle testified that a juvenile reported that "we're evil and we're out to shut them down and that the government should stay out of his business."  One of the boys talked about bringing a gun to a former school to kill a teacher and another student.  One related that he was involved as a drug dealer, and was involved in a theft and a battery.  All were asked about disciplinary practices at Heartland.  Mr. Waddle noted that children under placement frequently exaggerate care-giver inadequacies.  The interviews began at 9:00 a.m. and the boys were released by 4:00 p.m.  All were returned to Heartland after a decision was made that there was no risk of immediate harm to any of the children.  Parents were not contacted before the children were interviewed.  Mr. Waddle believed that Heartland was acting *in loco parentis* with respect to these young men and he had no obligation to contact the parents.  There is no indication that the children were advised or their constitutional rights under the Fifth Amendment of the United States Constitution, or of their right to call a parent or counsel.

The next questioning concerning Heartland was supposed to occur at Sheriff Parrish's office at 10:00 a.m. on May 3, 2003.  Mr. Waddle recalls that five Heartland employees, Mr. Peterson, Ms. AbuSaada, Mr. Osbon, Mr. Kepke, and Mr. Patchin were to be interviewed by Mr. Waddle and Sheriff Parrish in the presence of counsel.  Legal counsel from Heartland appeared for the

interrogations. When Sheriff Parrish announced a schedule conflict, Heartland personnel believed the session would be rescheduled. No attempt was made by Mr. Waddle or Sheriff Parrish to reschedule these interviews. Mr. Waddle believed it was not significant at that point that he talk to Heartland staff members. On the afternoon of May 3, 2001, however, Mr. Waddle wanted to interview four more juveniles from Heartland. Later, Sheriff Parrish talked to Steve Porter, local counsel for Heartland, and Mr. Sharpe, both of whom objected to the removal of the children from Heartland for interviewing without the presence of counsel on or off the Heartland campus. Upon learning of the objection, Mr. Waddle told Mr. Sharpe that he was taking juveniles into protective custody and if he interfered, he would be arrested by Sheriff Parrish. Sheriff Parrish later stated that he was not sure he had that authority. As he was leaving, Mr. Waddle was told that there were a couple more juveniles that they would eventually want to interview, so they might as well take them as well. A.C. was interviewed in the presence of a licensed psychologist, Dr. Kurt Bumby from the Missouri Division of Youth Services, who concluded that A.C. had been emotionally traumatized by being placed in the pit. After the interviews, all of the children were taken back to Heartland except A.C., who was taken to the Bruce Normile Juvenile Justice Center. Mr. Waddle learned that A.C. was under another Court's order, and was asked not to return the child to Heartland. At the time of these interviews, parents were not notified before the children were taken from Heartland to be interrogated, nor were children advised of their rights regarding the questioning. Mr. Waddle believed that only if the child was believed to be a law violator would the interview be conducted with parental consent. Where child abuse or neglect was suspected, parents were not first notified. Mr. Waddle's practice in interviewing juveniles who are suspected to be abuse or neglect victims is not to give them a Miranda warning.

On May 7, 2001, Rob Patchin brought eight more youths to the LaBelle Police Station for interviews. Juvenile authorities learned that the staff at Heartland had recently reduced discipline practices. On May 10, 2001, the Division of Family Services personnel visited Heartland, talking to 10% of the enrolled population in a sampling investigation. They concluded that no one at Heartland was being harmed.

Sheriff Parrish distinguishes himself in this proceeding with his truthful testimony in responding to difficult questions. It is the Court's repeated observation that he takes his oath

seriously.  His testimony adds some details concerning early law enforcement involvement at Heartland and the interrogation of juveniles from Heartland in the investigation of the Manure Pit Incident.  He confirmed that he is a former deputy juvenile officer supervised by Mr. Waddle. Heartland's current operation in Lewis County includes the Cattle Company, the Men's Recovery Center, and various residences.  In the Spring of 2001, he had some concerns about Heartland because of its considerable size in Lewis County.  He perceived it as an isolated community.  Many people were drawn to the Heartland church, initially, but eventually started going back to their own churches because of the disciplinary practices at Heartland and the "types of people and some of the issues as well."  He was concerned because of the lack of oversight of the Heartland Church and because it was not affiliated with any particular denomination. He started having concerns about the religious message at Heartland including what he heard about their interpretation of the Bible, including the issue of "submission."  He had performed some investigations at Heartland and became concerned about the dangerousness of kids that were there.  The word "cult" never "popped into [his] mind" until after the Manure Pit Incident.  People came to him with their experiences at Heartland, and he believed it had the "potential to be a cult."  The community was isolated and the people had an elitist view of themselves.  He believed that "Heartland was building its own community."  He became concerned that Heartland was "developing a mind set."  He questioned whether Heartland was a legitimate religious community.  He was concerned in 2001, about Mr. Sharpe's over-exalted status.   He contacted the Federal Bureau of Investigation in the summer of 2001, to see if that agency had a definition of "cult."   When some tried to leave Heartland, he was advised that they were told they could not survive outside Heartland and that Heartland was the best place for them. He reported knowing that some left in the middle of the night.   Sheriff Parrish said that Tim Kixkmiller of the Missouri State Highway Patrol may have used the words "Little Waco" in reference to Heartland after the investigation of Heartland began.  He is sure he had a conversation with Mr. Waddle about the potential for cult activity after the Manure Pit Incident, but is sure it was not an elaborate conversation.

Sheriff Parrish had visited the Heartland campus as part of a tour with the Northeast Missouri Juvenile Officers' Association after the school was first built.  His associations with Mr. and Mrs. Sharpe before April 2001, had always been cordial.  He only had a couple of conversations with  Mr.

Sharpe before that time.  He knew that  Mr. Sharpe had supported his opponent in the last election.  Mr. Sharpe had "done some things he did not care for."  In some manner,  Mr. Sharpe had offended him.  While he could not be more specific, Sheriff Parrish was sure he was not affected in the administration of his duties.  Later, Sheriff Parrish said that  Mr. Sharpe had a lot of money and you do not cross Charlie Sharpe.

Sheriff Parrish was familiar with the mission of Heartland to work with children with behavioral problems to turn their lives around.  He was concerned with the type of kids at Heartland.  His "constituents" complained to him about the kind of kids there.  Sheriff Parrish preferred that these kind of kids not be brought to Heartland.   When asked if he ever said "life would be easier if Heartland was shut down," he responded, "I've said that it would be easier if they didn't have those kids, but I didn't say if it were shut down, but yeah, I have said that."  He had reason to believe the other sheriffs in the area had concerns about Heartland.   At some point, there were a lot of run-a-ways.  People began locking their doors and were concerned for the welfare of their children.  Sheriff Parrish believed that this was changing the community in negative ways.  Some in the community were opposed to what was being done at Heartland.  He was concerned that people are being brought there from all over the world.  He was involved in an investigation where a Guatemalan child had been beaten with a belt.  It was not reported for two weeks, then someone at Heartland brought it to his attention.  He describes hearing about a man at Heartland named AbuSaada, from another law enforcement official, who was described as a former Palestinian freedom fighter who converted to Christianity.  Sheriff Parrish understands that Mr. AbuSaada is a chef at Heartland.  He also had developed concerns about Heartland from specific cases of which he had knowledge.  He related a matter about a child who almost died from hanging and of a child who fashioned a crude bomb and placed it at a barn.  In the context of the explosives investigation, he described the boy as the kind of a child that no one would want.  He had a stated preference that Heartland not bring into the community children with backgrounds with a predilection for criminal behavior.

Sheriff Parrish did not learn of the Manure Pit Incident until late April 2001.  He had run out of gas, and his mother brought him some fuel and told him what she had heard about the Manure Pit Incident.  She had received the information at the First Christian Church of LaBelle.  There was discussion about the issues of exalted status of the Heartland community, submission, and that

Heartland teachers were teaching about speaking in tongues.  Sheriff Parrish talked to Mr. Goodson and Mr. Griffin, former employees at Heartland, about the Manure Pit Incident.

On April 27, 2001, Sheriff Parrish made a hotline call to the Division of Family Services, reporting that it was alleged that a Heartland resident was required to stand in a dead cow pit up to her chest and several residents were required to stand under a conveyor belt that dumped manure, bedding and cow afterbirth on them.  He made it clear that he thought it was a criminal investigation.  Sheriff Parrish believed at the time that no child was in imminent risk of harm.  He talked to Pam McGowan at the Division of Family Services, telling her that he did not want the regular investigator, Tim Carter, involved, he did not want Heartland alerted, and he did not want anyone going to Heartland without law enforcement, because he was afraid restrictions would be placed on people with whom he wanted to speak.  When asked if Heartland personnel had been uncooperative in the past, Sheriff Parrish replied that they had been "cooperative in most things."  He had learned by this time that the practice of subjecting students to manure pit exposure had stopped "some weeks before."

Tim Carter, Out-of-Home Investigator for the Division of Family Services, conducted an investigation of events surrounding the Manure Pit Incident.  He made a probable cause finding that Rob Patchin had been negligent with respect to his decision to allow the manure punishment to take place.  He made the same conclusion with regard to Ms. AbuSaada, Mr. Peterson, Ms. Powell, Mr. Kiepke, and Mr. Osbon.  Of the six staff members originally charged as a result of the Manure Pit Incident, only Mr. Patchin's case went to trial.  He was acquitted after a very brief jury deliberation.  Charges against the other manure pit defendants were thereafter dismissed.  A few weeks before the trial in this case began, Mr. Peterson, Ms. AbuSaada, and Ms. Powell were again charged with crimes emanating from the Manure Pit Incident.  Ms. Powell is currently a senior at Culver-Stockton College in Canton, Missouri.

Before Sheriff Parrish went to Heartland on April 30, 2001, he talked to Mr. Waddle and reported to him all he knew about events there.  He is sure that he talked to Mr. Waddle about an investigative plan and probably discussed going to the Men's Center.  He is sure he talked to Mr. Waddle about where the interview of the young woman who had been in the manure pit should be conducted.  Usually, interviewing away from the area of abuse is preferred.  He believed that he could

take custody of a juvenile up to twelve hours, while a juvenile officer can take custody up to twenty-four hours. He believed this was a co-investigation and that under those circumstances it was the juvenile officer's responsibility to take custody. He and Mr. Waddle discussed the issue. When he arrived at the Men's Center he talked to Ron Osbon, who directed him and the Knox County Sheriff to M.I K. He, Mr. Waddle, Deputy Juvenile Officer Goodwin, and a deputy sheriff from Knox County went to the Girls' Dormitory. They took custody of M.I K. and transported her to the LaBelle Police Department for the purpose of conducting an interview. No attempt was made to contact her parents. He acknowledges that the usual practice is to advise parents before picking-up a child in the school situation. He does not know if M I K. was advised whether she could refuse to go or refuse to submit to questioning. There is nothing to indicate that she was advised of her right not to speak or of her constitutional right to the presence of a lawyer. Once at the police station, he recognizes that she was not free to leave. She was asked about her family history, problems she had at home, her medical and psychological problems, and her medication. Regarding Heartland's disciplinary practices, she said that she believed Heartland was helping her, but that the disciplinary practices were too severe.

Later, Sheriff Parrish, Mr. Waddle, and Mr. Goodwin went to the manure pit. Sheriff Parrish talked to Mr. Peterson and took some photographs. Mr. Sharpe arrived. Mr. Sharpe had been cordial with Sheriff Parrish in the past. Sheriff Parrish was asked if he addressed Mr. Sharpe by saying, "[w]hat do you got to do with this, Big'n? You wasn't involved in any of this." He denied saying it in that way, but when Mr. Patchin told him that he had called Mr. Sharpe "Big'n," he knew he had offended Mr. Sharpe, and apologized.

After Sheriff Parrish and Mr. Waddle talked to Mr. Peterson, the two conferred and agreed that they wanted to talk to some of the boys believed to be witnesses at the Manure Pit Incident. On May 1, 2001, Rob Patchin agreed to bring the boys identified after the M.I.K. interview to the LaBelle Police Station for questioning. After the boys arrived at the station, they were not free to go. There was no belief any of those boys were in imminent risk of harm. Sheriff Parrish has no recall if any parents were contacted before the interviews began. He did not contact any of their parents at any time. It is rare that Sheriff Parrish allows a parent to be present when he conducts an interview. He, Mr. Waddle, and Mr. Goodwin questioned the boys. There is nothing to suggest that

they were advised of their constitutional rights or their right to call a parent or counsel as required by the Missouri Rules of Civil Procedure.  They were asked why they were at Heartland and about their personal histories.  He learned that one boy had taken a gun to school to kill another student, one was there because of drug abuse and theft, and another for possession of an altered firearm.  They were also asked about the disciplinary practices at Heartland.  Some of the boys were upset about the questioning.  J.J. was so upset it was decided that he would not be interviewed.

Sheriff Parrish admits that the boys were questioned about events at Heartland other than just the Manure Pit Incident.  Sheriff Parrish said they wanted to know "what else was going on [at Heartland]."  They were asked what  Mr. Sharpe preached.  Sheriff Parrish had concerns about some of Mr. Sharpe's teachings.  He was concerned about the "mentality of the people and what kind of things were being said with respect to religious doctrine."  When asked if that pertained to Heartland as a "cult," he believed that his concern about the word cult arose later in the summer.  He was concerned that "the word of Charlie" rather than "the word of the Lord" was being preached.  After the interviews, parents were contacted.  J.M.'s father wanted J.M. returned to Heartland.  C.T.'s mother wanted him returned to Heartland.  All of the boys were returned to Heartland.  Sheriff Parrish believed at that time that the Juvenile Office wanted to work with Heartland.

He remembers that on the morning of May 3, 2001, arrangements were made for adults from Heartland to be interviewed at the Lewis County Sheriff's office.  Mr. Patchin, Mr. Osbon, Mr. Kopkei, Mr. Paterson, and Ms. AbuSaada went to his office in the company of Mr. Melton.  A deputy or a dispatcher explained that a domestic dispute required Sheriff Parrish's presence elsewhere and forced him to cancel the interviews.  When Sheriff Parrish returned to the office on May 3, 2001, Mr. Waddle, Ms. McGowan, Mr. Carter, and the Lewis County Prosecuting Attorney were at his office.  Ms. McGowan had talked to personnel at Heartland and she was told that no more children would be allowed to be interviewed.  The Lewis County Prosecutor said that Heartland would either turn the children over or he should be consulted about arranging an arrest.  Sheriff Parrish did not attempt to reschedule the adult interviews.

After that meeting, Sheriff Parrish, Mr. Waddle, Ms. McGowan, and Mr. Goodwin went to the Boys' Center where they talked to Mr. Patchin.  They told him that they needed to talk to the children off the site for questioning.  Mr. Patchin contacted  Mr. Sharpe and Mr. Porter and both

came to the Boys' Center.   Mr. Sharpe said that Sheriff Parrish had a vendetta against him, that Sheriff Parrish had reported to the boys that  Mr. Sharpe had a DWI arrest, that they had no authority to take the children, and they would not be allowed to take them.   Sheriff Parrish responded that not only did they have the authority, but that he believed Mr. Porter knew that they had the authority, and if they refused to turn them over, they would seek an arrest warrant.   Mr. Sharpe said that the kids could be interviewed at Heartland with counsel present.   Sheriff Parrish said that interviews at Heartland was not an option, that it would not be appropriate for them to have a Heartland attorney, and that he may have said something about a guardian ad litem being present if they felt that was necessary.   Mr. Waddle told  Mr. Sharpe  that if the boys were not turned over to him, he would direct Sheriff Parrish to arrest him for interfering with the investigation.   Sheriff Parrish had some concern about his authority to do that.   He wanted to call the prosecutor to get advice.   He wanted the issue taken out of his hands.   After the threat of an arrest by Mr. Waddle, the boys were produced.   Sheriff Parrish recognizes that one of the stated objections of  Mr. Sharpe in releasing the boys for further interviews was that one of the boys reported that they had been told that Mr. Sharpe had been arrested for driving while intoxicated.   Sheriff Parrish had heard from a state probation officer that  Mr. Sharpe had been arrested in Kansas City for DWI.   However, Sheriff Parrish denies that he so accused Mr. Sharpe.

Sheriff Parrish confirms that on May 3, 2001, four boys were removed over Heartland's objections and taken to the LaBelle Police Station without notification to the parents.   A this time, Mr. Waddle and Sheriff Parrish knew that parents had earlier objected to the taking of their children from Heartland for interrogation.   The only child Sheriff Parrish interviewed was A.C.   Sheriff Parrish talked to him about his personal history.   There is no indication that any of the four boys were advised of their constitutional rights or their right to call a parent or counsel before they were questioned as required by law.   The boys were returned to Heartland later that evening.

Jamie Goodwin was a deputy juvenile officer for the Second Judicial Circuit Juvenile Office before being employed by the Missouri Department of Corrections, State Board of Probation and Parole.   He worked as a deputy juvenile officer for Lewis County from March 1, 1999 to September 16, 2001.   He assisted in the investigation of the Manure Pit Incident with Mr. Waddle, Sheriff Parrish, Ms. McGowan, Tim Carter, and Kris Chamley.   He testified that his recollection was that the

first interviews were April 30, 2001, when seven or eight young people were questioned. Heartland personnel were not permitted to be present for the interviews, because at the time, the identity of the perpetrators was not known. Parents were not notified that their children were going to be interviewed, "[b]ecause it was just part of the investigation process. We didn't know what was coming up with it." Parents were not suspected of being perpetrators, and when that was the case, parents sometimes would not be called. It appears that there was no common practice for notification of parents when interrogation of their children by the Second Judicial Circuit Juvenile Office occurred. Mr. Goodwin believed that there were a lot of kids to be interviewed, and they did not have easy access to parents. There is no indication that there was even a thought given to contacting any parent. Obviously, some of the parents were very close. For these interviews, and for the interviews conducted in succeeding days, the "plan" was to interview the children first, and contact the parents after the interviews. Four or five people were in the room when each child was interviewed. The interviews were conducted in a police station, and Sheriff Parrish was armed. The kids were at the Police Station for the balance of the day, arriving at 9:00 a.m. and leaving between 4:30 p.m. and 5:00 p.m. Some were interviewed in the morning and then brought back for further questioning in the afternoon. Mr. Goowin is familiar with a manual Sheriff Parrish has which says parents should be notified in advance of interrogations. He is aware that, depending on the age of children, that they may be inclined to answer questions in a way that satisfies expectations of those present in the room. He is aware that the worst thing that can happen to someone is to be falsely accused of child abuse, and, for that reason, juvenile authorities must be very careful in questioning young people. Mr. Goodwin admits that one of the children, D.G., testified differently at a trial in Pulaski County, where Mr. Patchin was tried for charges arising from the Manure Pit Incident, from the answers he gave during his interrogation at the Police Station on May 3, 2001. He recalls that all of the children interviewed over a three-day period were returned to Heartland. He believes that no conclusion was reached that any children were in imminent risk of harm.

Mr. Sharpe also offered his perspective of the Manure Pit Incident. Manure pit exposure was "free-lance" punishment that involved three incidents over a period of a few days. Mr. Sharpe is aware that one child, J.J., slipped in the manure pit and got manure on his back. That child remains at Heartland. Dick Cramer, a former Heartland employee, reported that M.I.K. was in manure up

to her cheek.  There is no other evidence to show that is accurate, including information from the child.[7]  Mr. Sharpe believes if that was true, that such an incident would be inappropriate.  M.I.K. said that she was in the manure pit at a height just above her knee.  Mr. Sharpe believed and regularly announced that the manure pit practice was "dumb as a  rock."

 Mr. Sharpe describes why he believed the Manure Pit Incident was inappropriate:

Q.   And what was it about the manure pit punishment that you found to be dumb as a rock?

A.   Well, it was just -- It was the fact that it was manure.  We don't certainly want Heartland's name tied to manure.  That's -- That's not what we are about.  We -- We -- There is no question that we --our people used very bad judgment of doing this, not that it was hurting any child.  It didn't hurt anybody, but it was just -- it's just what it was.  There was no harm  done to anyone.  As a matter of fact, it was totally -- it was very effective because it had to do with kids not wanting to go to school.  And so we said, 'Well, let's show you what kind of a life you may have by doing other things.'  And what they did was took them down to the manure separator.  It's not a pit.  There's no -- There's no ends on it.  It's a platform, a flat platform.  There's nothing about it that's a pit, but it's manure, and that's not the image that anybody wants, but the kids, incidentally, all of them did want to go back to school the next day.

Mr. Patchin provided Mr. Sharpe with his first knowledge of the Manure Pit Incident and told him that the practice had been stopped one or two weeks before, which was about a month before Mr. Waddle and Sheriff Parrish became involved at Heartland.  While no one was injured because of the exposure to manure, Mr. Sharpe does not want the Heartland name associated with manure.  Mr. Sharpe believes that people used very bad judgment in using this practice.

After the Manure Pit Incident was broadcast as a world-wide news event,  Mr. Sharpe hired the public relations firm of Fleshman-Hilyard who described the childrens' participation as shoveling manure.  The Court concludes that the students involved were not sent to those areas to shovel manure.  Mr. Sharpe agrees that having students shoveling manure was clearly not the intent of staff

---

[7]  Before he was fired, Mr. Cramer had been employed at Heartland about five years after receiving treatment in the rehabilitation program at Heartland.  He wanted to operate a particular tractor that had a faulty engine.  He was told not to do so, and he said he would not operate any other tractor.  He was told if he would not operate a designated tractor he would have no job.  That terminated his employment.

members directing them to these areas.  The press release that was broadcast over the name of  Mr. Sharpe stated that the children were there to do farm chores.  One press account over  Mr. Sharpe's name reported that children were required to shovel manure for thirty minutes.  This account was an inaccurate recitation of the children's role in being at the manure pit and the separation platform.

Too much has been made of the Manure Pit Incident.  Mr. Waddle's reasons for removing the children from Heartland are based, in large part, on the Manure Pit Incident and criminal charges that followed, and his view that Heartland acted inappropriately in the way staff members failed to fire or separate those six individuals involved.  Any Heartland officials who continue to believe that the Manure Pit Incident was related to farm chores or the shoveling of manure have not listened carefully to the testimony in this case, or continue to elect to be oblivious to the truth.  The Manure Pit Incident was, as  Mr. Sharpe described it, "dumb as a rock."  It clearly was poorly conceived, enormously costly to the reputation of Heartland, caused intense scrutiny of the entire program, and was used exclusively as a means of punishment.   Many criminal counts have been filed against six Heartland employees as a result of the Manure Pit Incident, although none have been successfully prosecuted.  However, the Juvenile Office's preoccupation with this event and the unwillingness of juvenile court personnel to look beyond it, to recognize Heartland's right to exist, and to work cooperatively with Heartland officials to care for children beyond the bounds of reason, based on all the evidence in this case.

At the end of May 2001, Mr. Waddle took custody of a child named S.A. after being contacted by a Minnesota guardian ad litem who claimed that there was a concern that the child was receiving inadequate care.  Mr. Waddle asked Phil McIntosh, guardian ad  litem for children for the Second Judicial Circuit Juvenile Office, to be present when Mr. Waddle sought to take custody of the child.  There was a scheduled hearing to be conducted in the Minnesota action.  The guardian ad litem asked Mr. Waddle if he would serve a subpoena on S. A. to get her out of Heartland.  It was believed that her conversations were being monitored and the guardian ad litem wanted to consult with her without restrictions.  When they went to serve the subpoena, they were met by Ross Walden representing Heartland. He was in an agitated state, denying that Mr. Waddle had a right to take the child.  Mr. Waddle demanded that the child be turned over to him.  A telephone hearing was scheduled by the Minnesota Court. Mr. Walden said he wanted to be present at the hearing regarding

S.A.'s custody.  Mr. Waddle replied that until the Minnesota judge said that he should be present he would not be permitted to be present.  Mr. Waddle advised the Minnesota judge of Mr. Walden's request, which was denied.  Mr. Waddle applied for and received an order of protective custody of the child.

**III.     JUNE 28, 2001 THROUGH JULY 3, 2001 -- The first threat of removal by Mr. Waddle**

There was little communication from early May to late June between Heartland officials, juvenile officers, and law enforcement.  It was during this time that criminal prosecutions against the six Heartland staff members originally investigated were being prepared.[8]

Mr. Waddle testified that he and Division of Family Services' personnel wanted to meet with Heartland officials in May or June 2001, to discuss the Manure Pit Incident and other disciplinary practices at Heartland.  He believed that he had responsibility to notify parents about Heartland staff members who were criminally charged in the Manure Pit Incident, and because he had been unable to work with Heartland officials, he wanted to be assured that the five defendants criminally charged in the Manure Pit Incident were having no contact with children for the purposes of child care and discipline.  Since the five Heartland staff members were not charged until June 26, 2001, he could not have had concern about charged defendants before that time.  Their preliminary hearings were scheduled for September 11, 2001.  Mr. Waddle was aware that Division of Family Services' personnel had scheduled meetings on May 15, May 31, and June 15, and each time, according to Jerrie Jacobs-Kenner and Christine White, Division of Family Services' supervisors, Heartland officials cancelled.   Plaintiff's Exhibit No. 41 confirms his belief.

When there was discussion about a meeting between Heartland personnel and juvenile officers from the Second Judicial Circuit Juvenile Office  and the Forty-First Judicial Office in early Summer 2001, Mr. Sharpe contacted Representative Pat Kelly from the Missouri House of Representatives to see if she would meet with the parties to work with them in an effort to resolve some issues between them.  On June 26, 2001, Representative Kelly served in a mediating role to discuss issues

---

[8]   Ms. Powell was originally charged, but charges were dismissed against her shortly after her arrest.  She was later charged a short time before the hearing in this case on the same facts as the original charge.  References hereafter to the five criminally charged Heartland employees do not include Ms. Powell, unless she is specifically mentioned.

at Heartland.  Attending were Mr. Waddle; Rick Roberts, legal counsel for the Second Judicial Circuit Juvenile Office; David Melton, legal counsel for Heartland; Steve Porter, legal counsel for Heartland; and Ross Waldon, legal counsel for Heartland.  This was the first face-to-face communication between juvenile authorities and Heartland staff members regarding the Manure Pit Incident since the early May interviews.  Mr. Waddle denied knowing that criminal charges had been filed against six Heartland staff members on June 26, 2001, in the Associate Division of the Circuit Court of Lewis County, Missouri related to their involvement in the Manure Pit Incident.  He denies knowing that charges were going to be filed at the time he attended the June 26, 2001 meeting.  Mr. Waddle claims to have learned of the criminal charges being filed against Heartland staff members the evening of June 26, 2001.

Mr. Waddle describes the June 26 meeting as being of short duration and not productive.  He believes that Mr. Roberts did a good job of laying out the issues so both sides could build on their strengths.  He recalls that he and Heartland staff wanted the meeting so they could understand each other better and work together so he could feel there was good, safe care for children at Heartland.  He believes that Mr. Melton accused Sheriff Parrish of telling the kids during the interviews that Mr. Sharpe was a drunk and had been arrested for D.W.I.  He accused Sheriff Parrish of putting a set of hand-cuffs in the face of a child telling him that he had arrested the kid's father and if the child did not straighten-up, he would be arrested.  Mr. Waddle took offense at Mr. Melton's behavior.

Mr. Roberts asseverated in favor of cooperative efforts between Heartland and the Second Judicial Circuit Juvenile Office.  Mr. Roberts commended Heartland for its program.  Mr. Melton accused Sheriff Parrish of "putting words into the kids heads."  Mr. Waddle "may have" looked at Mr. Melton and told him to " wipe that smart ass smirk off your face," but in any event, he confesses to saying "the door is right there and you're free to leave."   Mr. Melton said, "[o]kay, let's leave."

Mr. Waddle believed at the June 26 meeting that he was not getting cooperation from Heartland officials, and relies upon that conclusion as one of his primary reasons for considering removal of the children from Heartland in late June 2001.  With this knowledge, Mr. Waddle realized that there was a facility in his jurisdiction where a probable cause finding of abuse had been made, and he believed that he had an obligation to tell all parents with children there that there were problems at Heartland.  At that point, he decided to make an application with the Juvenile Court for

a search warrant to get the identity and addresses of all juveniles at Heartland so he could notify all parents.

On June 28, 2001, Mr. Waddle conferred with Ms. Jacobs-Kenner, Ms. White, and his staff, as well as with legal counsel, other juvenile officers from the Forty-First Judicial Circuit, and other representatives of the Division of Family Services about the possibility of using injunctive relief for removal of students from Heartland. Mr. Waddle understood at this time that one of the reasons for seeking injunctive relief would be to cause Heartland to cease operations. He believed that there was no cooperation with Heartland personnel "and we were considering removal at that time, possible removal at that time because there was no other option available to us to try and accomplish protection of children that we thought was appropriate." A "Summary of Contacts Relating to Heartland Christian Boarding Academy" reduces to writing an account of events concerning attempts to work with Heartland according to Division of Family Services' officials (Pl. ex. 46). The memorandum speaks of hotline reports and investigations at Heartland; scheduled meetings cancelled by Mr. Sharpe; and a June 28, 2001 conference call where Mr. Waddle discussed "consideration of protective custody, logistics and staffing at Truman State and possibility of local prosecutors seeking injunction to cease operations." There is also a June 29, 2001 entry noting a conference call with Mr. Waddle indicating "local prosecutors would not file for injunction. Discussed how to prevent the five staff who had been charged from having access to the children." The memorandum speaks of communications among juvenile office personnel, Division of Family Services' personnel, and Heartland personnel, and of the July 12, 2001 meeting and the conclusions reached at that meeting.

On June 28, 2001, Mr. Waddle believed that without the cooperation of Heartland staff that there would be a certain risk of harm to children there. He had already asked Division of Family Services' personnel for all hotline reports the Division of Family Services had concerning Heartland. Mr. Waddle talked to Ms. Ayers about the possibility of closing Heartland by the injunctive route at the May 16, 2001 meeting. Mr. Waddle says that he had ongoing discussions with Ms. Ayers, Ms. Jacobs-Kerner, and Ms. White about pursuing this remedy. At the June 28, 2001 meeting, they discussed removal of the children by means other than by an injunction. A high-ranking official at Truman State University in Kirksville, Missouri was contacted to determine if dormitory space was available to provide shelter for the children upon removal from Heartland. Mr. Waddle wanted to

be sure there was adequate staff in place to provide for the safe removal.  He talked to prosecutors to encourage them to file a petition for injunctive relief to cause Heartland to cease operations.  Rick Roberts advised him that injunctive relief was not an option.  He may have asked Sheriff Parrish to confer with the Lewis County prosecuting attorney to determine if injunctive relief could be obtained. Sheriff Parrish testified, "I recall him wanting me to talk to Mr. DeCoster about an injunction, and I did that."  Mr. Waddle believed removal was necessary because he saw no other way to get Heartland cooperation.  Mr. Waddle knew on June 28, 2001, that five criminally-charged Heartland employees had voluntarily surrendered to Sheriff Parrish after being criminally charged on June 26, 2001.  Mr. Waddle told Sheriff Parrish that they should not have been allowed to self-surrender.

Among Mr. Waddle's claimed concerns about Heartland in late June 2001, was the filing of criminal charges against five people at Heartland related to the Manure Pit Incident who were still in child care provider roles at Heartland.  He admits that his investigation of that matter concluded on May 7, 2001, and he had not taken action to remove them from child contact for the seven weeks following completion of his investigation.  An additional claimed concern of Mr. Waddle was his inability to "get Heartland to the table."  He also believed that Heartland officials were making false statements to the press about the Manure Pit Incident by saying juveniles were in manure only up to their ankles, that they were doing farm chores, such as  "shoveling manure," and reporting that no one at Heartland had ever been injured.  His view was that there was no expressed concern about care of children.  He stated that he believed that parents needed to be notified, and that is why he sought a search warrant to get parents' names and addresses.

On June 29, 2001, Mr. Waddle knew that prosecutors would not file petitions for injunctive relief.  He sought to prevent all five of those criminally charged in Lewis County from having any contact with children at Heartland.  There were no bond restrictions on the five defendants in the Associate Court addressing lack of contact with the children.  Mr. Waddle and Division of Family Services' personnel believed remedial measures were necessary to prevent contact by these individuals with the children at Heartland.  In a letter dated June 29, 2001, from Mr. Durbin of the Division of Family Services to Mr. Waldon, faxed to Mr. Waddle by Ms. Jacobs-Kenner, Mr. Durbin merely proposes that there would be less concern if the five charged Heartland employees had no contact with children.  He did not demand that such a condition be imposed.  Furthermore, the letter

suggested the possibility of getting the names of children residing at Heartland.  He asked for a response by July 2, 2001.  Mr. Waddle acknowledged at trial that there was no threat of any formal action by the Division of Family Services.

On July 2, 2001, Rick Roberts sent a letter to Steve Porter at the direction of Mr. Waddle demanding that none of the five charged staff members have any contact with any of the children at Heartland (Pl. ex. 80).  The letter was copied to David Durbin of the Missouri Division of Family Services.  The letter stated that the Division of Family Services requested a list of all students at Heartland.  Mr. Waddle testified that in stating that if the information was not provided by Heartland, the "formal action" referenced in Plaintiff's Exhibit 80 meant that the Juvenile Office would request mass removal.  He does not recall that any Division of Family Services' personnel requested removal of the children from Heartland, and he acknowledges that no formal action was taken by anyone at the Division of Family Services demanding or requesting that there be no contact between the charged defendants and children at Heartland.

It clearly appears that Mr. Roberts exaggerated the stated suggestions of Mr. Durbin included in his letter of July 2, 2001, and Mr. Waddle admits that in the morning of July 2, 2001, the same date as the Roberts' letter, he was already preparing documents to get search warrants for seizure of material at Heartland.  This was at a time Heartland officials could not possibly have had time to respond to the Roberts' July 2, 2001 letter.  While he testified that he was directing a good faith request in the July 2, 2001 letter, he admits that a judge signed a search warrant at 9:35 a.m. on that very day, and he cannot say when the Roberts' July 2, 2001 letter went out.   While saying that he was seeking cooperation with Heartland for the care of children, at the same time, he was seeking search warrants to get sensitive information from Heartland with a view to the removal of the children against the will of Heartland, the children and parents, all without any attempt first to ask Heartland for the information he was successful in getting with the search warrants.  When asked if he had an open investigation file to form a basis for the search warrants, he said he had information about M I K., then admits that the M.I.K. matter did not relate to the search warrants.

Mr. Waddle testified that his purpose in requesting the search warrants was to get the names and addresses of parents of children at Heartland so an advisory letter could be sent to all parents.  He admits that he was not seeking information related to commission of crimes or of seizure of

contraband.  Under the law of the State of Missouri, those two assignments of reasons for applying for a search warrant are the only lawfully recognized bases for making an application and for obtaining a lawfully issued warrant.[9]   The seeking of a search warrant was solely the scheme of Mr. Waddle.  He does not recall who was present when he submitted his application to a judicial officer. He did not first consult any sheriff personnel.  When asked why he did not instead seek a subpoena to get the information, a remedy less onerous on Heartland and a remedy which would have permitted Heartland to respond, Mr. Waddle said that he chose to get a search warrant because "it was most effective."  He admits that he knew there would be no opportunity for Heartland  to receive notice

---

[9]Section 542.271 RSMo authorizes issuance of a search warrant for the following purposes:

1.      A warrant may be issued to search for and seize, or photograph, copy or record any of the
         following:
         (1) Property, article, material, or substance that constitutes evidence of the commission of
         a criminal offense; or
         (2) Property which has been stolen or acquired in any other manner declared an offense by
         chapters 569 and 570, RSMo; or
         (3) Property owned by any person furnishing public communications services to the
         general public subject to the regulations of the public service commission if such person
         has failed to remove the property within a reasonable time after receipt of a written notice
         from a peace officer stating that such property is being used as an instrumentality in the
         commission of an offense; or
         (4) Property for which possession is an offense under the law of this state; or
         (5) Property for which seizure is authorized or directed by any statute of this state; or
         (6) Property which has been used by the owner or used with his acquiescence or consent
         as a raw material or as an instrument to manufacture or produce any thing for which
         possession is an offense under the laws of this state.

2.      A warrant may be issued to search for and rescue a kidnapped person.

3.      A warrant may be issued to search for any person for whom a valid felony arrest warrant
         is outstanding.

4.      A warrant may be issued to search for and seize any deceased human fetus or corpse, or
         part thereof.

5.      The provisions of sections 542.261 to 542.296 and section 542.301 shall prevail over any
         rules and regulations promulgated by any state governmental agency, commission or
         board, to the contrary notwithstanding.

35

or be heard in advance of the issuance of the warrants.

The Lewis County Application for search warrant had the wrong address, and Mr. Waddle had to go back to the judicial officer before that warrant was executed (W-100).  Before he applied for search warrants, Mr. Waddle conferred with Ms. Ayer at a time at or before receiving the letter signed by David Durbin to Ross Walden dated June 29, 2001 (W-50).  On June 29, 2001, the Lewis County Sheriff's Log reflects that Mr. Ben Benning, who was at the time a deputy juvenile officer of the Second Judicial Circuit Juvenile Office,  requested from Lewis County Sheriff personnel a copy of an " application for search warrant" to be faxed to him (Pl. ex. no. 27).

On Saturday, June 30, 2001, before he sought and received search warrants on July 2, 2001, Mr. Waddle contacted Ms. Ayers to discuss getting a search warrant in all three counties for the purpose of determining the identity of the children at Heartland and the identity of their parents.  It seemed unusual to her and she was not familiar with the use of search warrants in this regard, so she told Mr. Waddle she was not sure if she would do that.  He said he wanted to contact the parents concerning criminal charges filed against Heartland staff members as a result of the Manure Pit Incident.  Because this was a new idea she had not considered, Ms. Ayers told Mr. Waddle that she first needed to discuss the proposition with others.  He wanted to execute the search warrants one county at a time.  She could not recall if Mr. Waddle said whether he was contemplating a removal of the children in the June 30th conversation, but up to that time, she had no conversations with him about a removal.  She went to Mr. Raymond to advise him of the discussion and to seek his legal advice as to whether there was a legal basis for getting a search warrant and how the procedure would work.  Ms. Ayers testified that she did not authorize application for any search warrant.  Mr. Raymond prepared a complaint for a search warrant which he signed; a probable cause statement ostensibly to be signed by Ms. Ayers, and a search warrant (Pl. ex. 9).  Mr. Raymond told Ms. Ayers that he had filed the complaint for a search warrant, but she never executed the documents.  After Ms. Ayers talked to the Shelby County Sheriff and Mr. Raymond, she believed that there were other avenues to explore, such as seeking a subpoena.  Based upon their advice, she decided not to seek a search warrant.  She had a further conversation with Mr. Waddle on June 30th wherein she expressed her thoughts and concerns, and believes she suggested getting a subpoena, but Mr. Waddle expressed no interest in that procedure.  Mr. Waddle raised other concerns about the safety of

children in the care of those facing criminal charges.  She learned on the 3rd or 5th of July that he had applied for and had been granted a search warrant.

On June 29, 2001, at 9:30 a.m., upon request from Mr. Waddle, Ms. Ayers sent an e-mail to Mr. Waddle advising him that Mr. Sharpe  had been bound over at a preliminary hearing on a class D felony charge of taking possession of a child without a court order in the matter of K.M.F. (Pl. ex. 45).

On July 3, 2001, Ms. Ayers filed a petition in the Circuit Court of Shelby County, Missouri in the interest of John and Jane Does ages one to seventeen residing at Heartland.  Her purpose was to to get "names and that sort of thing."  She was seeking, in part, the identities of children and parents at Heartland.  Subsequently, a subpoena was issued to "Charles N. Sharpe or Heartland Christian Academy records custodian."   Although the petition recites that "[d]espite requests, Heartland Christian Academy has failed or refused to provide identifying information on the children at the academy," this representation was apparently false, because Ms. Ayers is unable to identify anyone she knows that requested the information or that the information, if requested, was not disclosed by anyone at Heartland.  The petition also recites that the Juvenile Office has been unable to determine the propensity of certain staff members to have contact with children, but she admits that neither she nor anyone on her staff contacted anyone at Heartland in an attempt to make such a determination.

Ms. Ayers became aware of Mr. Waddle's signed letter of July 3, 2001, which was to be sent to parents or guardians of children at Heartland after names and addresses had been secured from Heartland.  The letter stated that due to lack of assurances from Heartland that Heartland will take corrective action regarding inappropriate discipline and removal of  staff with criminal charges, "the Juvenile Office is currently contemplating Juvenile Court intervention to ensure that no children will reside at this facility in an injurious environment (Pl. ex. 4)."  She said she did not know if she agreed with the letter.

 On July 6, 2001, at 9:59 p.m., Ms. Ayers sent an e-mail message to Mr. Raymond's secretary for Mr. Raymond's attention (Pl. ex. 32).  Ms. Ayers believed at 3:00 p.m., on that date, that removal of the children from Heartland was a real possibility, because she had received a call from Christine White of the Division of Family Services who talked about "taking all the kids."  She believed that

the Division of Family Services was in a position to remove all of the children from Heartland, because the safety of children at Heartland could not be assured. She concludes her e-mail message with, "Tammy- I talked with Kyle and he has some ideas about housing-but the [Macon] Armory looks good. Tammy please call Chuck Wood [Shelby County Presiding Commissioner] on Monday and give him a heads up that we may need a bus, housing, etc. See if he has any ideas if it comes to that." Ms. Ayers believed at 10:00 p.m. on July 6, 2001, that removal of all of the children from Heartland was imminent.

Also on July 6, 2001, Ms. Ayers applied for and received a Court order from the Shelby County Circuit Court, Juvenile Division, prohibiting Farah AbuSaada, Michael K. Peterson, Charles R. Patchin, Ronald G. Osbon and Eric D. Kepke, the five criminally-charged defendants, from contact with children at Heartland (Pl. ex.162). She stated that she may have spoken briefly with Mr. Waddle before she left for vacation, but she could recall no specifics of any such conversation. Ms. Ayers next learned that there was a meeting scheduled on July 12, 2001, and was advised that concern over Heartland had been reduced and that Division of Family Services' officials would not be making a request for mass removal of the children from Heartland. Heartland officials had agreed to remove the five criminally-charged defendants from disciplinary roles.

Mr. Waddle executed the Lewis County search warrant he received on July 2, 2001, by going to Heartland and requesting files on the juveniles. The Heartland staff was obedient to what members believed at the time was a lawful warrant. Mr. Waddle agreed at the Boys' dormitory that Heartland staff could copy the "face sheets" of the files before he removed them. Face sheets were not copied at the Girls' dormitory. Mr. Waddle had no first-hand involvement in the execution of the Knox County Search Warrant. All seized files were taken to the Bruce Normile Juvenile Justice Center, where they were copied and returned to Heartland. He admits that he kept personal information on females including reasons for their admission at Heartland, even though the search warrant was very specific in its grant of authority. Mr. Waddle was authorized by the terms of the warrant to seize only:

> The identity of [the juveniles] parents/legal custodians, including but not limited to, the names, phone numbers, addresses, court orders and contracts, who are currently being housed at said facility.

Obviously, information was seized beyond the scope of what was authorized.

Mr. Waddle states that Missouri Supreme Court Rule 124.01 authorized the search warrants issued in this case. His reliance on this Rule is misplaced. That Rule merely provides that application for a search warrant in juvenile cases may be made to the court. It has no self-enforcing provisions that expand the authority to obtain a search warrant. Rather, the Missouri Revised Statutes, as already noted, are very specific as to when search warrants may be issued. A reference to that Statute hereafter clearly reveals that search warrants are not authorized for the purpose sought by Mr. Waddle.

From the seized information, Mr. Waddle drafted the July 3, 2001 letter which he mailed to parents of children at Heartland. He revealed that sixty-eight felony charges had been filed against five Heartland employees and that he was contemplating taking action to assure that no child there would continue to live in an injurious environment. Mr. Waddle testified that this was a reference to mass removal. The letter was signed by Mr. Waddle and by Ms. Jacobs-Kenner of the Division of Family Services (Pl. ex. 4). Mr. Waddle testified that this letter was sent because he was unable to get assurances from Heartland. He then admits that he did have assurances that the manure pit punishment had been discontinued, but he was not confident that it would not be re-instituted. Before sending this letter, the only information Mr. Waddle had concerning disciplinary practices at Heartland was the Manure Pit Incident, swatting, and a report of children rolling up and down hills in a brushy area. While Mr. Waddle "thinks" there were conversations with Heartland attorneys about removal of the charged manure pit defendants from contact with children at Heartland, he acknowledges that while Mr. Roberts' letter of July 2, 2001, states that the Division of Family Services requested that those criminally charged have no contact with children, there is no documentation that such requests had previously been conveyed to anyone at Heartland (Pl. ex. 80).

About a month earlier, on June 6, 2001, in response to a request from the Lewis County Prosecutor, Sheriff Parrish sent him "probable cause statements (W 85 B)." Sheriff Parrish believed the Lewis County Prosecutor was going to charge the Heartland staff members with the crime of Endangering the Welfare of a Child. The prosecutor initially believed that the Manure Pit Incident related to farm chores. When the prosecutor asked for the probable cause statements, Sheriff Parrish knew that criminal charges were going to be filed. He would have preferred to have interviews with

the five individuals to be charged, but the prosecutor was going to proceed with what he had. He believes that the Second Judicial Circuit Juvenile Office would have been advised of these events. In Sheriff Parrish's reports, the names of the juveniles were not replaced with initials.  He  referred to the juveniles by name in the files that were open to the public.  The probable cause statements pertained to Mr. Peterson, Mr. Patchin, Mr. Osbon, Ms. AbuSaada, Mr. Kepke, and Ms. Powell.  On June 26, 2001, Sheriff Parrish filed additional probable cause statements pertaining to J.E.   Mr. Waddle, according to an entry on the Lewis County Sheriff's Log, requested on June 29, 2001, that it would be necessary for someone from the Sheriff's Office to take J.E. into custody.  Sheriff Parrish became aware that his probable cause statements had been included in the formal criminal charges after the arrests of the defendants were made.  He then began to receive many calls from news media personnel about information related to the juveniles.  He asked the Prosecutor how to respond.  The Prosecutor told him that the probable cause statements had been included in the charges, and if further calls were received to refer them to the Prosecutor.  The next day, Sheriff Parrish was advised that the names should be blacked out and the Prosecutor took care of the matter, immediately.

At 12:04 p.m. on June 29, 2001, after the public announcement of the charges against the five Heartland employees, an entry in the Sheriff's Log states that "Bill Nigus public service regarding wanted to say good luck and good job.  Also advised he is moving to Fulton (Pl. ex. 27)." Mr. Nigus is the pastor who had earlier expressed concern over religious issues at Heartland to Sheriff Parrish.

When the charges relating to the Manure Pit Incident were filed against the five defendants on June 26, 2001, the Prosecutor called  Mr. Sharpe and Heartland attorneys to advise them that charges were being filed and that he would allow them to self-surrender.  Mr. Waddle later told Sheriff Parrish that the five defendants should not have been allowed to self-surrender.  A *nolle prosque* was entered on Ms. Powell's case at Sheriff Parrish's recommendation.  In response to a question as to whether Mr. Waddle had made a statement that Heartland should be shut down, Sheriff Parrish said that Mr. Waddle told him to talk to the Lewis County Prosecutor about getting an injunction.

Mr. Waddle would only admit that it was possible that he had read the probable cause documents in the manure pit defendants' prosecution files at the Lewis County Courthouse before he mailed the July 3, 2001 letter.  In that letter, reasons were stated as to why juveniles were in

danger at Heartland with reference made to the probable cause statements which were represented to be accessible as public documents. The full names of juveniles were disclosed in the probable cause report (Pl. ex. 85-A). Juveniles are identified by their conduct. At paragraph 16, a boy is classified as taking a gun to school to kill another child. At paragraph 17, another youth is described as being in trouble with drugs and as having committed theft and battery. Paragraph 18 refers to a child described as being educationally delayed or mentally handicapped. At paragraph 21, a boy is reported to have had sex with his adopted sister. At paragraph 22, a boy is reported to have been arrested thirty times, having been in possession of crack cocaine, and in possession of an altered weapon. Mr. Waddle's letter to parents, sent because he said he was concerned about protecting children, advises them, to bolster his position that the children were at risk, to refer to unlawfully disclosed juvenile records. He encourages parents to remove their children from the only successful placement many of them ever had. Sheriff Parrish's probable cause statement contained unlawfully disclosed, personal, embarrassing information. Mr. Waddle admits that he could not lawfully disclose this information.[10] He did nothing to correct this unlawful disclosure of protected information until someone at Heartland made him aware of the need to take action. He agrees that this disclosure was not in the best interests of the children. His explanation is that he was not responsible for what the sheriff or prosecutor did.

Mr. Waddle sent an e-mail to every juvenile officer in the State of Missouri on July 3, 2001 (Pl. ex. 30). He advised them that children at Heartland were subjected to cruel and unusual punishment, that forms of discipline appear excessive, and that, in his opinion, they should determine whether they had liability with placements. He said, "I personally believe that you do and should remove any youth you have placed there immediately." The message he intended to convey was children should be removed from Heartland and not be returned. He did not advise anyone at

---

[10] Missouri Revised Statutes § 211.321.1 provides, in part, "[r]ecords of juvenile court proceedings as well as information obtained and social records prepared in the discharge of official duty for the court shall not be open to inspection or their contents disclosed, except by order of the court to persons having a legitimate interest therein[.]"

Missouri Revised Statutes § 211.321.3 provides, "[p]eace officers' records, if any are kept, of children shall be kept separate from the records of persons seventeen years of age or over and shall not be open to inspection or their contents disclosed, except by order of the court[.]"

Heartland that he had sent this e-mail message.

On July 3, 2001, Mr. Waddle also sent a letter to Mr. Sharpe, Mr. Porter, Mr. Waldon, and Mr. Melton advising them that they were being requested to provide to the Second Judicial Circuit Juvenile Office assurances that Heartland was providing a safe environment for children, that the five Heartland staff employees charged with crimes had been removed from program responsibilities at Heartland, and that they had no contact with juveniles (Pl. ex. 11).  Mr. Waddle believed at the time that Heartland was not a safe environment because the five defendants still had contact with children. He further demanded that a monitoring system be put in place to assure these defendants had no contact with children.  He said, "if we do not receive an affirmative response by 1:00 p.m. July 3, 2001 [the same day the letter was addressed and transmitted] then it will be the position of the juvenile officer to initiate Juvenile Office and/or Court actions to seek authorization *to remove all of the youth placed at Heartland Christian Academy in Knox and Lewis Counties*." (Emphasis added). Mr. Waddle had concluded Heartland presented an unsafe environment for children because one scheduled meeting was not productive, he believed that three other attempts to hold meetings by the Division of Family Services were unsuccessful because someone at Heartland had cancelled them, that the manure discipline was still a concern, that the five criminally-charged defendants still had contact with children, and he believed other children at Heartland continued to be abused.  Concerning removal of the five defendants, Mr. Waddle had not made any written requests that Heartland remove the five staff members before July 2, 2001.  He admits that he does not know what time his July 3, 2001 letter went out, but he concedes that sending a letter the same day requesting action by a time on that same day provides short notice.

Mr. Waddle's testimony, in many regards, is unbelievable.  In the July 3, 2001 letter he sent to parents stating he was contemplating intervention, he confirmed it was his intention to convey the message that he was talking about mass removal.  In addition to sending an e-mail to every juvenile officer in the State recommending removal, in the July 3, 2001 letter to Heartland officials, he imposed a 1:00 p.m. deadline which, if not met, would result in removal of all of the children.  With those documents before him, Mr. Waddle was asked, "[d]id you give any thought to whether this series of documents might have the same effect as a mass removal?"  He answered, "I did not give any thought it would have any effect of that nature at all."  In his involvement with Heartland, Mr.

Waddle issues threatening fiats with practically impossible time restraints, under circumstances that do not indicate the need for immediate action.  These practices are inconsistent with helping Heartland to provide better services to children under a continuum of operation.  Mr. Waddle's purpose, instead, the Court concludes, as demonstrated by his actions, was to make the continuation of the operation of Heartland impossible.

Three federal lawsuits were filed on July 2, 2001, naming Mr. Waddle as one of the defendants.  Initially, Mr. Waddle said it was a week to ten days, or a few days after these were filed before he was aware of the filings.  He then acknowledged that he had been contacted by a newspaper reporter on July 2, 2001, to get his comments on the suits.  While Sheriff Parrish, in his customary candid response, replied that he was unhappy about being named as a defendant, Mr. Waddle testified he had no significant reaction to it, and it did not affect his approach to Heartland.  Mr. Waddle admitted he was not "terribly fond" of public statements made by those at Heartland about his office, some of which he believed were inaccurate, and that his staff was frustrated when Heartland would not be more compliant with his demands, but claims no "ill will" towards Heartland.

There are five dated documents in this case that are very incriminating against the credibility and integrity of Mr. Waddle, others in the Second Judicial Circuit Juvenile Office, and Ms. Ayers.  A document dated July 3, 2001, transmitted at 2:15 p.m. states that the Juvenile Office will seek an order from the juvenile court to secure an order for protective custody of the children at Heartland, advising parents to remove their children, and to contact the Juvenile Office within twenty-four hours (Pl. ex. 186).  Mr. Waddle testified that he had never seen the form before, speculating that someone on his staff must have worked it up.  He speculated further that it might be a Division of Family Services' letter.  However, the document is actually from Shannon Long, his secretary, to his e-mail address, and he admitted that the form was prepared in his office.[11]  The Court does not believe that

_____

[11]  The email stated:

Form to be used for notification of custodians of children placed at Heartland Christian Academy.

Number one: Identify yourself.  'My name is – ' and then there's a blank and 'I am employed with – ' and then there's a blank.

Mr. Waddle is being truthful when he stated that he had never seen the form before. The form can have no other purpose, if mailed, than to cause removal of children from Heartland and to discourage their return, causing Heartland to cease operations.

In a telephone conversation between Timothy Belz, an attorney for Heartland and Mr. Waddle on July 3, 2001, Mr. Waddle was advised that the five charged defendants had been removed from child care responsibilities in Knox and Lewis Counties. A written notice by facsimile transmission followed on July 4, 2001 (Pl. ex. 26). After a request by Mr. Belz that the five persons be allowed

---

Number two: This call is to inform you of recent happenings at the Heartland Christian Academy. The Lewis County Prosecuting Attorney Jules DeCoster has filed felony criminal charges against five employees of the Heartland facility. The charges are in reference to abuse of children, specifically, while at Heartland Christian Academy. The charges allege children were placed in manure pits as a form of punishment. Manure pits are a large concrete basin that consists of water, manure, et cetera. This type of punishment is injurious to the health of children. It is our obligation to notify you as the custodian of a child placed at this facility. We know you want your child/children to be in a safe environment. As of this date, these employees remain at the facility, possibly caring for children. Should Heartland not take corrective action regarding these employees, the following will occur: Juvenile officers at the 2nd Juvenile Circuit will submit a petition to the juvenile court requesting protective custody of your child/children. To avoid this action, you must make arrangements to remove your child/children from Heartland. Please contact the Juvenile Office within 24 hours with your plan. If you fail to make arrangements to remove your child from Heartland, juvenile authorities will be requesting emergency protective custody of your child/children and the possibility exists that you may be charged with abandonment. If this occurs, your child/children will be placed in protective custody and child support enforcement authorities will be notified to seek financial support for your child/children's care in the state of Missouri.

Number three: What are your intentions with regard to arranging removal of your child/children?

Number four: The filed charges are a matter of public record filed 6-26-01 at the Lewis County Associate Division of Circuit Court, Monticello, Missouri.

44

to attend church services, Mr. Waddle responded with an admonition that there should be no contact between the five defendants and children at Heartland irrespective of the location (Pl. ex. 81). Mr. Waddle said he did not want any child having an adverse experience with the staff members. Had Heartland refused to prohibit contact between the charged defendants and the children, Mr. Waddle testified there would be no compliance with his conditions. On July 6, 2001, Mr. Belz followed the earlier telephone and facsimile communications between himself and Mr. Waddle with a letter confirming the "no contact agreement," but reserving the rights of the five staff members to preach at church services and lead other public church-sponsored meetings. He also invited Mr. Waddle and Sheriff Parrish to come to Heartland on July 12, 2001, at 10:00 a.m. to "begin a dialogue as to possible ways to resolve the differences between [Mr. Waddle] and Heartland" (Pl. ex. 58). Mr. Belz stated that "you and/or your representatives are welcome to attend and monitor any or all of these public meetings." Mr. Waddle would likely have sought to remove the children from Heartland if monitoring of church services had not been permitted.

Thereafter, the Second Judicial Circuit Juvenile Office staff members were dispatched to monitor church services at Heartland. The Court understands that this was done upon invitation of Heartland, and that the purpose was to check on the substance of contact between the five criminally-charged defendants and Heartland students, and not to be critical of the religious practices or messages of any sermon. Mr. Waddle believed that this was something he could do to move forward with progress between his office and Heartland.

The identified staff members selected to monitor church services at Heartland were Jeff Hall, Chad Sawyer, and Melissa McCauley. Ms. McCauley received a directive from Mr. Hall to attend Heartland Church services on July 9, 2001. In an e-mail to Mr. Hall, she asked to be relieved of that responsibility (Pl. ex. 65). Ms. McCauley said it was in direct conflict with her religious beliefs, and that she had "no knowledge of the Heartland controversy and cannot place myself in what I consider to be a compromising position without further information." Later in her message, she again states that it "violates my religious beliefs." At the hearing, she tried to put a different spin on the request to be relieved of the duty, claiming that she had already scheduled Mass that evening and she had missed prior church services and needed to go to her own church. From watching her testify, however, the Court is of the view that monitoring a church service for a governmental agency was

45

repugnant to her, and her alleged conflicts of church services was contrived.  She was excused from the monitoring assignment.  Ms. McCauley otherwise presents herself as a believable witness, with a difficult assignment.

Mr. Melton recalls the serving of the search warrants and the events that followed and remembers that Heartland was given little opportunity to respond to Mr. Waddle's demands, which if not met, would have resulted in the mass removal of the children.  The search warrants were served by Mr. Waddle on July 2, 2001.  On July 3, 2001, Mr. Melton received the letter from Mr. Waddle, which was transmitted to him at 10:30 a.m., requesting confirmation that the five criminally-charged Heartland employees were having no contact with juvenile residents at Heartland, and that the Juvenile Office be allowed to monitor these individuals to see that they no longer are active staff members in the youth program.  Mr. Melton had two and one half hours to respond, or allow the threatened removal of the children go unchallenged.

About this same time, Mr. Melton became aware of Sheriff Parrish's thirteen-page report concerning the five Heartland staff members arrested in the Manure Pit Incident when two family members called him after they had  received calls from the media explaining that parents of juveniles at Heartland had their telephone numbers included in the Sheriff's report.  Mr. Melton contacted Steve Porter and Ed Campbell in an attempt to get before a court to get the names sealed.  Missy Hollenbeck was successful in sealing those files from further public exposure.

Sheriff Parrish recalls the events surrounding the issuance of the search warrants.  In an entry on the Sheriff's Log at 5:25 p.m. on June 29, 2001, Mr. Buening called asking if he could get a copy of an application for a search warrant.  Someone at the Sheriff's Office responded that an application could not be located.  At 5:56 p.m., Sheriff Parrish was aware that Mr. Waddle was interested in getting a search warrant, and in a message inquires as to why a search warrant is being sought and admonishes that before anything happens, Deputy Wiemelt should be contacted.  The recollection of Sheriff Parrish is that Mr. Waddle called him and said he had acquired search warrants for the purpose of getting the identity of children at the Boy's Center.  Sheriff Parrish understood that this search warrant was not issued for the purpose of gathering evidence in a criminal investigation.  Sheriff Parrish had some  concerns because he had never heard of a juvenile officer making a request for a search warrant.  They discussed the legality of the search warrants, and Sheriff Parrish asked him why

he had not worked through the Prosecutor's Office. When initially contacted by Mr. Waddle about the search warrant, Sheriff Parrish was "dumb-founded." Mr. Waddle said there was authority for it and he already had a judge's order. Sheriff Parrish talked to two other sheriffs who voiced similar concerns for the issuance of a search warrant. He was advised that if it was signed by a judge, it was his duty to serve it. Sheriff Parrish, his chief deputy, Mr. Waddle, and one of his officers went to Heartland to enforce the warrant (Pl. ex. 28). When they arrived to serve the warrant, Mr. Melton alerted Sheriff Parrish that the warrant described a place to be served in Knox County, not Lewis County. Sheriff Parrish knew he had no authority to search in Knox County. They departed, and Mr. Waddle secured another warrant. This time, Sheriff Parrish's chief deputy helped execute the new warrant.

Mrs. Sharpe recalls the date Mr. Waddle's search warrants were served. On that date, Mike Kite, Knox County Sheriff, Robert Baker, and Andy Grimm, a Second Judicial Circuit juvenile officer, appeared and told her they had a search warrant to gain information on students. They expected to take the entire files of each child. In her office, she had files on all teenage girls and all girls and boys under twelve years of age living at Heartland. Boys under twelve live in group homes. The files contain all of the information available for the child, including application for admission, background information, involvement with delinquency issues or with law enforcement, and treatment practices including medical and psychological issues. They wanted the whole file on each child. They took the files from her metal cabinets. Mrs. Sharpe believed that she had no choice but to release all the files to the officers. Sheriff Kite had mailing labels upon which he wrote the student names. He put all of the binders in a box, took them to an automobile and departed. The files were returned later that evening.

The Juvenile Court Judge was not supplied complete and accurate information by Mr. Waddle in the search warrant applications. The Juvenile Judge does not recall seeing the July 3, 2001 letter Mr. Waddle sent to parents on July 3, 2001, saying the Juvenile Office was "contemplating Juvenile Court intervention to ensure that no child will reside at this facility [Heartland] in an injurious environment." He did, however, view it in preparation for his testimony. He had no discussions with Mr. Waddle before the letter was sent. The Juvenile Court Judge was not made aware that the names of juveniles had been wrongfully placed in criminal files. He was not told after the warrants were

issued that the Second Judicial Circuit Juvenile Office personnel monitored Heartland church services, nor that one of the members of the juvenile staff refused to monitor the church services or that juveniles had been interrogated without notice to their parents.  Mr. Waddle did not tell the Juvenile Judge that he and Sheriff Parrish had interrogated the juveniles on the subject of religious messages preached at church services.  He had no recall that either Mr. Waddle or Sheriff Parrish expressed concern that Heartland might be engaged in cult activities.  Mr. Waddle never told him that he did not believe that people at Heartland were really not Christians.  The very first time, according to the Juvenile Judge, that Mr. Waddle and he discussed mass removal of children from Heartland was on the morning of October 30, 2001, when Mr. Waddle came into his office with motions and draft petitions for protective custody.

## IV.    THE JULY 12, 2001 MEETING

The July 12, 2001 meeting was attended by about three dozen people including Mr. Waddle; Mr. Hall; Denise Cross, Director of the Missouri Division of Family Services; Mr. Harrison from the Division of Family Services; Ms. Rohrbach with the Out-of-Home Investigative Unit of the Division of Family Services; Mr. Sharpe; Mr. Melton; Dr. Kliman; several parents and some children from Heartland.  The meeting was described by Mr. Waddle as an "ambush."  Mr. Melton, according to Mr. Waddle, gave a forty-five minute overview, and then parents were permitted to ask questions. Mr. Waddle suggested that the key stakeholders who were going to make decisions on discipline should meet, and he excused himself to the hallway.  Later that same day, there was a second meeting attended by fewer participants.  Subjects of philosophy, policy, and procedures of the Second Judicial Circuit Juvenile Office and the Division of Family Services and other entities having responsibility under the law were discussed, including unique problems at Heartland, what is involved in an injurious environment to children, appropriate discipline and future conduct of staff members, and care of children that would produce a safer environment for the children.

Mr. Waddle, in his testimony, emphasized Dr. Kliman's recommendations that any juvenile should receive no more than five swats[12] per day; that female staff members should administer swats

---

[12]  A swat is a form or corporal punishment administered at Heartland whereby a person stands behind and to the side of the person receiving the discipline, and with the aid of a wooden paddle, applies force to the buttocks of the recipient of the punishment.  There is a prescribed

to female juveniles and male staff members should administer swats to male juveniles; that Heartland staff should do more in Heartland's intake assessment; that in-service training should be increased; some children needed to be treated with psychotropic medications; and an ombudsperson[13] needed to be appointed.  Mr. Waddle believed that a Division of Family Services' employee should be appointed as ombudsperson.  The participants discussed the respective roles of the groups attending. Substantiated and unsubstantiated reports were discussed.  The unique population at Heartland was discussed insofar as requirements for care and treatment were involved, and disciplinary practices that were in place for those individuals.  Changes that had already been made in disciplinary policies at Heartland were discussed.  There was discussion about the "no contact" limitation that had been observed by the five criminally-charged staff members at Heartland, and that the limitation should be changed to a "no discipline" restriction.

When Mr. Waddle departed from the July 12, 2001 meeting, he was "comfortable."  He said that he believed that most, if not all, of his concerns had been addressed.  Heartland staff was to write a summary of changes that had been made.  Upon receipt of the Heartland memorandum, Mr. Waddle agreed to send a letter to parents and all juvenile officers in the State that placed children at Heartland, reporting the progress that had been made and that most of his concerns had been alleviated.  He was to confer with juvenile authorities in the Forty-First Judicial Circuit to advise them of the meeting and see if all could work towards a cooperative agreement.  He felt that some trust between Heartland and the Second Judicial Circuit Juvenile Office was established as a result of that meeting.  He wrote a very conciliatory letter to Mr. Sharpe dated July 27, 2001, wherein he recognized that the July 12, 2001 meeting was helpful; that he had been in contact with Ms. Ayers expressing to her his satisfaction with the progress achieved at the meeting; that he wanted to meet the registered nurse who had been hired as the ombudsperson; and that he looked forward to getting the written details of the agreement and in working with Mr. Sharpe in the future (Pl. ex. 97).

On July 30, 2002, Mr. Belz drafted and sent a letter to Mr. John J. Lynch, Assistant Attorney

---

limitation as to the distance the paddle may be from the person being swatted and the wrists of the administrator of the swats are not allowed to experience a bending as swats are administered.

[13]  All references by all witnesses at all hearings are to "ombudsman," and references to "ombudsperson" are the references of substitution by the Court.

General for the State of Missouri and the attorney for Mr. Waddle in this Federal litigation, outlining the details of the agreement reached at the July 12, 2001 meeting at Heartland. This letter specified all of the points of agreement reached at the July 12, 2001 meeting concerning revisions of the corporal discipline policy, appointment of an ombudsperson, adoption of Dr. Kliman's recommendation for assessment and treatment of high-risk children for psychological disorders, removal of the five criminally-charged defendants from any disciplinary responsibilities, and provided for the responsibilities of Mr. Waddle in implementing the agreement. This letter was followed by one dated August 6, 2001, to Mr. Sharpe from Mr. Waddle confirming a telephone conversation between the two of them, wherein Mr. Waddle stated that he "again made a request for the written details of the cooperative agreement that was verbally entered into at a meeting held at Heartland on the 12th day of July, 2001." The letter stated that Mr. Waddle had said he would send letters to parents and e-mails to juvenile officers, but the action had been delayed by "your delay in sending the information[.]" Additionally, Mr. Waddle stated that some issues had not been addressed in the agreement, including Dr. Kliman's recommendations that background investigations be conducted on all staff members working with children; that there be additional staff training for recognition of problems of children; and that intake assessment procedures be improved to identify needs of children admitted at Heartland. Mr. Waddle concludes, "[t]hank you for your time in responding to these requests and your willingness to work together" (Pl. ex. 98).

Mr. Waddle obediently complied with his representation and sent a letter dated August 13, 2001, addressed to parents or guardians, acknowledging that he had previously sent them a letter on July 3, 2001, expressing concern that their child may have been residing in an injurious environment. He informed them that a meeting was held with Heartland and that, as a result, a plan was put in place which "alleviate[s] many of our concerns as to whether children are currently in danger of abuse or neglect at Heartland."

Mr. Waddle believed that an agreement of understanding between Heartland and the Second Judicial Circuit Juvenile Office was reached at the July 12, 2001 meeting (Pl. ex. 13). In his August 13, 2001 letter, he acknowledged that arrangements had been made for programming changes to be implemented, including: 1) Revision of the Corporate Discipline Policy; 2) Appointment of a Student Ombudsman; 3) Psychological and Psychiatric Assistance for Seriously Disturbed Students; and 4)

Prior No-Contact Order, concerning the five criminally-charged defendants.  In addition, he set forth the policies to be implemented, but not yet reduced to writing, including: 1) Background Checks on all Staff; 2) Staff Training; 3) Intake Assessment; and 4) Medication Management for Seriously Disturbed Youth.  Mr. Waddle told them that the number of swats would be reduced from ten to five, there would be concurrence with three staff members before swats would be given, swats would be administered by persons of the same sex as the person receiving the swats, witnesses would be present during any swatting activity, and a student ombudsman would be appointed as a "safe person" students could consult.

Dr. Kliman had recommended appointment of a person jointly hired by Heartland and the Division of Family Services to assure independence.  Mr. Waddle believed, at the time, that this would be a full-time position.  Carrie Abbott was the person hired.  Mr. Waddle was not aware until the September 26, 2001 meeting that she was not a full-time ombudsperson.  Ms. Abbott was aware that she was a mandated reporter requiring her to file a Division of Family Services' hotline report when there was reason to suspect child abuse or neglect.  Mr. Waddle wanted to meet with the ombudsperson to discuss rules and regulations.  When the August 13, 2001 letter was sent to parents, Mr. Waddle wanted further assurances that progress was being made at Heartland, but he was comfortable to remain engaged with "healthy scepticism."  He believed there was still a lot of work ahead for implementation. During August and September 2001, the Division of Family Services' Office of Out-of-Home Investigations was supplying Mr. Waddle with reports of its investigations.  Mr. Waddle made inquiries about other hotline reports.

In an August 14, 2001 letter addressed to Mr. Melton, Mr. Roberts writes that he acknowledges receipt of Mr. Melton's letter to John Lynch dated July 30, 2001, concerning the July 12, 2001 meeting at Heartland.  In addition, he states that Mr. Waddle had sent letters to parents or guardians of children at Heartland and to juvenile officers in the State of Missouri announcing the existence of a cooperative agreement.  He states that the parties would meet with Carrie Abbott, "ombudsman," "for the purpose of discussing how the position of ombudsman would be utilized as a contact point for both the Missouri Division of Family Services and the Second Judicial Circuit Juvenile Office for the handling of the investigation of any new complaints of suspected child abuse/neglect reports which may be filed in the future.  It is my understanding that this discussion will

seek to set up joint procedures for these investigation [*sic*] which will be designed to be as least intrusive and disruptive to the children and staff at Heartland as is possible while allowing both agencies to discharge their statutory responsibilities (Pl. ex. 99)." In his customary conciliatory style, Mr. Roberts expressed that he was looking forward to receiving information concerning the responsibilities of the ombudsperson, looked forward to meeting with her, expressed satisfaction that their clients had successfully completed the cooperative agreement, and expressed hope that the clients could concentrate in the future on a joint mission of serving troubled youth. Specifically, Mr. Roberts stated, "I am very pleased that our clients were able to successfully complete this cooperative agreement on July 12, 2001[.]" Mr. Waddle testified that he is sure he received a copy of Mr. Roberts' letter, but he has no recollection of seeing it. Mr. Waddle was specifically asked, "[s]o, Mr. Waddle, as of August 13 of 2001, did you believe that the issues between Heartland and the Juvenile Office had largely been resolved?" He responded, "I believed we were making significant progress, that we were opening the lines of communication, beginning to develop a positive working relationship, and had their commitment to do what they agreed to do, and that we were moving forward, yes, all of those things."

Mr. Waddle then wrote a letter to Christine White, Deputy Director of the Missouri Division of Family Services, on September 4, 2001, advising her that a meeting with Carrie Abbott had been tentatively scheduled for September 17, 2001, "to have open discussions with [Ms. Abbott] to develop policy and procedure of how future reports of abuse and neglect might be handled." He relates that the meeting would also provide for discussing Ms. Abbott's role in overseeing the cooperative agreement developed at the July 12, 2001 meeting and her role in supervising discipline and monitoring the five staff members with pending criminal charges. In this letter, he clearly confirms that he believed an agreement was reached on July 12, 2001. He mentions that the preliminary hearing on the criminal charges was set for September 11, 2001. He also requests hotline reports and the report of physical abuse finding on Mr. Sharpe (Pl. ex. 54).

At the time of the September 4, 2001 letter, there is nothing in the record to show that Mr. Waddle had any intention of initiating any further action to seek mass removal of the children from Heartland. He expresses in writing that a cooperative agreement is in place and steps are being taken to comply with it. He makes no written statements to suggest that there was any thought but that

his office and Heartland would work in the future in a spirit of cooperation. However, on the very same day, September 4, 2001, Mr. Waddle writes a memo to Ms. Ayers stating that he has been trying to arrange a meeting with "Heartland officials ombudsman" to review the cooperative agreement, to discuss future child abuse and neglect reports, and how the ombudsperson is monitoring the five criminally-charged defendants. He makes reference to a letter of Mr. Roberts to Mr. Melton "to get the meeting scheduled." Then, he makes the following statement:

> I am of the opinion that if we can't get the meeting scheduled, then I am unable to ensure the safety of the children residing at Heartland and *might once again be in a position of needing to seek further court action to do so*." (Emphasis added). I hope it does not get to that. At this time they are suggesting a meeting on the 17th of September. Put it on your calendar and let me know . . . they have not confirmed as of yet[.]

This is the second of the five very troubling written documents. First, he acknowledges that Heartland suggested the date for a meeting which he claims that he wants. There is nothing to suggest that anyone at Heartland would not attend the meeting. Mr. Waddle, in writing, expresses the view, simply because he is unable to see a meeting scheduled, which he has no apparent reason to believe will not be scheduled, and which date was supplied by Heartland, he "might once again be in a position of needing to seek further court action," words which sound more like someone wanting to start a fight than someone abiding by the previously represented statements of "willingness to work together (Pl. ex. 55)." When asked if he could not get a meeting scheduled if he was prepared to remove the children, Mr. Waddle testified that he may have made the statement out of frustration. He testified, in any event, that frustration did not affect his judgment. This is another link in the chain that shows Mr. Waddle's purpose all along was to remove the children, and he was preparing the way, to alert Ms. Ayers, that such action had not been foreclosed, even in an atmosphere of stated good will and cooperation.

Ms. Ayers recalls this September 4, 2001 Memorandum from Mr. Waddle. She understood that he was talking about mass removal of the children. As of that date, Ms. Ayers did not believe she needed to mass remove the children in the Forty-First Juvenile Circuit and she was not ready to file an action to do that. She also received an e-mail from Mr. Waddle on September 6, 2001, asking her if she would be attending a meeting in October, and if so, whether she would place on the agenda at a planned juvenile organization meeting the issue of "Faith Based Programs." Additionally, Ms.

Ayers had conversations with Mr. Waddle about unlicensed facilities.  She knows that he felt uncomfortable with unlicensed facilities and favored those that were licensed.

In addition to his belief that he was considering removal of the children from Heartland if he could not arrange a meeting, Mr. Waddle expressed bias against Faith-Based institutions.  The Legislature of this State has made a conscious decision to allow organizations of faith to operate unlicensed facilities.  Mr. Waddle has expressed his opposition in his testimony to the existence of such facilities in "his jurisdiction."  He claims to recognize his duty to enforce the juvenile laws, but he has demonstrated a clear proclivity to do so in a selective and discriminating manner, while making moral judgment about the professed faith of residents in the Second Judicial Circuit.  Mr. Waddle's written words and course of conduct project a far clearer vision of his true beliefs than his statements at trial.

Ms. Ayers responded to his September 6, 2001 message by e-mail, saying that she would be in Florida and would be unavailable for the scheduled meeting on September 17, 2001.  Mr. Waddle responded to her e-mail at 10:43 a.m. on September 6, 2001, stating that he preferred to hold the scheduled meeting in her absence, unless she objects.  He then adds post script, the third of five very troubling documents:

> Are you going to the Administrative Concerns meeting in October?  I wish someone would ask for one of the agenda items to be Faith Based Programs . . . .  But I do not want it to be me?  *I would rather be available for input than be on record . . . at least at this point . . . as leading a charge against the Christians . . . (obviously I use that word rather loosely . . . ).*

(Pl. ex. 56) (emphasis added).  These are not the words of a conciliatory government representative looking to serve the best interests of children, contrary to his frequently volunteered mantra, "I just want what is in the best interests of children."  His words demonstrate that he is having concerns not only about faith-based groups in the Second Judicial Circuit, but additionally, he places in question the professed faith beliefs of those he is under oath to protect to assure their religious freedoms remain inviolate. These are not words about the protection of children.

 Mr. Waddle does not mask his true feelings about his objection to the law in Missouri which recognizes the legitimate right of an unlicensed residential faith-based facility to exist in this State. Mr. Waddle believes that residential care facilities should be licensed.  Licensed facilities do not

permit corporal punishment.  Only faith-based programs have this exemption.  Mr. Waddle has advocated for abolishment of this exemption.  He testified:

> It's my professional opinion that all facilities that care for children on a 24-hour-a-day basis should be licensed. I do not believe there should be an exemption in the state of Missouri for any persons that care for children in a residential setting. Missouri is the only state in the nation that gives an exemption to anybody for all of the minimal standards of care that ensure safety of children, and I think Missouri is way behind in times of getting up to speed and doing the right thing for the safe care of children, and it's something that I believe should be addressed in the legislature.

Mr. Waddle was also asked:

> Q.    Okay. And for that reason, do you object to unlicenced facilities such as Heartland?
>
> A.    As long as the law provides an exemption, then I will deal with that and deal with it fairly and equitably and professionally, but I have a belief that there should be legislation proposed and acted on to continue looking at changing that exemption for Missouri.

Mr. Waddle fails to understand that faith-based organizations are in a better position than licensed facilities to care for some children.  His blind opposition to faith-based operations demonstrates his inability to function within the laws of this state.  The facts of this case clearly demonstrate that his staff failed to provide proper care of children, even for the brief time Heartland children were under his protective custody.  Mr. Waddle's unalterable belief that there should be no unlicensed residential-care facilities in his jurisdiction, and his abuse of the legal right of personnel at Heartland to administer corporal punishment to students at their faith-based, residential-care institution, creates a tension which favors Heartland under the laws of the State of Missouri.  The Legislature, not Mr. Waddle nor this Court, have any right to change the law which the citizens embrace.  It is a noted fact that no one at Heartland has ever been convicted of violating any law nor of ever refusing to strictly obey every court order directed to them.  As demonstrated by facts of this case, not every juvenile officer and law enforcement official charged under oath to obey and uphold the laws of this State and Nation have been obedient to their oaths of office.

## V.    INCIDENTS OF CORPORAL PUNISHMENT AT HEARTLAND

There was a substantial amount of time during the trial of this case used to address specific corporal punishment incidents at Heartland.  In rural areas of this State, the Missouri Division of

Family Services of the Department of Social Services works in close cooperation with county juvenile offices to serve and protect the interests of children. Generally, those agencies use the resources awarded to serve all of the citizens well. In this case, there has been regular investigations of reports of abuse and neglect at Heartland. For as long as that facility operates, such investigations will be occasionally required. Division of Family Services' personnel, juvenile officers and law enforcement officials have collective duties under the law to execute their respective responsibilities for the care and protection of children, without regard to the use of oppressive practices executed under color of law. There are several incidents of claimed abuse and neglect that will be considered independently, in an effort to determine whether Heartland has been operating a facility where children are at imminent risk of physical harm. Review of these incidents will also examine the extent the Division of Family Services, juvenile officers or law enforcement officers have used resources entrusted to them to execute their respective roles in protecting children, or whether their focus has been to interfere in the operations of Heartland in providing for children in a lawful manner.

Some of the following reports will be specifically discussed in this analysis. The first substantiated report before October 30, 2001, occurred on May 6, 1999. It is Report 99-124-129, and was a hotline on a boy, S.S., who received an injury while playing basketball. The claim of abuse or neglect was that there was a delay in getting medical attention for S.S. Substantiated report 99-180-104 concerns J.L. The allegations of abuse in that case were against three staff members for use of the punishment chair, which will be discussed in greater detail. The next report, the J.O. matter, was unsubstantiated before October 30, 2001, but was later reinvestigated and a probable cause conclusion was made by a court. That report of February 18, 2000, is no. 48195. The next report, dated April 27, 2001, contains thirteen incidents, twelve related to the Manure Pit Incident and one related to swats applied to L.H. by Rob Patchin. Reports 115-50-23 and 115-70-45 are dated June 4, 2001. Probable cause findings of physical abuse for two boys, B.A. and S.D., were made. The above cases of substantiated abuse are the only substantiated reports of abuse and neglect made by the Division of Family Services before October 30, 2001. These are the only substantiated reports upon which Mr. Waddle relied in making his decision to remove the children from Heartland, because these three reports are the only ones in existence at the time. Although two more investigations were being processed by the Division of Family Services in matters involving O.M. and J.K., no

determinations were made as to substantiation before October 30, 2001.  Mr. Waddle, however, relied on information from the cases involving O.M. and J.K. in making his decision to remove the children from Heartland.  He had contacted either Ms. Jacobs-Kenner or Ms. White at the Division of Family Services for this information, and while he could not say that he was advised that the reports would be substantiated, he and either Ms. Jacobs-Kenner or Ms. White had concluded that abuse had occurred.  Mr. Waddle relied rather heavily on these investigations in making his decision to execute the mass removal.

In 1999, the Division of Family Services conducted an investigation into a matter concerning J.L., who reportedly had been tied to a chair with a belt and extension cord, with tape placed over his mouth, after fighting in the kitchen.  David Moss, Principal of Heartland School, was presented as the witness having the most information about this incident which was found to be substantiated after an investigation.

Mr. Moss has been at Heartland for four and one-half  years.  He has served as Principal of the Heartland School for more than a year.  He started as an assistant to a teacher, then he served as a teacher for three years.  He has also driven a bus at Heartland.  He is not a certified teacher.  He graduated with a B.S. Degree in Psychology from Evangel College in Springfield, Missouri in 1987, and he took some graduate courses at the Assembly of God Seminary in Springfield, Missouri and at Mid-America Nazarene in Kansas City, Missouri.  After learning of Heartland on a mission trip from some acquaintances, he was invited for a tour, and thereafter, he and his wife moved to Heartland.  He recognizes that corporal punishment is used at the School.  A rubber paddle, six inches by one and one-half inches is used.  Swats may be administered to the palm of the hands, or to the buttocks.  At the time of his testimony, he related that, originally, a maximum of ten swats may be given, but in the summer of 2001, the number was reduced to a maximum of five swats per day.  Some children learned that they could get five swats at one location, then move to another place and have immunity from further punishment from swats.  When administered to the palms, the palms of the hand are extended in an upward position.  Administration of ten swats is a theoretical number, but it is unlikely that as many as ten swats would be applied in any day.  No swats are administered to a child who is moving uncontrollably.  Rarely, when a child must be restrained, the "clamp method" is used before swats are given.  Mr. Ludeman trained him in the proper technique for

administering swats.  The student must remain still, to assure that the swat will be applied to the intended area.

Mr. Moss noted that other forms of discipline include withholding of privileges, requiring writing assignments, restrictions on snack food, required wearing of particular clothing, "grubbing," the practice of picking-up sticks or rocks in a field, placing a child in the "punishment chair" (used only for teenagers),  and offering a student "Food For Life," a nutritious meal, but one not likely to be requested by a child.  Heartland Stew is an example of one such menu item.  The punishment chair is only used when a teenager is demonstrating a rebellious or bad attitude.  It is a larger chair that is used as a "time-out" for teenagers.  In elementary school, younger children are given one to three swats.

Children at Heartland are under constant accountability, whether at their jobs, at school, in the dormitories or elsewhere.  Swats are most generally given at school, in the dormitories, or while they are in residential placement.

Concerning the J.L. incident, Mr. Moss testified that he was not in the room when J.L. was tied to the chair.  When Mr. Moss departed from the kitchen, J.L. was sitting in the chair.  Later, his feet and legs were tied to the chair.   He remained in the chair for ten to fifteen minutes.  He was told to sit in a chair, but he kept getting-up.  Mr. Moss told him to stay in the chair.  After Mr. Moss departed, J.L. became belligerent and rude, making threats of physical harm.  Mr. Moss had earlier explained to J.L. that he must stay in the chair and that if he would not do so voluntarily, he would be tied in the chair.  Mr. Moss did not intend for Clifford Mullins and Shawn Scianna, junior staff members, to take his comment literally.  When Mr. Moss learned that two junior staff members had tied J.L. in the chair, he removed the restraints.  J.L. was crying.  Mr. Moss agrees that this was inappropriate and unreasonable and it should not have happened.  He recognized that he failed to supervise the individuals involved.   He completed an incident report and presented it to his supervisor, Mr. Patchin.  Mr. Moss was disciplined by Mr. Patchin for his role in the event and was removed from involvement with the young people at Heartland for three months.  The Division of Family Services found probable cause to believe that J. L. had been physically abused.  Mr. Moss fully cooperated with the Division of Family Services' investigation.

As a youth minister, Mr. Moss learned his obligation to report child abuse through the

Division of Family Services hotline. He has photographed the buttocks of children with bruises from paddling, but he has not reported such events to the hotline. He does not believe that any of the incidents he witnessed rose to the level of abuse requiring reporting. He believes that a hotline call should be made when the situation is apparent and obvious, or where there is an intent to harm a child. He believes that at Heartland, children are to be kept safe and not harmed, and that all personnel at Heartland are to be constantly on the lookout for safety of children. He has not been given written material at Heartland pertaining to a definition of abuse. Mr. Sharpe constantly communicates at staff meetings about safety and protecting children.

Mr. Moss notes that in addition to children in recovery at Heartland, there are children of staff members and children from the community being educated at Heartland. Some children require discipline and some require no discipline. Swatting as a disciplinary practice occurs as a "last resort." A few kids frequently get swats. There are eight to ten kids who are frequently in the principal's office. Hand swats is a relatively new form of discipline, adopted one year before he became principal. This practice is used on children in grades seven through twelve. Hand swats or paddling will be used as an option, depending on how a particular child responds. A child could express a preference for the particular swats to be administered. Currently, Mr. Moss is infrequently involved in administering discipline.

There are several unsubstantiated incidents upon which Mr. Waddle claimed to have relied in making his decision to remove the children from Heartland. On such report concerned S.A., a two year old child disciplined by Allee Marshall, a group home parent, formerly a respite home parent, who provided care of children taken from other placements for additional care (W-168 LS.-p.8). She gave S.A. four swats with a wooden spoon over a diaper and pants. A photograph was taken. Mrs. Sharpe talked to Mrs. Marshall about the matter, and no official disciplinary action was taken against her. No hotline report was made.

Allee Marshall and her husband moved to the Heartland Community on February 25, 2000. Her husband works in the transportation department at Heartland. During the first year at Heartland, both were respite parents. Now they are full-time house parents. Currently, eleven boys ranging in age from thirteen to seventeen live with them. In August 2001, five or six boys lived with them varying in age from two to seven. Before moving to Heartland, Mrs. Marshall was employed as a

teacher's aide for the severely handicapped in a public school. She worked in Hospice Care and as a nurses' aid in different hospitals with patients aged infant to adult. Mrs. Sharpe supervises her as a group home parent. Mrs. Marshall was given a book at Heartland on child rearing. In disciplining children, she used a kitchen wooden spoon for smaller children and a wooden paddle twelve inches by two inches by one half inch for older children. She was instructed that the hands are meant for loving and a paddle, not hands, was to be used as a "rod" in administering discipline. Mrs. Sharpe had instructed her that the paddle was to be used only as a last resort. She would go two to three weeks sometimes without paddling any of the children. When she paddled a child, she had to complete an incident report. She did not get concurrence of three staff members before disciplining the younger children. Now, a witness comes in if she paddles a child. Her husband paddles the older children. She was not aware, in her testimony, of the requirement that three staff members had to concur before a child was swatted. She has the hotline number in her home, but has not made a hotline report.

G.W., a six-year old male, hid two wet pull-up diapers in the closet in a plastic bag (W-168 L.S. p. 10). This incident was reported as occurring on September 30, 2001. G.W. was disciplined for lying and for direct disobedience. After discovering the wet pull-ups, Mrs. Marshall applied one swat with a wooden spoon. There is no indication from the report that a male witness was in attendance at the time. Mrs. Marshall explained that in a group home setting, summoning another staff person is counterintuitive to the discipline, because, by the time another staff person arrives, the child does not appropriately associate discipline with aberrant behavior. G.W. would sometimes put the pull-ups in the dumpster, and sometimes he put them in the closet. She warned him several times that he would get a swat if he continued to put them in the closet. She took him to a pediatrician in Hannibal to address his bed wetting problems after conferring with the child's mother. She notifies parents when corporal punishment is administered. G.W. denies that he was bruised or feeling abused during the swatting, and he stated that he understood why he was swatted (W-168-LS pp. 10-11).

Mr. Carter conducted an Out-of-Home Division of Family Services' investigation concerning an allegation that Mrs. Marshall force-fed green beans to S.A., a two year old child who refused to eat. Mrs. Marshall's version is that the child wanted more watermelon, but Mr. Marshall was

quiescent until the child ate some green beans.  Mrs. Marshall placed some green beans on a fork and put them in the child's mouth.  The child rejected the offer by spitting them out, but finally ate them and was given watermelon.  Four swats were given with a wooden spoon over the child's diaper and pants before she ate the green beans.  This investigation was reported "unsubstantiated."  Mrs. Marshall first imposed a "time-out" which did not produce the desired result.  The child's mother was in the Women's Program at Heartland.

 Other forms of punishment Mrs. Marshall observed at Heartland were use of colored jump-suits for the boys.  For children that were disobedient she might have them write sentences, such as, "I will obey,"one hundred, two hundred and fifty, or five hundred times.  Anytime there were consequences for behavior,  she was required by the training she received to file an incident report.  Mrs. Marshall presents herself as a very credible witness.

The "Talley System" at Heartland  is a method of recording unacceptable student behavior, and  when a child gets thirteen tallies, she or he is subject to receipt of swats.  No one at Heartland can administer swats who is angry or who has been in an altercation with a child.  In group home settings, where discipline needs to be administered in close proximity to the time of the behavior to be corrected, it is not always possible to get permission from a supervisor before discipline is administered, nor is it always possible to assemble the requisite number and correct gender of witnesses.  Mr. Sharpe believes in "old fashioned discipline that gets results."  If an injury results from anger,  Mr. Sharpe believes it is abuse.  Bruising on the buttocks from swatting, he believes, is not abuse.  Mr. Sharpe and the juvenile offices have not reached an accord on the definition of child abuse.  Mr. Sharpe believes and instructs that safety of children at Heartland is the top priority.  Heartland's image is of secondary importance.  At Heartland, children are "number one in all respects."   Mr. Sharpe does not like the administration of swats, but believes it is sometimes necessary. He does not like to see bruising on anyone.  In his upbringing, Mr. Sharpe received welts from swatting.  He does not consider light bruising to constitute an injury.   Mr. Sharpe has seen no photographs which indicate an injury to a child.  Irrespective of the identity of the person involved in any incident, keeping children safe is the top priority at Heartland.  The practice at Heartland is to

"get to the bottom" of any incident report[14] to determine if there is any reason to suspect abuse. Parents must give expressed consent, at admission of the child to Heartland, that swatting of their child is acceptable.   Mr. Sharpe emphasizes that swatting is a very small part of what Heartland is about.

There has been no formal training concerning the administration of swats at Heartland, except as staff members are trained on site, and the on-site training sets forth specific procedures which are always to be followed when swats are given.  Mrs. Sharpe believes that she has not observed abuse at Heartland.  While she cannot apply a definition to the term "abuse," she recognizes that some children can receive injuries while being disciplined.  She acknowledges that she has a responsibility to report abuse if she observes it.  Mrs. Sharpe acknowledges that at the July 12, 2001 meeting, Heartland agreed to change its discipline policy.  A maximum of five swats each day for any child was to be administered and swats were to be administered only after concurrence of three staff members. The ombudsperson would follow-up within 48 hours.  Swats were to be administered by persons of the same sex administering and receiving swats.  However, that practice proved to be unworkable and currently, ten swats may be administered each day to a particular person, although this infrequently, if ever, occurs.  Additionally, male staff members may administer swats to females, as long as swats are administered in the presence of female staff members.

On July 31, 2001, Mr. Sharpe administered swats to J.W., a female (W-168 C.S.).  This occurred after the July 12, 2001 meeting when it was agreed that persons administering swats and the person receiving swats would be of the same sex.   Mr. Sharpe acknowledges that this arrangement just did not work.  On the evening when he administered swats, Mr. Sharpe was in his office about two blocks from the Girls' Dormitory.  He received a call to come to the Dormitory. He was the only one to handle the situation.  J.W. was very violent.  Her behavior that night was consistent with behavior she exhibited on prior occasions.  His intervention was necessary to prevent injury to J.W. or other staff members.  He restrained her by use of the "clamp method."  With this procedure a person's arm is placed behind their back to control their movement.  In this case,  Mr.

---

[14]  There are two boxes of incident reports prepared by Heartland staff members.  There is no showing of any pattern to conceal incidents or any failure of any staff member to prepare and file a report following any circumstances which demonstrate administration of discipline.

Sharpe took her right arm, forced her to the floor and administered swats.

A staff member reported that J.W. was out of control.  Staff members could not handle the situation, and the staff was concerned that the child or staff members might be injured if action was not taken to control her.  Mr. Sharpe described J.W. as a large girl, "strong as a man," and extremely violent.  He states that she had "supernatural strength."  There was no one close by who could be contacted.  He took control of the situation, because there was really nothing else to do.  J.W. often engaged in controlled head banging.  She butted her head into walls just enough to make it appear that she was hitting the wall but she never harmed herself. Her pattern of behavior never changed until she left the program.  She exhibited self-destructive behavior.  When Ms. Abbott prepared her report, she could not conclude if J.W.'s bruises were inflicted from the swats or from struggling with staff members.  Four staff members also received minor injuries in the incident.  The matter was not reported to the Division of Family Services' hotline.

On August 7, 2001, J.W. refused to do her homework, was trying to cut herself with a ruler and a pin, and refused to get dressed.  Ms. Gilmore reported that staff members restrained her for five minutes.  In the restraint, Carol Lunstead, a staff person, received a fractured rib.  J.W. tried to smash her head on the floor.  When staff members allowed J.W. to get up, she lunged at Ms. Gilmore.  Brenda McNatt  and Ms. AbuSaada each grabbed a leg of J.W. as staff members tried to carry her to her room.  J.W. tried to bang her head against the wall.  Mr. Moss arrived to try to settle her by speaking to her.  Mr. Moss told Ms. Gilmore to give her swats  and after they were given, she settled down and went to school.  Ms. Abbott noted bruising of J.W., but it was not known if the bruises were from swats or from the struggle with staff members.   J.W. was swatted again on August 8, 2001, by Ms. Gilmore.  A photograph was taken of a half moon bruise on J.W.'s buttocks.  J.W. denies there was bruising (W-168 L.S.).  J.W. reported that Becky Gilmore had swatted her, but that she did not feel abused.  She believed that she was swatted because Heartland staff loved her and because she had disobeyed (W-168 L.S -p.54).  Ms. Lunstead and Ms. Gilmore were again involved in disciplining J.W. on September 21, 2001, by administering three swats initially and two additional swats when she threatened to kill herself.  At a "Powerhouse" group meeting. she tried to choke herself with a bobby-pin.  All of her possessions were removed from her room and placed in the hall.  J.W. was restrained when she refused to relinquish a bobby-pin and a pencil (W-168-L.S. pp. 47-49).

On September 21, 2001, J.W. shoved another student at breakfast. She said she wanted to kill herself and would not stop pounding her head. A total of ten swats were administered to J.W. over the two day period. Mr. Sharpe believes that "we really did not get the job done with this girl." She had been placed at Heartland by her mother. J.W. departed from Heartland of her free will before she graduated.

At the July 12, 2001 meeting at Heartland one of the issues discussed was the definition of reasonableness under Missouri law and whether swats were abusive if applied in a reasonable manner. James Harrison, a Division of Family Services' official from the State Office, stated that what is reasonable under Missouri law insofar as corporal punishment or discipline is concerned is unclear and there are probably as many definitions of "reasonable" as there are people. Mr. Sharpe announced at the meeting that the policy at Heartland was to administer no more than ten swats per day, but thereafter the policy would be changed to no more than five swats per day.

At this meeting, there was also a discussion about the definition of injury as it related to swats. At tape recording was made at the meeting. Mr. Harrison said it was not clear what constitutes an injury. He said, "[n]ow what is injury? Is it one bruise or massive bruising that is on both buttocks or is it a broken tail bone or some accidental injury to the kidney? I don't know. The thing about it is, to me, I think that it's not that easy to define." Mr. Waddle concurs that if the length of the swatting stroke did not exceed ten inches with no breaking of the wrist of the person administering swats, that there should be no bruising. That is the adopted policy and practice for swatting at Heartland.

No one at the July 12, 2001 meeting adopted the view that bruising itself is an indication of abuse. Mr. Waddle's view and what he thinks Mr. Harrison said is that a slight bruise is not always an indication of abuse. He is not sure if he asseverated at the meeting that anytime there is bruising there should be a hotline call. Mr. Waddle testified, however, if there is bruising caused by swatting, there should be a hotline call. Mr. Waddle agreed that Mr. Harrison made the above statements concerning "injury."

Mr. Waddle also agreed that it was reasonable for Mr. Sharpe and Heartland staff to rely on these statements. Yet, Mr. Waddle does not agree with everything Mr. Harrison said at the meeting. Mr. Waddle advises that Mr. Harrison did not have authority to speak for him at the meeting. Mr.

Harrison said that when bruising of children was being considered, reasonable discipline was difficult to determine.  Mr. Harrison and Mr. Waddle obviously do not share the same views concerning the action indicated for investigative agencies when bruising and injuries are involved. Mr. Waddle believes that where slight bruising is involved, a conclusion of abuse cannot always be made, but it must always be investigated.  He wants to know the dynamics of the person giving discipline, whether the punishment fits the "crime," what part of the body was involved, and, if buttocks are involved, what force is required to cause bruising.  Mr. Waddle wants to know the amount of force applied and the manner of the force, the nature of the implement used to apply force, and the purpose for carrying out discipline.  He believes that he has a high level of responsibility to know the developmental level of the child involved, and whether swatting is in the child's best interest. He believes that a child is placed at high risk when swatted by a wooden paddle.  He believes that when a person who is a mandatory reporter sees bruising, there is a requirement to make a hotline report.[15]  He refers to M. I. K., who had experiences from an orphanage.  Swatting, he opines, had caused her to have flashbacks.  Since the children at Heartland are a high-risk population, a high level of training is needed to provide for the children.  He believes that the intake evaluation of each child is extremely important to fashion a treatment plan.  Dr. Kliman agreed with this last conclusion at the July 12, 2001 meeting, and thereafter, an intake regimen was observed at Heartland.

Mr. Sharpe explained that swatting was part of Heartland's discipline regimen and that bruising would likely occur.  Specifically,  Mr. Sharpe recalls of the meeting:

> Q.   And do you recall making statements to Mr. Waddle, Mr. Harrison and the other representatives present of these various agencies about bruising at Heartland?
>
> A.   Yes.
>
> Q.   And what comments do you recall making in that regard?
>
> A.   I -- I said that where there was -- where swats would be administered, there would be times that there would be some bruising.
>
> Q.   And did you explain to them why?

---

[15]  This creates an irreconcilable conflict between Heartland and the Second Judicial Circuit Juvenile Office.

A.   Yes.   Some children or just people will bruise very, very easily.   Other people will hardly bruise.   It's their -- It's very difficult for some to bruise. You can -- You can do the exact same thing to two people.   One may be bruised and the other will show no bruising.

Q.   Now when you made these comments, did Mr. Harrison, Mr. Waddle or anyone present state any disagreement with that?

A.   No, they did not.

Q.   Did anyone in that meeting tell you that bruising in and of itself is an indication of child abuse?

A.   No, they did not.

Q.   Did anyone at that meeting tell you that anytime you or your staff saw a bruise, they were supposed to call the hotline?

A.   No.

After the July 12, 2001 meeting, Milton Fujita, M.D., psychiatrist, made monthly visits to Heartland to treat students.

Even today, Mr. Waddle does not make the connection between Heartland's religious belief and swats.   "I don't think I understand that their whole emphasis about swats and the reason for swats is solely related to their religious beliefs.   I'm not sure I could go that far."   He is aware that Heartland's program is Biblically based.   He thinks the explanation given in administering swats, i.e., that holding the paddle no more than eight to ten inches from the buttocks of the person being swatted and that the wrists of the person administering swats not "break" is fairly reasonable and seems like a good standard.   Mr. Waddle is not opposed to corporal punishment where the population of children are not dealing with emotional issues.   He believes that the number of swats is important, that the intent of the person administering swats was possibly relevant, and no more that five swats should be given.   Ultimately, his concern is what is reasonable under Missouri law.

It is apparent that when dealing with the vagaries of actual situations involving juveniles in different situations, "cookie-cutter" answers do not advance the debate on bruises, injuries and hotlines.   For example, Mr. Waddle's staff inflicted bruising and scratches on L.L. in her escape attempt from the Preferred Family Health Care Center after she was removed from Heartland.   This

will be later chronicled.  However, no hotline call was made to report her bruises and scratches.  Mr. Waddle stated that he was not aware that L.L. was bruised by his staff.  Before a hotline call would be necessary in that case, he believed that he would need more information.  If the bruises were caused by holding L.L. down, he did not think a hotline call should be made.  When reminded of his earlier conclusion that anytime there is a bruise, there should be an investigation, Mr. Waddle had difficulty reconciling his earlier position.  Further, while Mr. Waddle thinks that his office is excused from calling in a hotline report when his personnel takes a juvenile to a hospital after a restraint attempt, he condemned Heartland for not making such a report after Heartland took a child to the hospital after an attempted restraint procedure.[16]  In the brief period while the Heartland population was in Mr. Waddle's control after the mass removal, two juveniles were taken to the hospital for treatment.  A girl broke an ankle while trying to escape from the Preferred Family Health Care Center.  Hotline calls were made in neither of the cases.   It is obvious that Mr. Waddle adopts a double-standard when it comes to his Office, or he is unreasonable in his application of his interpretation of what is required by law when Heartland is the focus of criticism.

Mr. Waddle is highly critical of Ms. Abbot, specifically, and Heartland, in general, regarding its policies and procedures in regard to reporting of events at Heartland.  Every time there is an incident report, it is reviewed by Ms. Abbott.  Ms. Abbott's job description includes prompt investigation of incident reports.  She is to enhance the safety of children at Heartland.  Her investigation has four separate parts.  First, a complaint is received.  Complaint boxes are available throughout the Heartland Community.   Secondly, Ms. Abbott makes an inquiry and proceeds to make an investigation.  Thirdly, Ms. Abbott makes findings.  Finally, a report is issued with a copy sent to the parent or guardian.

There were twenty-four incident reports filed by Ms. Abbott between July 15, 2001 and October 30, 2001, which Mr. Waddle claims influenced his decision to seek mass removal of the

---

[16]  Concerning O.M., Mr. Sharpe believed that when O.M. was taken to the hospital for treatment for his ear, that the physician, if child abuse was suspected, should make the hotline call.  Mr. Sharpe agrees that once the child is returned to Heartland and more information is gathered to support child abuse, that a hotline call should be made (W-168 J.F. pp. 24-25).  Mr. Waddle was critical concerning Heartland staff who failed to call in a hotline report on O.M.

children from Heartland.[17]  He admits that she took photographs at appropriate times to record bruising after swatting.  He further agrees that at the July 12, 2001 meeting, when he and another staff person were present from the Second Judicial Circuit Juvenile Office, and high-ranking officials were present from the Missouri Division of Family Services, no one said that if there are bruises on children, there must be a hotline report.  There is no suggestion that Heartland officials were not entitled to rely upon the representations made at that meeting.

## VI.    SEPTEMBER 26, 2001 MEETING

Four pages of minutes are recorded by Deputy Juvenile Officer Melissa MaCauley from a meeting on September 26, 2001 (Pl. ex. 71).  Those present at the meeting were Mr. Waddle, Jeff Hall, Rickey Roberts, Ben Buening, Melissa McCauley, Ms. Ayers, all representing the Second and Forty-First Circuit Juvenile Offices; Donna Rohrbach and  Tim Carter from the Division of Family Services; Steve Porter representing Heartland; Carrie Abbott; and Mrs. Sharpe.  Slightly more than thirty days preceding the mass removal of the students from Heartland on October 30, 2001, these minutes stand in sharp contrast to any suggestion of acrimony of those attending.  Mr. Tim Carter, Out-of-Home Investigator for the Missouri Division of Family Services,  reported at the meeting that there had been no hotline reports received at "CRU" in Jefferson City since the July 12, 2001 meeting "which was unprecedented in the past five years."   Mr. Porter announced that Dr. Kliman recommended that the position of ombudsperson be increased to a full-time position.  Mr. Waddle presented an overview of the philosophy behind co-investigating reports of child abuse and neglect. Ms. Rohrbach announced that when a hotline report is received, the Division of Family Services

---

[17]The incident reports are prepared at Heartland by the ombudsperson when discipline is imposed.  These have limited relevance, because they were not considered by Mr. Waddle in making his decision to remove the children at Heartland.  These were reported as a result of swatting when photographs were taken.  The following are all incident reports from July 15, 2001 through October 30, 2001 which show bruising: 1) 0084 - 0090; 2) 2745 - 2746; 3) 0936 - 0938; 4) 0085 and 1998; 5) 1582 and 0350; 6) 2415-2416; 7) 2612 and 1227-1228; 8) 2719-2721; 9) 1337-1338; 10) 0251-0252; 11) 1347 and 2735; 12) 0077-0078 and 1985; 13) 2516-2517, 2006 and 0097; 14) 1129-1132 and 1134-1135; 15) 1290 and 1292-1297; 16) 0213-0214; 17) 2630-2632; 18) 2664-2667; 19) 1276, 2660 and 2827; 20) 1229-1231; 21) 1910-1913 and 0005, 1915-1917; 22) 2026-2027; 23) 1940-1945, 1951-1952 and 0043-0045; 24) 1956-1973, 0064 and 1975-1977 and 0067; and 25) 2458-2459 and 1063-1069 (W- ex. no. 168 S. B.)).

would attempt to contact the Heartland ombudsperson "to coordinate efforts rather than make a surprise visit." Ms. Abbott explained her job responsibilities, then expanded on procedures she followed upon request by Mr. Roberts. Mr. Waddle expressed his appreciation that Dr. Kliman thought the ombudsperson position should be from an outside independent agency. In response to a question by Mr. Waddle, Mrs. Sharpe reported that criminal background checks on staff were being conducted, that staff training has been implemented, that Dr. Kliman is conducting intake screenings, and that two children have been placed on psychotropic medication. Ms. Abbott reported that when children are photographed, she or a female nurse photograph girls and males photograph boys. Those photographs, she reported, are dated and attached to the student's file.[18] Mr. Waddle then asked Ms. Abbott about the interaction between children and the five criminally-charged defendants. She reported no inappropriate action, and Mr. Porter stated that all were removed from disciplining children. Mr. Porter praised the work of Dr. Kliman and said he hoped the relationship between Dr. Kliman and Heartland would accomplish the mutual goals of Heartland, the Division of Family Services, and the juvenile courts.

Mr. Waddle stated that if the ombudsperson calls the hotline, the Division of Family Services and the Juvenile Office would coordinate with her. If a child reveals something to someone outside Heartland and the information is forwarded to the hotline, Mr. Waddle did not want Heartland put on notice because of the perception that someone at Heartland might be talking to the kids prior to the investigation. He also objected to interviews being conducted with lawyers present and the taping of interviews. He said, however, if there is mutual trust, he had no objection to a Heartland staff member being present in the interview as support for the child. Mr. Waddle announced that the standard juvenile office policy for questioning was to take the victim to a neutral environment such as the Juvenile Office, a Division of Family Services' office, or a sheriff's office "to reduce the risk of the child not being comfortable talking about an incident while still being in the environment where the incident occurred," with the exception of a small child who would be traumatized by removal. In that case, a room on campus would be sought. Mr. Waddle said he had no objection to notifying

---

[18] Mr. Waddle believes that, in fact, this is inaccurate, even though this report is prepared by Ms. McCauley of his office. When asked if it does not show that Ms. Abbott was documenting bruises, Mr. Waddle said, "[t]hat was not what I took from her comments[.]"

Heartland that a hotline had been received, but the details would not be revealed.  When Mr. Porter said that the perception of "leaning" goes both ways, Mr. Waddle offered, "so that a relationship of mutual trust can be developed, that interviews could feasibly be conducted in Kirksville at the Bruce Normile Juvenile Justice Center interview room, allowing Heartland staff or attorney's [*sic*] to view the interview."  In response, Mr. Porter said, "I think this is a huge step forward to develop trust between the agencies and Heartland . . . you astound me and surprisingly so."  Mr. Waddle suggested that the ombudsperson sit with the attorney during the first few interviews to develop a feel for the interview procedures.  Mr. Waddle said he would like some named staff members "over the next three to six months . . . [to] visit frequently with Carrie Abbott to see how things are going and to develop a mutual trust."   He offered any available resources and expertise from the Second Circuit to assist with Heartland's endeavors with children.

Mr. Waddle requested that procedures be put in place to deal with staff implementing discipline not in the handbook and to have the ombudsperson approve and document such implementation.  Mrs. Sharpe reported that this had already been accomplished with reports going to her.  When Mr. Waddle said he would like the report to be maintained by the ombudsperson, Mrs. Sharpe agreed.  Heartland staff, Division of Family Services' personnel and the court staff agreed to coordinate their efforts with the Heartland ombudsperson, with Heartland deferring how involved the ombudsperson would be in the disciplinary issue until a later time and with Mr. Waddle suggesting that Dr. Kliman be consulted about that issue.  The following co-investigation procedures were agreed to:

> • If a hotline called by the ombudsman, efforts would be coordinated with the ombudsman.

> • If hotline called by outside Heartland, the ombudsman would be contacted and advised there had been a hotline but no details would be released.  The Ombudsman would facilitate contacting the victims and witnesses for interviews.

> • If necessary to remove a child from Heartland, the juvenile officer would remove child and conduct interview at Bruce Normile Juvenile Justice Center, with Heartland attorney or designee witnessing interview in observation room.

In this memorandum of minutes of the September 26, 2001 meeting, there is no reservation of conditions that any sheriff's department be involved in any interrogation of any juvenile. Nothing could be clearer than that a policy had been established between Heartland and the Second Judicial Circuit Juvenile Office that all interrogations of juveniles from Heartland after September 26, 2001, would be conducted at the Bruce Normile Juvenile Justice Center in Kirksville, Missouri. Mr. Waddle characterized this meeting as being "powerfully positive" and believed it represented the "high-water mark" in relations between Heartland and the Second Judicial Circuit Juvenile Office.

Mr. Hall drafted a letter, which is undated, for Mr. Waddle's attention. It is a draft of Mr. Waddle's understanding of the September 26, 2001 meeting. Much is said by Mr. Waddle of training and professionalism, and the lack of both by Heartland officials. The letter concludes, "Kiss my ass, Jeff." This does not reflect either by Mr. Hall (Pl. ex. 70).

On October 2, 2001, Mr. Roberts signed and sent a letter to Mr. Porter referencing the September 26, 2001 meeting (Pl. ex. 105). In that letter he specifically states, "[a]s I stated at this meeting these procedures do not include law enforcement contacts with the Heartland Christian Academy and are limited to contacts between Heartland and Juvenile Officers and Missouri Division of Family Services." Later in this letter he notes, "[t]he Juvenile Office as a matter of law is the only the [*sic*] agency that can remove a child from the Heartland campus for the purpose of an investigation with the exception of law enforcement officers who have the power to remove a child for referral to the juvenile officer." Subsequently he reports, "[t]he Juvenile Officer will only remove a child from the Heartland Campus in the course of an investigation which is a co-investigation of serious allegations of abuse or neglect where criminal charges may result."

When Mr. Waddle made the agreement to interview all juveniles only at the Bruce Normile Juvenile Justice Center so witnesses could observe through a one-way window, he claims that he told Heartland that he could not speak for law enforcement and he believes that Mr. Porter, who was in attendance, "seemed" to understand. Mr. Waddle swears that he told those attending that the cooperative agreement, insofar as it pertained to interviewing juveniles in Kirksville at the Bruce Normile Juvenile Justice Center with witnesses looking through a one-way window, would not apply to law enforcement. There is no such limitation pertaining to the operative agreement as reduced to writing by Ms. McCauley. Mr. Melton believes that the language of the September 26, 2001

71

cooperative agreement makes the Lewis County Sheriff's Department bound by the agreement by the language, "[t]he juvenile Office, as a matter of law, is the only agency that can remove a child from the Heartland campus for the purpose of an investigation with the exception of law enforcement officers who have the power to remove a child for referral to the juvenile officer."

Ms. Ayers describes the September 26, 2001 meeting as very positive with all in attendance communicating well.  Mrs. Sharpe believed the September 26, 2001 meeting was the "high-water mark" between Heartland and the Juvenile Office.

The September 26, 2001 meeting contrasts with the previously hostile and contentious relationship between the Second Judicial Circuit Juvenile Office and Heartland.  At this meeting, there is no acrimonious behavior noted.  Mr. Waddle offers the resources of the "court" in Heartland's endeavors to help children.  In view of what objectively appears to be a very cooperative spirit of relations between Juvenile authorities and Heartland on September 26, 2001, a close examination of the circumstances affecting Heartland and the Second Judicial Circuit Juvenile Office and the Forty-First Judicial Circuit Juvenile Office after this date is very important in determining whether any rational basis exists to justify the forced mass removal of children from Heartland by the Second Judicial Circuit Juvenile Office and the Forty-First Circuit Juvenile Office just 34 days later.

Mr. Waddle testified that what happened to change the relationship between the Second Judicial Circuit Juvenile Office and Heartland was that additional abuse and neglect reports came in. On October 21, 2001, J.B. and J.K. were "picked-up" in Knox County.  The Second Judicial Circuit Juvenile Office first became involved with these two juveniles after seeing reports that  they were "run-a-ways" from Quincy, Illinois, a city east of the Second Judicial Circuit.  They had both been at Heartland, and Mr. Waddle had some prior involvement with them, mostly with J.K.  Mr. Waddle recalled a conversation wherein he reminded Mr. Hall, in conducting interviews, to remember their "deal" with Heartland and to be sure that he or Ms. McCauley made contact with Ms. Abbott about the cases.   Both juveniles were taken into protective custody in the Bruce Normile Juvenile Justice Center.  Contact with Ms. Abbott was made at 11:00 a.m. on October 22, 2001.  She was advised that the boys would be interviewed at noon on that day.  Kirksville attorney, Ed Campbell, was contacted to appear for Heartland.  Mr. Waddle and Ms. McCauley also participated in the interview.

According to Mr. Waddle,  J.K. threatened to kill himself if forced to return to Heartland,

stating that Christianity was "shoved down his throat" and he did not believe that all the people at Heartland were Christians.  Mr. Waddle personally called-in a hotline report.  J.K. was not interrogated about religious practices at Heartland.  He stated that at Heartland, on a particular occasion, he had been outside the dormitory.  He returned and "things were out of control."  He had been in trouble with Carin Patchin for allegedly threatening to bring knives and guns to school to hurt staff members.  He believed that he was getting in trouble because  A.S. had actually made such statements and they were inappropriately ascribed to him.  He began hitting a mirror.  Nathan Mays, a Heartland staff member, said, "[i]f you are  going to destroy the house of God, you might as well destroy yourself, as well.  Punch it, punch it again."  He obliged by hitting it about twenty-one times until his hands were bleeding.  He was taken to the hospital for medical care.  Mr. Waddle  had a conversation with Mr. Campbell about placement of J.K.  Both agreed that J.K. needed evaluation by a mental health specialist.  In a later conversation between Mr. Waddle and Mr. Porter, an agreement was reached as to the identity of a health care provider.  Mr. Waddle conferred with Mr. Porter and both agreed that J.K. needed to be seen by a mental health professional.  Either Mr. Waddle or Ms. McCauley talked to J.K.'s mother.  She said that J.K. had greatly improved at Heartland and that he tended to exaggerate things.  She said that her son was bipolar, had been suicidal when placed in detention, and she wanted him returned to Heartland.  She said that J.K. had tried to hotline her, that J.K. is a danger to her family, and she was concerned about the safety of her one-year old child around J.K., because J.K. had been violent to her mother and older sister.  She had to hire a body-guard when she took J.K. to Heartland.  J.K. was taken into protective custody (W-163).

  J.B. had no other care provider.  He was released back to Heartland with Mr. Waddle's admonition that Ms. Abbott  have regular contact with him.  J.B. was concerned that no one would talk to him.  Mr. Waddle testified that J.B. is a little more mature, and if he gives his word, he will exert his best effort.  Mr. Waddle reported the J.K. matter to the Child Abuse and Neglect Hotline at 11:48 p.m. on October 23, 2001.

  From the interviews with J.K. and J.B., Mr. Waddle concluded that a juvenile named O.M. had also been abused at Heartland.  The incident arose over a persistent request by some of the boys that they wear orange, not green jump-suits when that attire was required.  They were told that swats

73

were going to be administered.  J.K. reported that O.M. had been slammed to the floor and as a result, his eardrum was "busted."  Other evidence suggests that while being physically controlled by Mr. Flood, O.M. grabbed Mr. Flood's necklace trying to choke him, and O.M. bit Mr. Flood.  When Mr. Flood attempted to remove his arm from O.M.'s teeth, his elbow came in contact with O.M.'s ear.  J.K. apparently did not witness the O.M. incident, but recounted what he heard.

On October 24, 2001, Mr. Waddle went to a conference at the Lake of the Ozarks.  While there, he received some telephone calls from Mr. Hall, the juvenile officer in charge in Mr. Waddle's absence, regarding J.K., O.M., and possibly J.B.  On October 25, 2001, Mr. Waddle received a second call from Mr. Hall who said he could not assure O.M.'s safety at Heartland.  Mr. Waddle recalls that O.M., A.C., and maybe L.T. and C.T. had been interviewed and maybe J. B. had been interviewed again.  Permission to interview the adults involved in the J.K. and O.M. matters had been denied by Heartland personnel.  Thereafter, "[t]he decision was made by the investigative team that Chief Deputy Power and this officer [Ben Buening] would transport C.T., L.T., J.B. and O.M. back to the Lewis County Sheriff's Office for the purpose of interviews while Chief Deputy Hall, and Mr. Englehardt would remain at the Heartland Lodge to interview A.C. and possibly two other staff members involved in these allegations" (references to juvenile names in the report are replaced by initials) (W-163).  There is no showing that anyone, including any juvenile officer attempted to adhere to the September 26, 2001 agreement that juveniles only be interviewed off-campus at the Bruce Normile Juvenile Justice Center.  Instead of interviewing the juveniles first to determine if there should be a co-investigative team formed to determine if criminal charges should be filed, the Second Judicial Circuit Juvenile Office personnel agreed that Chief Deputy Power would lead a newly created team to conduct the interviews.  Chief Deputy Power said he did not want attorneys representing a defendant observing the interviews.  None of the interviewed  juveniles had witnessed the O.M. incident, and could report only what they had heard, except there was an account of one or more of the boys reportedly having seen O.M.'s red ear.

Through long distance conversations with the police officers who interviewed the juveniles, Mr. Waddle had learned that O.M. had gotten into trouble and was taken to another room for swats.  O.M. resisted as Mr. Flood was restraining him, and bit Mr. Flood on his arm.  Mr. Flood's elbow struck O.M. in the ear, rupturing his eardrum.  Mr. Waddle believes that Mr. Flood raised his arm and

crushed it into O.M.'s head.  O.M.'s ear was reportedly red after the incident.  He was taken to another staff member named Jerry Parrish, who apparently held himself out as having some medical training.  Mr. Parrish pronounced O.M. well and sent him back to the dormitory.   This incident occurred on October 17, 2001.

The means and manner of the investigation headed by Deputy Power were inconsistent with all of the protections that had been formulated at the July 12 and September 26 meetings.  In effect, the agreement that Heartland representatives believed had been put in place to satisfy their concerns and protect children at Heartland was of no effect in Lewis County, if the Lewis County Sheriff decided to conduct a criminal investigation.  There is no suggestion that anyone at the Second Judicial Circuit Juvenile Office spoke a word to suggest that the interviews should be conducted at Kirksville, but instead, Mr. Hall embraced Chief Deputy Power's initiative to take the juveniles to the Lewis County Sheriff's Office, without anyone from Heartland being allowed to observe the interrogations.

Mr. Hall offered his testimony in detail, about the O.M. investigation.  Mr. Hall had been a deputy juvenile officer since December 1994, before becoming the Chief Deputy Juvenile Officer of the Second Judicial Circuit Juvenile Office two years ago.  He supervises deputy juvenile officers assigned to Adair, Knox, and Lewis counties.  He testified that where child abuse and neglect allegations were serious enough to be considered for criminal prosecution, the Juvenile Office, the applicable sheriff's office, and the Division of Family Services, jointly conduct investigations.   This is done, in part, to save time and protect evidence.  If a child was abused there was a desire to get the best information possible.  If false allegations were lodged, the intent was to conclude a fair investigation for the advantage of the child witness or victim and to reduce the number of interviews.

Mr. Hall confirms that on October 21, 2001, a Sunday, J.B. and J.K., run-a-ways from Heartland, were picked-up in Knox County by the Sheriff's officials.  They were turned over to the Second Judicial Circuit Juvenile Office for questioning.   The next day, Mr. Waddle and Ms. McCauley conducted the interviews following the protocol of the cooperative agreement of the September 26, 2001 meeting.  After the interviews, Mr. Hall received information concerning O.M. from Mr. Waddle.  He was instructed to contact Mr. Englehardt of the Out-of-Home Investigative Unit of the Division of Family Services and Rob Power, Lewis County Deputy Sheriff.  Mr. Waddle was leaving for the Lake of the Ozarks on October 24, and he asked Mr. Hall to conduct some

interviews concerning O.M., a Heartland juvenile who reportedly had received an injury to his eardrum.  Mr. Hall was reminded of the protocol to be observed as set forth in the cooperative agreement.  He was instructed to contact Ms. Abbott and tell her to bring the juveniles to the Heartland Lodge so that the children could be taken to Kirksville for questioning, and to remind her if Heartland wanted an attorney present she should make those arrangements.

Mr. Hall initiated the investigation on October 24, 2001.  He intended to conduct interviews of J.B., C.T., L.T., and O.M.  The Sheriff's Log reveals that at 8:20 a.m., Mr. Buening talked to Sheriff Parrish.  At 9:27 a.m., Mr. Hall talked to Sheriff Parrish (Pl. ex. 5).  Mr. Hall testified that he did not know if he was there personally, or was connected by telephone, but he knows he called to talk about O.M.  The Sheriff's Log shows that at 10:48 a.m. Mr. Hall and Mr. Buening talked to Sheriff Parrish at the Sheriff's Office.  They met there to talk about the O.M. investigation.  Chief Deputy Powers was assigned by Sheriff Parrish to the investigation.  Mr. Hall admits that he was at the Sheriff's Office to enlist Sheriff Parrish in the co-investigation.  Mr. Hall also met with Mr. Englehardt on October 24, 2001.  It was agreed that L.T., C.T., O.M., J.W., and A.C. would be interviewed (W-163 H).

Mr. Hall does not know if he told Sheriff Parrish to observe the protocol of the cooperative agreement.  He does recall that Deputy Powers told him on October 24, 2001, that it was a criminal investigation and he would be taking the children to the Lewis County Sheriff's Office for questioning.  Deputy Powers said that he was not bound by the agreement and there would be no attorneys looking through a window during questioning.  Mr. Hall told him it "was his discretion." No one from Heartland was advised of this plan.  Ms. Abbott was to be told that the investigative team was on its way to Heartland once they were underway on October 25, 2001.  During the twenty-four hours before the trip to remove the children, although the identity of the children were known, none of the parents were told that their children would be interrogated the next day.  Mr. Hall told Mr. Waddle that the agreed interviewing protocol was not going to be observed.  Mr. Waddle said that law enforcement was not bound by the agreement, and the interviews should go forward as planned.

On October 24, 2001, when Sheriff Parrish had received some information about O.M. and J.K., he knew about some of the details of an agreement between Heartland and juvenile authorities

76

regarding interviewing of juveniles at the Bruce Normile Juvenile Justice Center in a fashion so Heartland personnel could monitor the interviews through a one-way window. Mr. Hall believes he may have talked to the Sheriff on that date to determine how he felt about the agreement that had been made concerning interviews. Sheriff Parrish advised Mr. Hall that he would be opposed if a lawyer paid by Heartland would be present observing through a one-way window. Nothing could be clearer, that if the Second Judicial Circuit Juvenile Office allowed or encouraged Sheriff Parrish or any Sheriff to interrogate juveniles, contrary to the cooperative agreement so tediously fashioned, it would be meaningless. The Second Judicial Circuit Juvenile Office totally abdicated its responsibility to the Lewis County Sheriff, to conduct interrogations of four children, knowing that the Sheriff had stated his opposition to interrogations where a Heartland-hired lawyer was observing through a glass. The Second Judicial Circuit Juvenile Officers knew how vital Heartland personnel viewed observance of the agreement. The Second Judicial Court Juvenile Officer abdicated its responsibility to interview the children, and chose instead to allow the Lewis County Sheriff to decide where the interviews would be conducted and the nature of the ground rules for the interrogations. There is no doubt that Mr. Hall knew of the obligation of the Second Judicial Circuit Juvenile Office to observe the recently adopted cooperative agreement between the Second Judicial Circuit Juvenile Office and Heartland. Instead of observing that agreement, he asked Sheriff Parrish to get involved in the investigation. Sheriff Parrish would not agree to allow a Heartland-hired attorney be present at a juvenile interview. Sheriff Parrish was opposed to anyone representing the juvenile being present during questioning. On October 24th, Deputy Powers said this was a criminal investigation and he would take the juveniles to the Lewis County Sheriff's Office for the interviews. He said that since it was a criminal investigation, he had no agreement with Heartland requiring him to allow anyone look through a window during the interview of a juvenile. Mr. Hall told him it was his decision.

Any professed surprise by anyone at the Second Judicial Circuit Juvenile Office, including Mr. Waddle, that Mr. Melton expressed the view that the cooperative agreement was in shreds after October 25, 2001, is pretensive and unbelievable. Whether a preexisting plan existed to work through law enforcement to avoid compliance with the carefully drafted cooperative agreement and to deprive the juveniles and Heartland of the presence of counsel for the juveniles or of the presence of the childrens' parents during law enforcement interrogation, or whether the Juvenile Office

knowingly and willingly abdicated their responsibility to the juveniles and their parents, is a distinction without a difference because the result is the same.  The Second Judicial Circuit Juvenile Office personnel, Sheriff Parrish and his deputies knew of the cooperative agreement, and knew how significant full compliance thereof was to Heartland.  Nevertheless, officials of the Lewis County Sheriff's Office and officials of the Second Judicial Circuit Juvenile Office agreed together, understandingly, knowingly, wilfully, and intentionally to interrogate juveniles from Heartland in direct contravention of that agreement.  It is beyond any doubt that the Second Judicial Circuit Juvenile Office personnel and Sheriff Parrish's Deputy discussed whether the juveniles would be interviewed at the Bruce Normile Juvenile Justice Center  where counsel for the children could be present according to the cooperative agreement, and it was agreed, instead, that the questioning would be conducted at the Lewis County Sheriff's Office.  Officials from the Second Judicial Circuit Juvenile Office and personnel from Sheriff Parrish's Office knew that Heartland personnel were inextricably opposed to children being taken from Heartland without Heartland personnel being notified in advance and, more significantly, of Heartland personnel being present for the interviews. It had been previously known by Heartland personnel and confessed by the Second Judicial Circuit Juvenile Office staff and by Sheriff Parrish that the children had been questioned about the religious practices at Heartland, about their personal histories, including their medical, psychological and social antecedents, and about suspicions that there might be cult activities at Heartland. The children were asked about disciplinary practices at Heartland and the children had been misinformed about  Mr. Sharpe's criminal record.  The children were asked about many subjects that had no relevance to the issues of the particular *de jure* investigation.  Such interrogations were entirely consistent with gathering data to close Heartland, and inconsistent with operating within the framework of a cooperative agreement to care for children.

On October 25, 2001, the investigative team arrived at Heartland at approximately 12:23 p.m. Ms. Abbott was told that the investigative team was on its way either as the team left the sheriff's office or on the way to Heartland.  When they arrived, she was told the identity of the juveniles to be delivered to them.  She began to make arrangements to get the boys requested.  Mrs. Sharpe appeared. Deputy Powers advised her of the nature of the investigation and told her he "was  going to remove the children off of Heartland and take them back to a neutral setting, either at the Juvenile

Office or the Sheriff's Department." He told her that he was aware of an agreement between the Juvenile Office and Heartland regarding questioning, but since it was a criminal investigation, he was making the decision and he was taking them to the "office." Mr. Hall also told Mrs. Sharpe that the agreement was between the Juvenile Office and Heartland, and since it was a criminal investigation, law enforcement was making the decision to remove the children from Heartland. Deputy Powers took protective custody of O.M., C.T., L.T., and J.B. They were all in school at the time. Ms. Abbott was compliant with Deputy Power's demand that the boys be turned over to him. Parents were not notified before the interrogations.

Mrs. Sharpe recalls that on October 25, 2001, about lunch time, she had received a call from Carrie Abbott, just before officials arrived, advising her that officials were coming to interview O.M., J.B., L.T., C.T., and A.C. She expressed to Mr. Hall and Deputy Powers that the interviews should be conducted under the September 26, 2001 cooperative agreement. Deputy Powers gave her no option but to turn the boys over. He said that Ms. Abbott or attorneys could go to the Sheriff's Office, but they could not be present for the interviews. He said she could do whatever she wanted, but he was taking the children and no one could attend the interviews. Mr. Hall was present for the discussion and made no objection nor suggest that the cooperative agreement should be enforced. Deputy Powers and Mr. Buening took four of the boys, leaving A.C.

After the questioning of the juveniles at the sheriff's office, Mr. Hall learned the history of the O.M. matter. O.M. had gotten into trouble at the Boys' Dormitory for "horseplay." The version of what occurred varies. Mr. Hall believed that staff members said that all of the boys involved would get swats. O.M. was resistant. Two staff members "dragged" him to the office explaining that he would get swats. Mr. Flood had his arm on O.M.'s head. O.M. told him to remove his arm. O.M. then bit Mr. Flood and Mr. Flood "slammed" his arm into O.M.'s head. It is undisputed that O.M.'s eardrum was ruptured. Mr. Hall later became aware that Mr. Flood had apologized, saying that his action was a reflex motion after getting bitten by O.M. Mr. Hall professes that he had no notice that charges were going to be filed against Mr. Flood on October 30, 2001, the day of the mass removal. He has no knowledge that there was any effort to determine Mr. Flood's legal status or his relationship with the children before the children were removed.

The interrogations of C.T., L.T., J.B., and O.M. did not terminate until 6:00 p.m. on October

25, 2001.  The children were again asked about other concerns and complaints against Heartland, their personal histories, and why they were placed at Heartland.  It was concluded that O.M. and C.T. were victims and L.T. and J.B. were witnesses.  The investigative team wanted to interview Mr. Flood and other staff members.  Deputy Powers contacted Mr. Porter requesting an interview with Mr. Flood (W-163).  Mr. Porter explained that he needed to speak with others before agreeing to staff interviews.  Deputy Powers said that if he was not allowed to interview staff members, he wanted Flood removed.  Mr. Melton called back at 9:00 p.m. saying he needed to confer with someone who was out of town.  Deputy Powers said he would not release the boys until he heard that Mr. Flood was removed.  The boys' release depended on Mr. Melton's compliance with Deputy Powers' demand.  The Second Judicial Circuit Juvenile Office had reported that it wanted no contact between Mr. Flood and any of the children.  Deputy Powers reported back to Sheriff Parrish what he had learned about Mr. Flood.  Mr. Hall decided sometime late in the evening of October 25, 2001, to place O.M. in protective custody and return the other three boys to Heartland.  This would apparently be protective custody of the Juvenile Office, because Chief Deputy Powers had already taken protective custody of the boys at Heartland earlier in the day.  All of the boys had been detained away from their school responsibilities since shortly after noon.  O.M. was kept in protective custody until October 29, 2001, when the petition in his case was withdrawn.  There was no hearing in his case.  He was returned to his mother who, in turn, returned him to Heartland.  Mr. Englehardt continued his investigation of the O. M. matter past the mass removal into November, 2001.

By now it is clear that a pattern has developed.  When Heartland staff members are submitted or submit themselves for interviews, their statements are taken, they are charged with crimes and are arrested.  If they rely upon their constitutional rights to remain silent, Mr. Waddle demands that they be removed from the care of children.  Either way, upon an incident involving an injury to a child, or upon the discovery of circumstances Sheriff Parrish or Mr. Waddle decide are injurious to children, Heartland staff are involuntarily taken out of service.  Staff members cannot be immediately replaced.  This practice, based on suspicion, has been destructive to the continuity of care of the children and threatens the existence of the Heartland program.

After O.M. was taken into protective custody, Mr. Waddle arranged for O.M.'s siblings to visit him on October 27, 2001, at the Bruce Normile Juvenile Justice Center.  On October 27, 2001,

Mrs. Sharpe was taking O.M.'s siblings to see O.M. when she unintentionally encountered Mr. Waddle, who asked her if there was to be a meeting on October 29, 2001, between him and Mr. Melton.  According to Mr. Waddle, she told him that Mr. Melton needed to speak to Mr. Sharpe, who was out of town, to determine if there would be a meeting.

Mr. Waddle testified that he did no other work at the Bruce Normile Juvenile Justice Center on that date and does not recall, but believes that he did no work there on October 28.  However, Plaintiff's exhibit 109 is a monthly expense account of Mr. Waddle submitted in January, 2002.  There is a notation, "10-27 through 11-16, all Heartland child abuse/neglect investigation/ *removal* and federal court."  (Emphasis added).  Mr. Waddle charged to the State lunch and dinner for Heartland work on October 27, 2001.  He did the same thing on October 28, 2001.  He admitted, upon seeing the exhibit, that "I'm sure I was doing work-related if I claimed expense on those dates."

He met with O.M. and O.M.'s mother on October 29, 2001, in court where he dismissed the petition filed <u>In the Interest of O.M.</u>, thereby allowing O.M. to be in his mother's custody.  Mr. Waddle was not aware that his mother was taking O.M. directly back to Heartland.

On October 26, 2001, Mr. Waddle was in telephone contact with Mr. Melton.  Mr. Waddle was concerned that Mr. Flood be removed from child care responsibilities at Heartland.  Mr. Melton said that, in his opinion, because of the interrogation of juveniles outside the terms of the cooperative agreement, the cooperative agreement had been "torn to shreds."  Mr. Waddle assumed that meant there was no longer an agreement in force.  He believed that since there was no longer any agreement as to assurances previously made by Heartland officials, there was no agreement concerning the ombudsperson and the five criminally-charged defendants could return to care of children.   He says that when he proceeded with the mass removal on October 30, 2001, he did not know that Mr. Flood had been charged with criminal assault.  He did ask Mr. Melton on October 26, 2001, that Mr. Flood be removed from child care responsibilities and that he have no contact with children.  That request was, in fact, granted.

On October 29, 2001, Mr. Waddle claims that he told Ms. Jacobs-Kenner and Ms. White, of the Division of Family Services, that Heartland would cooperate with the Division of Family Services in the interviewing of alleged adult perpetrators and in investigations of abuse,  but not with the Juvenile Office or law enforcement, and after inquiring of them if they wanted to proceed on that basis, they said "no."  He said they recommended to him that he should take protective custody of

all of the children at Heartland.

A conversation log was prepared by Mr. Waddle reflecting the communication initiated by Mr. Melton at 3:40 p.m. on October 26, 2001. Mr. Waddle advised that the Second Judicial Circuit Juvenile Office would not change its position that Mr. Flood have no contact with children at Heartland. Mr. Waddle rejected Mr. Melton's suggestion that O.M. be moved to another group home and allow Mr. Flood to remain in his current position. Mr. Waddle believed that would appear that the child, instead of the perpetrator, was being punished. Mr. Melton replied that the cooperative agreement had been "torn to shreds" because of the recent interrogation of juveniles in direct contradiction of the cooperation agreement. Mr. Waddle urged Mr. Melton not to "jump to conclusions" and that they should sit down and have a discussion. Mr. Waddle had concluded that Mr. Flood had used excessive force and his act was not an accident. He was relying on the report of Mr. Hall who, in Mr. Waddle's opinion, was trained and had experience in recognizing abuse, and on a conclusion of Chief Deputy Powers, and a conclusion of Mr. Englehardt of the Division of Family Services, that O.M. had been assaulted, causing the matter to rise to the level of a criminal investigation . Mr. Waddle expressed his view that he was concerned that Mr. Flood might injure another child. O.M. was in protective custody at the Bruce Normile Juvenile Justice Center. Mr. Waddle testified, that at the time, he was not aware that O.M. expressed the view that the incident with Mr. Flood was not Mr. Flood's fault, a fact Mr. Waddle learned later.

When he talked to Mr. Melton, Mr. Waddle testified that he did not believe the O.M. matter should undo the agreement with Heartland. He asked for a meeting with Mr. Melton on October 29, 2001, but Mr. Melton would not confirm that he would attend. Mr. Waddle wanted to arrange an interview with Mr. Flood. When asked, under oath, if Mr. Melton had stated that it would not be appropriate for him to compel a Heartland staff member to submit to an interview with a potential for criminal charges being filed, Mr. Waddle testified, that this was the "party-line" of Heartland and so Mr. Melton "probably" said that. At the time of the conversation with Mr. Melton, Mr. Waddle believed that Mr. Flood had used excessive force against O.M. and that he had caused physical harm to O.M. by rupturing his eardrum. The recognized Heartland proposal that staff members be interviewed by Division of Family Services' personnel without Juvenile Office staff members and the Sheriff's Office personnel being involved was unacceptable to Mr. Waddle. He believed that the Division of Family Services would not accept the assignment because of the potential for criminal

prosecutions.

A letter, dated October 26, 2001, by Mr. Hall to Mr. Melton, Mr. Sharpe, and Mr. Porter, followed the Waddle-Melton conversation on that date.  Mr. Hall restated that interviews with some Heartland staff members had been requested, but no response to the request had been made (Pl. ex. 74).  On October 26, Mr. Waddle confessed to "some thought" of mass removal of the children from Heartland, but he hoped there would be a meeting on Monday, October 29, 2001, to get a resolution of an understanding of each others' concerns.  Mr. Waddle was giving thought to a mass removal because he believed that Mr. Melton had already made up his mind, that he would not meet with Mr. Waddle, that he believed the agreement had been "torn to shreds," and that he did not have a very good demeanor of cooperation.  There is a possibility that he talked to Jeff  Hall about a mass removal on October 26, 2001, and it is possible that he talked to Cindy Ayers. Mr. Waddle testified that he did no work on the mass removal on either Saturday, October 27 or Sunday, October 28, 2001.  As noted, written documents prepared by Mr. Waddle reveal that he did work on the removal on October 27 and October 28, 2001.

The October 26, 2001 version of the facts by Mr. Waddle reflects that he recalls granting a request by Mr. Patchin for  O.M.'s sibling to see O.M. at the Bruce Normile Juvenile Justice Center. On Saturday, October 27, 2001, Mrs. Sharpe and Ms. Abbott accompanied the siblings to the Bruce Normile Juvenile Justice Center  for a visit with O.M.  around 10:00 a.m.  Mr. Waddle visited with Mrs. Sharpe at the visitation and encouraged her to request a meeting between Mr. Waddle and Mr. Melton.  She was vaguely  aware that a request had already been made.  He did not advise Mrs. Sharpe that he was thinking of a possibility of a mass removal.  Mr. Waddle categorically denies making any plans for the mass removal on either October 27 or 28, 2001.

Mr. Waddle testified that he recalled no other involvement with Heartland on October 29, 2001.  He then said there possibly might have been a conversation with David Melton late that morning.  He wanted Mr. Melton to agree to allow Heartland staff members to be interrogated by the Second Judicial Circuit Juvenile Office personnel and have Mr. Flood removed from contact with children.  He recalls it being a brief conversation, because Mr. Melton would not agree to his conditions.  He may have told Mr. Melton that Heartland staff would not be interviewed exclusively by the Division of Family Services.  Mr. Melton would not agree to a meeting on October 29, believing the cooperative agreement was in shreds.  Mr. Waddle testified that Mr. Melton was irate.

Mr. Waddle did recall Mr. Melton saying he would not agree to Heartland staff being interrogated by Second Judicial Circuit Juvenile Office personnel or personnel from the Lewis County Sheriff's Office. Mr. Waddle would not agree to Mr. Melton's proposal for the interviews to be conducted by the Division of Family Services. Mr. Waddle is not sure if he knew of the possibility of criminal charges being filed against the Heartland staff members to be interviewed. On October 29, 2001, Mr. Waddle said that he believed Mr. Melton would not agree to meet with him, that they had no agreement and there was no opportunity to work out their issues. In the conversation between Mr. Melton and Mr. Waddle on October 26, 2001, Mr. Melton relates that when Mr. Melton said he believed the cooperative agreement was "in shreds," he did not say that the maximum number of swats was being changed to ten; he did not say that swats would be administered without the concurrence of three staff members; he did not say that he ombudsperson position was being omitted; and he did not say that the five individuals charged in the Manure Pit Incident would be disciplining children. In a letter from Mr. Waddle sent on October 30, 2001 to Mr. Sharpe, Mr. Melton, and Mr. Porter, Mr. Waddle confirms the prior day's conversation between him and Mr. Melton, relating his perception of the opposition of Mr. Melton to remove Mr. Flood from child care responsibilities and Heartland's refusal to produce alleged perpetrators for interviews. It does not reference the cooperative agreement being "torn to shreds" (Pl. ex. 106). However, Mr. Waddle's notes of October 26, 2001, in his handwriting, show that Mr. Melton expressed the view in a telephone conversation of that date that the cooperative agreement was shredded and voided. Additionally, the motion he filed with the Juvenile Court to initiate the mass removal is silent on the subject of the cooperative agreement being "torn to shreds."

Mr. Waddle testified that he decided on October 29, 2001, to execute a mass removal of all children from Heartland. The Court concludes that this decision was, in fact, made no later than October 23, 2001, and that Mr. Waddle gave untruthful testimony when he said he did not decide until October 29, 2001, to remove the children. He said that he consulted with several people on that date, but not the Juvenile Court Judge. Irrespective of the date when he decided to remove the children from Heartland, Mr. Waddle made a unilateral decision for a mass removal without a conference with the Second Judicial Circuit Juvenile Judge. In a conversation with Division of Family Services' personnel, Mr. Waddle testified that he told them of Mr. Melton's request that the Division of Family Services' personnel interview Heartland staff members suspected of abuse. He asked Ms.

Jacobs-Kenner and Ms. White of the Division of Family Services if they would be making a recommendation to his office for removal of the children.  He said he told them that there was an impasse between him and Heartland officials.  In that regard, he said,  "[w]ell, I had formed an opinion that [Heartland staff] was untrained and not qualified and able to manage the level of behavioral problems and emotional problems and care these children needed and were entitled to." He believed that Heartland used objectionable disciplinary practices;  that Heartland staff used bad judgment in enforcing  its disciplinary practices;  that irrespective of claimed reforms at Heartland children there continued to get hurt;  that Heartland staff had been unsuccessful in managing risks to children; that he had no confidence in the ombudsman whom he concluded was ineffective;  that a convicted felon had offered inadequate medical treatment to a juvenile and offered counseling to another named B. L., and that Heartland staff used the inappropriate "clamp" method for restraint of juveniles. He believed two Heartland staff members "either directly caused serious physical injury to a child or participated in directing and allowing a juvenile to have serious injury to his hands that required emergent care, and that we both believed the nature of having those staff there with access to children continued to make all children at that facility at risk of harm."  He believed that Heartland would not produce the staff members for interrogation, that Heartland would not remove Mr. Flood from contact with children, that Heartland was unwilling to sit down and work out issues, that he was getting no cooperation with Heartland, and that Mr. Melton wanted the Division of Family Services to conduct the interviews with Heartland staff.  Mr. Waddle understood the Division of Family Services' view to be that they were required by law to seek police help under the existing circumstances. He testified that Ms. Jacobs-Kenner and Ms. White told him that "we should do it."[19]

_____

[19]There is other evidence which post dates October 30, 2001, that could not have been relied upon by Mr. Waddle in forming an opinion to remove all of the children from Heartland, but the Court will consider it only for the limited purpose in regards to whether further injunctive relief should be granted in this case.  This evidence will not be considered as to whether Mr. Waddle was influenced by it in deciding to remove the children from Heartland, but will be considered on the issues of the credibility of Heartland officials, and whether further injunctive relief is indicated. That includes evidence of a broken arm of D.A.; the neglect investigation of F. and B.; that F. did not get treatment for emotional problems and the separate Out-of-Home Investigative Report concerning J.O. in January 2002 (W- 139 pp. 1475 and 5089).  There have only been four juvenile office investigations at Heartland in the last twenty months since the mass removal.  Two were delinquency investigations involving juveniles stealing cars and running away

Mr. Waddle testified that he decided late in the day on October 29, 2001, to make an appointment with the Juvenile Court Judge on October 30, 2001, the very day one hundred and thirteen children were involuntarily removed from Heartland. He had not enlightened the Judge about Heartland issues before going to see him on October 30, 2001. He does not recall if he recommended removal of the children before Ms. Jacobs-Kenner and Ms. White recommended removal. He asked

---

and two were abuse and neglect investigations involving improper care and treatment. The abuse and neglect allegations concerned F. and B. This investigation was conducted by the Division of Family Services. One of the girls had been placed at Heartland after being sexually abused by her father. She believed Heartland was not sufficiently concerned about the abuse she received from her father and she ran away from Heartland. Mr. Waddle says there was no hot-line report filed concerning the abuse by the father, but he does not explain why such a report was indicated. That was abuse that bought the girl to Heartland. Mr. Waddle says, "[m]y concern in that respect is that there was no hotline call made by any of the staff at Heartland sexual abuse allegations that the young lady reports *sic* reporting to the Heartland staff." This is confusing! Surely there is no expectation that Heartland must filter through the hot-line reporting system the nature of every problem facing a child coming to Heartland. Considering the paucity of investigations during the last twenty months, this concern seems misplaced. The Juvenile Court placed the child in protective custody and arranged for care in a residential treatment center, because Mr. Waddle believed she was not getting proper care at Heartland.

Current objections to Heartland's operation by Mr. Waddle include his belief that staff members at Heartland receive inadequate training. He believes Heartland acts irresponsibly in taking children that cannot be managed at home, kids that have been sexually abused, those who have threatened suicide, and others who have other serious behavioral problems. Without trained staff, taking these children is reckless and irresponsible. He disagrees with Mr. Sharpe's conclusion that Heartland has the best trained staff in the World. He believes that Mr. Sharpe is acting irresponsibly if he does not know whether Heartland staff members or officials there are listed in the Division of Family Services Child Abuse Registry. Issues with front-line staff, according to Mr. Waddle include use of inappropriate restraint of juveniles, inadequate treatment of children with emotional problems, making inappropriate food restrictions, placing children in inappropriate clothing for punishment, inadequate staff training, and the inability to demonstrate that Heartland has been able to provide better for the children than they received before admission there. Mr. Waddle believes that his is the most important job in the World. He thinks that he represents the last line of defense in the care and protection of children. At the time of the mass removal Mr. Waddle relied on fourteen probable cause findings against staff members involving twenty children since 1996. He also relied on unsubstantiated reports, because he believes that gave him a better picture of the different disciplinary practices at Heartland. When considering current concerns of Mr. Waddle pertaining to Heartland, he is relying on Out-of-Home Investigative Reports compiled since October 30, 2001. In addition, he believes that there have been twenty-nine incident reports filed by the ombudsperson since that date with nine of those being substantiated.

Ms. Jacobs-Kenner and Ms. White to investigate available resources for a safe removal. He told them that he would be seeking a removal order, that he had bed space for thirty-two children at the Bruce Normile Juvenile Justice Center, excluding beds that were currently occupied; that he did not know the number of children to be removed, but he knew there were more than thirty-two; that he would check in the local area for bed spaces; and that the Preferred Family Health Care Center for substance abuse was available. He had the benefit of the seized information from the earlier search of Heartland records for estimating the number of children to be accommodated. He believed that the number of children removed would be at least as many as listed in those records, and perhaps more. Mr. Waddle testified he also had a conversation with Ms. Ayers, "bringing her up to speed" on the incidents that recently occurred, on the impasse with Heartland, on Heartland's refusal to permit interviews of Heartland staff members, on Heartland's refusal to remove Mr. Flood from contact with children at Heartland, and on Heartland's refusal to schedule a meeting. He told her of the relief he intended to seek and asked her if she would seek the same relief as Chief Juvenile Officer for the Forty-First Judicial Circuit. He testified that they "brain-stormed resources," and he asked her about the children in her jurisdiction. Ms. Ayers reported to him that she had made no immediate commitment to seek judicial relief for a mass removal. He was not sure if she was agreeable to seek a removal of children by the end of the day on October 29. He thinks she said to let her know if there were other plans. She expressed concern over availability of adequate resources.

Ms. Ayers called Mr. Waddle at some point and confirmed that she would seek relief for a mass removal of children in Shelby County. Mr. Waddle also was in contact with Andrew Grimm, Director of Program Residential Services throughout the day on October 29, 2001. Mr. Grimm reported to him that there were adequate resources at the Bruce Normile Juvenile Justice Center and the Preferred Family Health Care Center to meet the children's physical and emotional needs. In the event of need, Mr. Grimm concluded that a gymnasium could be available for cot placement for some children. He discussed potential physical and mental health needs of the children. He was told that there would be one doctor and three nurses present. Mr. Grimm reported that the easiest task would be providing food service for the children. Mr. Waddle admits that the seized records from Heartland, in addition to containing only names and addresses of parents, also had medical information on some of the children. Mr. Waddle asked his staff to go through those records to search for helpful data. Mr. Waddle asked Mr. Hall to investigate availability of transportation

through a local bus company. He and Mr. Hall "brain-stormed" about the removal. Mr. Waddle testified that he was "formulating all of these issues in his head," and that he did not go over the issues in depth with Mr. Hall and Mr. Grimm.

Mr. Waddle testified that it was his intention to turn the children over to their parents after they were removed from Heartland's control. When asked if there was a study of the parents' suitability to resume custody of their children, he said, "not much." He knew the overall characteristics of the population at Heartland. He claims no knowledge about histories of family abuse or sexual abuse of siblings, even though there was such information unlawfully contained in the probable cause statements in the prosecution file of the five criminally-charged defendants. Reminding Mr. Waddle of testimony that one juvenile had attempted sex with his sister, counsel asked if research had been done to determine if there would be a risk of returning such children to their families. Mr. Waddle responded, "I did not think that was necessary." He did not know of the potential threat of harm by children to the family. Before this mass removal, the most children Mr. Waddle had involuntarily removed was eight or nine.

Mr. Waddle had a conversation on October 29 with Ann Hutton and Mike Schwend of Preferred Family Health Care Center about availability of resources. On October 29th he had no contact with sheriffs or the Missouri State Highway Patrol about the planned removal. Back on October 26, 2001, Mr. Waddle said that he held out hope that Mr. Flood would have no contact with the children, that Heartland staff be interviewed in the O.M. matter, and that there would be another meeting to discuss issues. Mr. Waddle's final conversation with Mr. Melton occurred at 4:00 p.m. on October 29, 2001. Mr. Waddle was interrogated about that conversation and his decision-making process to remove all of the children from Heartland:

Q.   Have we talked about all your conversations on October 29th?

A.   As best I can recall, yes.

Q.   When you had the telephone conversation with Mr. Melton earlier in that day, did you tell him that you were thinking about a mass removal?

A.   I'm not sure if it was the 27th and the 29th both or -- or just the 29th, but at one or both of those telephone conversations I had with him, I told him that I believed that Heartland had gotten back to where I believed it was an injurious environment for the children in the program.

Q.   And that was based upon his refusal to meet your demands?

A.   No. It was based upon the actions of staff at Heartland inflicting serious physical injury to the students and their conduct and reckless care of students.

Q.   Well, you said on -- I think you've already testified that on October 26th, you certainly didn't regard the O.M. matter or the J.K. matter as a reason to undo all the things and all the positive progress that had occurred up to that point, is that correct?

A.   It was -- it was a combination of their abuse, but it also was a combination, an issue of Heartland's inability or unwillingness to manage those abusive staff, yes.

Q.   Again, all of that information, you had on October 26th, is that correct?

A.   On October 26th, I believe that I still had some working opportunity to resolve those issues in a way that would allow Heartland to manage those staff who were abusive, would get us back to the table to clarify any issues that any of the parties had, and it would keep us on track, and so I was trying to not act hastily at that point. I was trying to be as patient with them as I could to give them as much opportunity as I could and continue to convey to them, as sincerely as I could, that I wanted to get back to the table, I wanted to resolve these issues, I wanted their assistance to work together.

Q.   And, again, the things that you held out possibility for on the 26th is that Jason Flood would be removed from contact with children and that these staff members would be produced for interviews by law enforcement; that's what you held out hope for on the 26th, is that correct?

A.   That was part of it, yes.

Q.   What else was there that you hoped for on October 26th?

A.   For us to have a joint meeting and talk about all of these issues and understand each other and continue to work together.

Q.   Those three things. Anything else?

A.   Not that I can think of.

Q.   Have we exhausted your recollection about the things that occurred on October 29th?

A.   I think so.

89

Mr. Waddle demonstrated by executing the mass removal a total lack of faith in the judicial system he was sworn to uphold.  He had the authority to ask for a hearing in the Second Judicial Circuit Juvenile Court,  first giving notice to Heartland, parents or guardians, and legal counsel for all so that the due process rights of all could have been protected, as an alternative to removing the children on an *ex parte* basis.  At the Temporary Restraining Order Hearing, Mr. Waddle testified that, if he had followed that procedure, there would have been the opportunity for a request for a change of judge to be filed which would have caused delay.  He preferred to take upon himself the responsibility ordinarily entrusted to the courts.

If he would have given notice to Heartland, parents or guardians, and other interested persons to be heard before forcefully removing the children, he would have learned that at least one child threatened deadly force against family members and another was placed at Heartland because of having sex with a sibling.  He would have learned that a family had spent $50,000.00 in medical expenses to get a child's medicine identified and carefully administered.  That medicine was not taken to the Bruce Normile Juvenile Justice Center with the child and that child was without the medication, because of the mass removal.  Mr. Waddle has given sworn testimony that places him in a position that is impossible to reconcile.  He fails to demonstrate the necessity for mass removal of the children because of existence of immediate risk of physical or emotional harm.  His testimony concerning the reasons assigned for the mass removal of the children and his conclusion that he did not decide to mass remove them until October 29, 2001, is not believable.  If he believed that Mr. Flood posed a risk, he does not explain how that concern impacted the female population.  Mr. Flood was arrested on October 30, 2001, the same day as the mass removal, but Mr. Waddle disclaims any knowledge about that charge.  He does recognize that bond conditions could be put in place to restrict Mr. Flood's contact with children, and, in fact, on that very day, bond conditions prohibited his contact with children at Heartland. The resultant crudely executed loading of the children like criminals on buses, in a fashion reminiscent of horror of earlier World events, with only secondary juvenile office personnel on site, all of whom disclaimed any position of responsibility, demonstrate a lack of justification for the mass removal and a serious lack of planning for such a traumatic event.  If he did not plan the mass removal until October 29, 2001, he acted recklessly in undertaking such a complicated task without more advanced preparation.  If he did plan the mass removal around October 23, 2001, which the Court concludes that he did, then his assigned reasons for the mass

removal are contrived, fabricated, and Mr. Waddle has engaged in inexcusable behavior and given perjured testimony. It is undisputed that Heartland was not first given the opportunity to deliver custody of the children or that parents were given the option to take custody of their children before the forced mass removal. The evidence in this case clearly points to one conclusion. Mr. Waddle decided that he would mass remove the children in mass from Heartland and force the closure of Heartland in July, 2001. When other public officials intervened, and when there was a total lack of any abuse or neglect for an unprecedented few months, Mr. Waddle waited for another opportunity to execute his plan to close Heartland. He violated the terms of the cooperative agreement by allowing children to be interrogated in violation of that clear agreement. He erroneously seized upon what he believed was an opportunity to close Heartland. Giving his testimony full credit for the events of October 29, 2001, he made plans with many people for the mass removal of the children, without ever first consulting the Juvenile Court Judge.

Mr. Waddle testified that he "may have" asked Mr. Hall to draft pleadings on the 29th of October or he may have made the request on October 30. In any event, he believes that Mr. Hall made the original draft of the motions and petitions, and he, Mr. Waddle, and Mr. Roberts collaborated on the final drafts. There was a lot of paperwork to be prepared for submission to the Juvenile Court Judge. It seems very unlikely that all of that material could have been prepared in the morning of the day it was first presented to the Judge. The following recitation is made to reflect Mr. Waddle's testimony of events immediately preceding and during the mass removal.

The first thing he did on October 30, 2001, was review, with Mr. Roberts, "motions" that had already been prepared by Mr. Hall for emergency protective custody. He had prepared the motions based on information he had received in the search of records at Heartland on July 2, 2001. He denies knowing that these records were out of date and consequently unreliable when he used them to prepare his pleadings. It is clear that he misstated facts regarding O.M. and J.K. when he obtained ninety-two signed orders for removal of children from Heartland. Some of the orders pertained to children that were no longer at Heartland. Four of the children were eighteen years old, so Mr. Waddle had no jurisdiction over them. In a "few" cases he had procured orders for children stating that they resided in a particular county, when in fact, the children lived in counties other than the one stated on their motions.

The Court is also convinced from all of the evidence that "motions" with significant

preparation time were ready for presentation to the Juvenile Court Judge early on October 30, 2001, that complicated arrangements were in place to provide food, clothing, shelter, medical and mental health for the removed children to the Bruce Normile Juvenile Justice Center, Preferred Family Health Care Center and at other potential locations, and that all supporting staff were in place for the removal of the children from Heartland. The testimony of Mr. Waddle, Mr. Hall and Ms. Ayers is untruthful when they attest that the removal was not planned until October 29, 2001.

Additionally, an analysis of all of the evidence and circumstances occurring on October 29 and 30, 2001, taking Mr. Waddle's version of the facts as true, presents him with impossibly reconcilable credibility problems. On the morning of October 30, 2001, he had one hundred and thirteen petitions prepared for the Juvenile Judge's signature; had made arrangements to feed and house an unknown number of juveniles, but presumably as many as he had prepared petitions to be filed; had arranged for intake assessments for all the unknown number of juveniles; took an additional hour and one-half to prepare verified petitions after non-verified petitions were rejected by the Judge; had arranged for medical care for any juvenile requiring treatment; had arranged mental health services to any juvenile requiring treatment; had prepared a letter on the morning of October 30, 2001, advising parents of their responsibilities in caring for their children after they had been removed from Heartland threatening them with possible involvement with law enforcement if they returned their children to Heartland; arranged for buses to transport the juveniles; contacted law enforcement officials in Knox and Lewis Counties; conferred with Division of Family Services' personnel; conferred with Ms. Ayers to determine if she would be seeking mass removal of all of the Shelby County juveniles and sent her draft forms to use if she decided to seek juvenile court intervention; had at least two meetings with the Juvenile Court Judge for the Second Judicial Circuit; and spent time with his staff coordinating all of the mass removal details. There is nothing in his detailed list of reasons for taking the drastic course he followed that reasonably suggests such immediate removal was necessary. For one thing, he did not get a petition on file for the very student he claimed was in need of protection, i.e., O.M. He filed petitions seeking protective custody for eighteen year old children over whom he had no jurisdiction. He removed thirty-five children for whom he had no Court orders. If he decided on the evening of October 29, 2001, to remove the children the next day, he acted recklessly in not allowing enough time to plan for the removal. If he decided to remove the children on October 23, 2001, his reasons for removing the children are fabricated. Mr. Waddle is not being truthful with the Court in

testifying that he had not decided before October 29, 2001, to involuntarily remove the juveniles from Heartland.

Mr. Waddle swore he had no conversations with law enforcement personnel before he conferred with the Juvenile Court Judge. He told the Judge that the facts would be the same in all of the petitions. He presented a form of a male and a female order for the Judge's review. He admits knowing that students lived in different places with different care givers. He believed that the circumstances would be the same in each case because he had prior involvement with Heartland. Mr. Waddle confesses, however, that he had never been at the Heartland School to view its operation, he had never been to the Girls' Dormitory, he had never been to the Boys' Dormitory, and he had never been to any of the Group Homes. He acknowledges that he had only been on Heartland property to conduct investigations, but regards that as insignificant because he had gotten information from hotline reports. He had made no effort to determine which children were subject to harm, whether only boys were subject to harm, and clearly, there is no evidence that any of the girls were subject to harm at the time preceding the mass removal, yet they were also removed.

Mr. Waddle lists in the identical petitions filed in every case the reasons relied upon by him in removing the children. The reasons stated in the motions are based on Missouri Revised Statute § 211.031, and allege the children are in need of care and treatment because the environment and associations of the children are injurious to their welfare in that Heartland was not providing a safe and protective living environment. The motions raise various allegations regarding how Heartland was not providing a safe living environment. First, the motions allege that Heartland is not cooperating with the Division of Family Services, the Juvenile Office, and law enforcement in a current investigation of a child abuse/neglect hotline alleging staff caused intentional or reckless injury to a youth. Mr. Waddle describes this allegation as relating to not allowing employees to be interviewed and failing to manage employees so children are safe. It is also a reference of refusal to remove Mr. Flood from contact with children.

The second allegation relates to refusal of the facility to produce employees who abused youth or who are witnesses to the abuse of children. However, Mr. Melton had offered to have the employees interviewed by the Division of Family Services.

The third allegation is that Heartland is concealing an individual who struck a thirteen-year-old child in the ear with sufficient force to rupture his eardrum. This is the Flood/O.M. matter. There

is no proof Heartland ever concealed any person suspected of neglect.

The fourth allegation states that Heartland was concealing a male who gave verbal orders to a male to strike a mirror twenty times, resulting in physical injuries that were later treated at a hospital. This is the Nathan Mayes/J.K. matter. There is no evidence Heartland ever concealed Nathan Mayes.

The fifth allegation is that Heartland is concealing a parolee from the Missouri Department of Corrections who had his E.M.T. license cancelled who gave medical attention to a youth when the parolee is specifically prohibited from doing so and is precluded from having contact with children. This refers to the Jerry Parrish/O.M. matter. There is no evidence that Heartland was concealing Mr. Parrish or anyone. In addition, allegations concerning cancellation of his license were false.

The sixth allegation is that Heartland had a number of substantiated child abuse and neglect hotline reports and failed to take corrective action. This reference would necessarily be before July 12, 2001, since none were filed after that date and before the mass removal. The reports on O.M. and J.K. were not substantiated until after the mass removal, but Mr. Waddle believes that he had information from the Division of Family Services that those two reports would be substantiated. In fact, they were not substantiated until December, 2001. Mr. Waddle admits that none of the substantiated reports involved issues in any of the court orders. While alleging lack of corrective action, he acknowledges in Court that subjecting children to the manure pit had stopped and that as of July 12, 2001, he was satisfied with corrective action taken by Heartland. He believed Heartland failed to take corrective action by not removing two staff members from contact with children. He relied upon a report of substantiated abuse against Mr. Sharpe for swatting a female, S.D.[20] He

---

[20] A sister of S.D.'s mother prevailed upon Mr. Sharpe to interview S.D.'s mother, concerning the prospect of admitting S.D., a sixteen year old mother with a one year old baby, to the Heartland program. S.D.'s mother was afraid of S.D. because she had physically attacked her. She was a very violent girl. S.D.'s child did not come with her to Heartland. S.D. was between five feet five and five feet six inches tall and weighed between one hundred fifty and one hundred sixty pounds. A day or two after she arrived, Mr. Sharpe was called to assist staff members, Amy Wilson, Heather Clark, and Farah AbuSaada at the Girls' Dormitory, who were trying to prevent S.D. from getting out a door to leave Heartland. When he arrived, Mr. Sharpe began talking to S.D. She said she was leaving to be with her baby. Mr. Sharpe told her that she could not leave without her mother's permission. He told her that he had been in communication with her mother, and that if she "got her act together," her baby would be brought to Heartland. He

admits that there has never been an adjudication supporting this allegation, and does not recall Mr. Melton advising him on July 12, 2001, that Mr. Sharpe no longer disciplines juveniles.  Mr. Waddle admitted that he was unaware at the time of the hearing that the juvenile had departed from Heartland long before the October 30, 2001 mass removal, and that he had applied for and received an order from the Juvenile Judge removing her from Heartland.

In the seventh allegation, Mr. Waddle alleged abuse in a case called the J.O. matter, acknowledging that facts arising in the matter occurred in 2000.  The J.O. matter appears to be a situation where Mr. Waddle and Sheriff Parrish attempted to create an investigation report to be used against Heartland.  J.O.'s father brought the boy to the Boys' Dormitory seeking help from Heartland staff to get the child to admit the theft.  Mr. Melton investigated the J.O. matter.  J.O. was accused of stealing money from his father.  J.O. denied the theft.  He was taken to the Boys' Dormitory and given swats by his father to get him to admit the theft.  There was a discussion at the time as to whether J.O. should be in the Program because he was living with his parents in one of the residences owned by the Sharpe Land and Cattle Property.  At the time, criminal charges were filed against the father, not Heartland personnel, as a result of the J.O. matter.  J.O.'s father entered a plea of guilty to abusing his son.  He told Mr. Sharpe that his son did not receive nearly the punishment that was due to him for his behavior.

In the Summer of 2001, Sheriff Parrish initiated an investigation which concerned events involving the J.O. matter, after the Federal lawsuit was filed against him.  This case had earlier been investigated by the Division of Family Services, which concluded that the report of abuse was

---

told her if she did not settle down, she would get swats.  She was restrained and given five swats. After the swats, S.D. said, "[a]re you satisfied now?  I am still going to leave."  Mr. Sharpe talked to her for an additional five to ten minutes.  She persisted in her plan to leave.  He told her she would get more swats if she did not settle down.  She was restrained and given three or four more swats.  She then said she would obey.  Mr. Sharpe talked to her for another twenty minutes and had no further difficulty with her.  She made no complaints of injury nor of bruising.  Her baby was ultimately brought to Heartland.  There was never a reason thereafter to discipline S.D. In his motion presented to the Juvenile Court Judge on October 30, 2000, Mr. Waddle filed a sworn statement that the Division of Family Services made findings that  Mr. Sharpe hit a child -- a reference to S.D. -- thirty-five times (Pl. ex. 89).  Mr. Sharpe testified this is absolutely untrue. He testified that she only received eight swats.   S.D. was removed from Heartland by her mother for reasons unrelated to swats.

unsubstantiated.  He first received information about the case in April 2001, from some people referred to him by Mr. Nigus.  He did not discuss the investigation with anyone at Heartland.  He discussed the case with Mr. Waddle or Mr. Goodwin sometime during the Summer of 2001, advising them that he was looking into the matter.  On August 31, 2001, Sheriff Parrish received a facsimile message from Mr. Hall with the Juvenile Office/Division of Family Services Report (Pl. ex.163).  After receiving this report, Sheriff Parrish and Deputy Powers contacted the juvenile authorities, and went to Excellsior Springs, Missouri on September 5th to interview J.O.  Sheriff Parrish did not attempt to interview Heartland personnel or the Division of Family Services' investigator who earlier concluded the matter was unsubstantiated.  Part of the reason for not contacting anyone at Heartland was because things had gotten "ugly over the summer."  Sheriff Parrish, in his custom of giving honest testimony, said he was unhappy because two Federal lawsuits were filed over the summer and the media coverage was an issue.

        As a result of this investigation, on September 7, 2001, criminal charges were filed in the J.O. matter against three staff members. Even though these individuals had attorneys, were on bond, and admittedly were not flight risks, Sheriff Parrish made the decision not to permit them to self-surrender and to arrest them at Heartland.  Mr. Patchin was arrested in front of the children and in front of his family, handcuffed, and put into a police car.  Part of the reason for not allowing them to self-surrender was because of the filing of Federal lawsuits against him, because of media criticism that summer, and because Sheriff Parrish was being intimidated.  When asked why he was intimidated, Sheriff Parrish testified, "Charlie Sharpe is a man who has a lot of money, . . . , and everyone in at least Lewis County understands that you don't cross Charlie Sharpe, and I believed at the time, and even talked to our prosecutor at the time that there were going to be some repercussions from this and it was going to be a tough row to hoe for everybody."  When asked if it had gotten personal with him, Sheriff Parrish answered, "I had to check myself at the door, yes, sir."  The Prosecutor wanted to get the information about the J.O. case before the date of the preliminary hearing on the five Heartland employees charged in the Manure Pit Incident, which was scheduled September 11, 2001, in order to be prepared to make a decision as to whether to seek charges in the J.O. matter.  If charges were indicated, he would file them in the J.O. matter before September 11, 2001,  because if the State lost that preliminary hearing on other defendants, the Prosecutor did not want people to think he was retaliating. If the defendants were bound over, he did not want it to appear that he was

piling-on the cases.  Mr. Waddle testified that he "probably" talked to Sheriff Parrish about the J.O. matter before September 1, 2001.  There is no question that these charged individuals had retained counsel who represented them in the charges stemming from the Manure Pit Incident.  When asked if Sheriff Parrish ever told Mr. Waddle that he arrested the defendants at Heartland as opposed to allowing them to self-surrender because this Federal lawsuit had been filed, Mr. Waddle had no recall.  Likewise, he had no recall whether the Lewis County Prosecuting Attorney and Sheriff Parrish were considering filing charges in the J.O. Matter before September 7, 2001.

In his motion for mass removal, Mr. Waddle says he further relied on the ombudsperson's failure to report abuse allegations promptly.  Specifically, Mr. Waddle's reliance in this regard is the O.M. matter and the J.K. matter which he believes were not promptly reported.

On the morning of October 30, 2001, Mr. Waddle then took one of the petitions to the Adair County Courthouse to present it to the Juvenile Court Judge.  No one at Heartland had been forewarned that the petitions were going to be filed, because, according to Mr. Waddle, it was not in the best interests of the children at Heartland to give notice to Heartland.  When asked if he had considered proceeding by the issuance of summons rather than by the filing of petitions *ex parte,* he said that he had considered it, but he did not "give it weight or value or believe it was an appropriate avenue."  He said he did not want to leave the children in the risk of harm waiting for "a petition to get filed and trial settings and all those things that happen and be drug out for a year or two like this case has been."  Then he said, "I really can't say I gave thought to it."  He knew of the procedures, but thought the way he proceeded was best.  At the Temporary Restraining Order hearing he said he was aware of the right of litigants to file a motion for change of judge which causes delay.  At this trial when asked if he was concerned about the change of judge procedure, he said he was just concerned about children being injured.  When asked why he did not give notice to Heartland, Mr. Waddle testified that doing so would interfere with the safe and proper removal of the children.  He said Heartland was not entitled to notice under the rules and statutes, and because the Juvenile Court Judge agreed, no notice to Heartland was required.  Of course, if the Juvenile Court Judge had been accurately informed of all of the facts known by Mr. Waddle in an objective manner, it seems very unlikely that he would have been favored with that concurrence.  The Associated Press had a copy of the pleadings on October 30, 2001, because Jim Salter, a reporter, called Mr. Melton on October 30 and read the contents of the motion to him.

Additionally, Mr. Waddle said he believed that proceeding by first giving notice to Heartland would not be safe, because he had no trust or confidence that Heartland staff would cooperate. He confesses he gave no thought to calling anyone at Heartland requesting that someone there bring the children to the Bruce Normile Juvenile Justice Center instead of forcibly removing them, but, in any event, he would not want individuals who abused children bringing them to Kirksville. When reminded that as of September 26, 2001, Mr. Roberts represented that the relationship between Heartland and the Second Judicial Juvenile Office was strong, and on October 30, 2001, the children were removed, Mr. Waddle confirmed that he had testified earlier, regarding his conversation with Mr. Melton on October 26, 2001, that he told Mr. Melton, "[d]on't do anything rash. We've made all this progress. Let's not throw it away." When asked by counsel, "what changed?", he responded that additional children had been harmed, Heartland failed to remove staff, and on October 26 and 29, 2001, Mr. Melton said the agreement was in shreds and he would not agree to another meeting. Mr. Waddle testified that he still held out hope that there would be cooperation after the October 26, 2001 conversation with Mr. Melton, and he hoped, after talking to Mrs. Sharpe, that a meeting could be held on the following Monday, "and then all of that disappeared when Mr. Melton told me on the 29th, there would be no meeting, we had no cooperative agreement, and he did not want to cooperate and work things out." However, Mr. Waddle testified that on October 26, 2001, he was giving thought to the possibility of a mass removal of the children from Heartland because Mr. Melton's demeanor by his lack of cooperation on that date was not good. As he did in June, Mr. Waddle relies on what he perceives to be poor cooperation with Heartland as a justification to consider mass removal of the children from Heartland. The Court concludes this was a pretext for his actions against Heartland, that he had already decided to remove the children from Heartland on or before October 23, 2001, before talking to Mr. Melton on either October 26 or October 29, and that the statements by Mr. Melton, if they were spoken as Mr. Waddle claimed, in any event, in conjunction with the other issues upon which Mr. Waddle claimed to have relied, did not justify the mass removal. The Court finds this testimony contrived and untruthful. The Court believes that a decision was made by Mr. Waddle to remove all of the children from Heartland by at least October 23, 2001, in an attempt to close Heartland. Considering Ms. Ayers' memorandum to the Forty-First Judicial Circuit Juvenile Judge dated November 2, 2001, the fourth of the five troubling written documents, saying that "[o]n October 23, 2001, the 41st Judicial Circuit in cooperation with the 2nd

Judicial Circuit *met and agreed that the removal of children without parental custody from the Heartland Facility was indicated*";[21] the letter, prepared in advance of the mass removal by Mr. Hall, the fifth of five troubling writings, threatening parents that if they returned their children to Heartland it could result in "referral to other agencies including law enforcement for further review and action if any," drafted by Mr. Hall on October 26, 2001; Mr. Waddle's Memorandum to Ms. Ayers dated September 4, 2001, which said "if we can't get the meeting scheduled, then I am unable to ensure the safety of the children residing at Heartland  and might once again be in a position of needing to seek further court action to do so"; and Mr. Waddle' s testimony that as of October 26, 2001, he was considering mass removal of all of the children from Heartland, it is clear and the evidence is quite convincing that Mr. Waddle was moving towards removal of the children so they would not be returned to Heartland with the consequence that Heartland would be closed.  Furthermore, Sheriff Parrish testified that sometime in October at the Juvenile Law Day in Canton, Missouri, he, Mr. Waddle, Mr. Hall, and Mr. Roberts were having lunch at a restaurant named Primos.  While they were discussing the O.M. matter, "Mr. Roberts [] might have said that they  may have said that they may have to go and remove all of the kids."  This testimony is further evidence that the plan to remove the children from Heartland pre-dated October 29, 2001.  Mr. Waddle's testimony that Mr. Melton's statements were a bases for his actions is untruthful.

There was no emergency justifying the removal of the children on October 30, 2001.  When he applied for orders to remove the children, Mr. Waddle knew that the five criminally-charged defendants were not participating in the administration of discipline.  He knew that the J.O. matter arose in 2000, and had been unsubstantiated by the Division of Family Services.  No staff member had ever been adjudicated guilty of child abuse or neglect.  The three substantiated child abuse or neglect reports by the Division of Family Services in 2001, were known by him in the summer of

---

[21]  Mr. Waddle testified at one time that he did not recall the memorandum, but he would not rule out that the conversation occurred as it was not beyond the realm of possibility.  He later denied there was such a meeting, concluding that Ms. Ayers had made a mistake.  Ms. Ayers says that the October 23rd date was a mistake.  However, October 23, 2001, was the day after the J.B. and J.K. interviews.  The Court heard her testimony, and concludes that her explanation is unpersuasive that the date is not a mistake.  The Court concludes that by the date of October 23, 2001, an agreement had been reached between the Second Judicial Circuit Juvenile Office and the Forty-First Judicial Circuit Juvenile Office to execute a mass removal of children from Heartland.

2001.  He knew the Boys' Dormitory and Girls' Dormitory were separated by twelve miles.  There is no proof that the children were in eminent risk of harm.  If the allegations regarding Ms. Flood and Mr. Mayes were factual, according to Mr. Waddle's belief, these incidents were insufficient to justify removal of all of the children.

There was substantial questioning in cross-examination about what Mr. Waddle told the Juvenile Court Judge when he delivered his motion and forms of petition and orders to the Juvenile Judge, and what they discussed concerning the specific allegations in support of removal of the children.  In addition, there were questions as to what was contained in the proffered documents. Initially, Mr. Waddle said he told him of the efforts he had made to avoid removal of the children; of avenues he believed were available; of the meetings attended including the meetings on July 12 and September 26, 2001; of the cooperative agreement including the agreement to reduce the number of swats; of the  intake assessment to address specialized needs of children; of how an ombudsperson had been appointed; of how Heartland personnel were to be allowed to participate in the interviewing of children; of how, "in general," law enforcement personnel would not allow Heartland personnel to be present for interviews;  of how law enforcement had been involved; of how Heartland and the Second Judicial Circuit Juvenile Office were at an impasse; of the refusal of Heartland to allow interviews of staff members; and of how Heartland refused to remove Mr. Flood from contact with children at Heartland. When continually pressed on the issue of what Mr. Waddle specifically told the Juvenile Court Judge,  Mr. Waddle concluded, "[b]eyond what's in the motion for protective custody, I think specifically the issues we talked about was my response that I got from David Melton as to Heartland's willingness to resolve any of the issues and move forward in a cooperative manner." When asked if he told the judge anything byond those words, Mr. Waddle responded:

> A.   Yes. Like I told you earlier, that Mr. Melton stated there would not be a meeting to sit down and talk about these issues, that there would be no production of staff for interviews, that they would not remove the perpetrator of child abuse from child care responsibilities, and that his belief that we did not have a cooperative agreement or a working relationship.

> Q.   Anything else you told Judge Steele orally?

> A.   Not that I can recall.

When the Juvenile Judge asked Mr. Waddle about the care of the children, he said he would contact

support staff and would get buses.  Mr. Waddle does not believe that he told the Juvenile Judge that he planned to provide notice to discourage parents to return children to Heartland.  The Juvenile Judge wanted assurance that the removal be safely completed.  The morning of the mass removal on October 30, 2001, was the first time Mr. Waddle had talked to the Juvenile Court Judge about the mass removal.

Not only was the morning of October 30, 2001, the first time Mr. Waddle says that he approached the Juvenile Court Judge about the mass removal, but he also says it is the first time he ever suggested to him that this was being considered.  That testimony is practically the only testimony that is consistent with the Juvenile Court Judge's testimony.  Mr. Waddle said that he approached the Judge early because he wanted to know where the Judge would be later in the morning, because he wanted to present a motion for removal of the children from Heartland.  No other information was supplied to the Judge that he can recall in the first conversation.

The Judge does not believe that Mr. Waddle first appeared with any prepared documents.  When the petitions were presented, they were not verified.  Because of the seriousness of the matter and the number of young people involved, the Judge required that the petitions be verified, because he wanted reliable information.  Plaintiff's Exhibit no. 89 is an example of the order presented.  The Judge relied on Missouri Revised Statute § 211.031 as authority for granting the orders.  He is not sure if he was told that the children lived at different locations.  He knew there were dormitories, but does not recall that there were group homes.  He was not supplied with any information concerning care givers for any particular children or of any particular problems facing any particular child.  All the Juvenile Judge considered were the motions before him and Mr. Waddle's statement that there was an operating agreement and Heartland was not following the agreement.  He understood that Heartland had agreed to make staff members available for interviews and had not done so.[22]

Mr. Waddle did not tell the Juvenile Judge that Heartland would produce staff members for interviews by the Division of Family Services, or that the reason for not producing them for

---

[22]  That part of all of the motions concerning Heartland's failure to cooperate is stated in the following language:  Heartland Christian Academy is refusing to cooperate with the Missouri Division of Family Services, the Juvenile Office and local Law Enforcement personnel in a current child abuse/neglect hotline which alleges staff from said facility has caused intentional and/or reckless physical injury to a youth in said program."

interrogation by the Sheriff was because of pending criminal prosecutions and the staff members' rights under the Fifth Amendment to the United States Constitution.  The Judge was not told that felony charges were going to be filed against Heartland staff on the very day the Judge was issuing the orders for mass removal of the children.  He was not told that Mr. Waddle never asked for an interview with Mr. Flood, the alleged perpetrator in the O.M. matter.  The written record placed before the Juvenile Judge stated that the emergency medical technician at Heartland who offered medical attention to O.M. had his license revoked; however, the Judge was not told that this fact was inaccurate.   He was not told that Heartland had agreed to remove all of the criminally-charged defendants from discipline of the children and that the Juvenile Office had agreed to that arrangement. He does not recall being told by Mr. Waddle or anyone that a letter had been sent to parents in August 2001, advising them that the concerns of the Juvenile Office had been largely satisfied or that Mr. Waddle had sent an e-mail to all juvenile officers in the State of Missouri that he was comfortable with changes at Heartland and that his concerns had been alleviated, but he knows that there was an agreement at some point addressing these issues.  He does not recall being told by Mr. Waddle that Mr. Roberts had advised parents in a letter that as of October 2, 2001, that there were no hotline calls involving Heartland since July 12, 2001.  He was not told that as of October 4, 2001, Heartland was being commended for its conduct.  He is not sure if he was told before October 30, 2001, about the specifics of the agreement to take juveniles to Kirksville for questioning.  He was not told of Heartland's position that the Second Judicial Circuit Juvenile Office had torn the cooperative agreement to shreds by taking four juveniles to the sheriff's office in Lewis County for interviews, in contravention of the terms of the agreement which provided that they be taken to Kirksville where Heartland staff could observe the interviews through a one-way window, a provision agreed to by the Second Judicial Circuit Juvenile Office.  Not until the very day of his testimony was the Juvenile Judge made aware that the child, O.M., whose investigation served as one of the professed motivating factors for the mass removal, did not have his name submitted as a child in need of protection.  No petition for removal of O.M. was sought.  He was not told that the person alleged to be a perpetrator against O.M., Mr. Flood, had a bond condition imposed that he have no contact with juveniles.

The Juvenile Judge asked Mr. Waddle if there was an alternative to mass removal,  and Mr. Waddle said "no."  There was no discussion with Mr. Waddle about calling the parents to ask them to remove the children.  There was no discussion about calling Heartland to ask that the children be

brought to the Bruce Normile Juvenile Justice Center. The Judge recognizes that the orders recite that there is immediate risk of harm to the juveniles. He understood when he signed the orders that Heartland had no opportunity to be heard before the mass removal. Mr. Waddle never mentioned to him any belief that Heartland should receive advance notice of the mass removal. The Juvenile Court Judge was not informed of any of the corrective action taken by Heartland officials resulting from the July 12 and September 26, 2001 meetings.

Mr. Waddle presented the Judge with orders for removal of children from Heartland that were not in the Judge's jurisdiction. Between both circuits, orders were presented requiring removal of four eighteen-year-old children over whom the Judge had no jurisdiction. The Judge is now aware that the Second Judicial Circuit Juvenile Office personnel removed a substantial number of juveniles without any court orders. The Judge determined later that some of the allegations in the petitions were not true.

The Juvenile Judge has no recall of whether he saw Mr. Hall's August 26, 2001 letter (the letter Mr. Hall testified was really prepared on October 30, 2001 ( Pl. ex. 25). He was not aware that parents were advised in Mr. Hall's letter that if they returned their children to Heartland such action could result in the child being placed in protective custody for failure to provide a safe environment for the child or that there might be a referral to law enforcement for further action. Mr. Waddle relies on the court orders to justify his actions. If the Juvenile Court Judge issued the orders, then he believes he acted with authority to carry out his plan. However, the Court believes that he must be held accountable for his role in providing misleading, inaccurate and incomplete information upon which those orders were issued. The Juvenile Court, under the rules and law promulgated, is entitled to rely on truthful and accurate information. He did not get either from Mr. Waddle.

Mr. Waddle says he returned to his office on October 30, 2001, and advised Mr. Hall and Mr. Grimm to proceed to arrange for resources for the mass removal. He called representatives of the Division of Family Services and Ms. Ayers. He said that he told her that he was going to file motions for mass removal of the children from Heartland and that the Juvenile Judge was going to sign the orders. He also inquired into her plans, learned that she would file petitions, and advised her that he would send her a copy of his form of petition. She duplicated the incomplete and inaccurate information in her form petitions. Mr. Grimm arranged to have the juveniles then occupying the Bruce Normile Juvenile Justice Center removed to alternative locations. He contacted someone at

the Preferred Family Health Care Center.  It was at this time that Mr. Waddle  says he had Mr. Hall and Mr. Roberts finalize a letter to be given to parents when they arrived to collect their children. The Juvenile Judge then appeared at his office to sign the prepared orders.  Mr. Hall then contacted law enforcement about the mass removal and Mr. Waddle faxed a letter to Mr. Sharpe, Mr. Melton, and Mr. Porter, stating that he was confirming a conversation he had with Mr. Melton on October 29, 2001, who said that Heartland would not remove Jason Flood from child care responsibilities, and would not produce employees who were alleged suspects of abuse or witnesses of abuse to be interviewed by an investigative team.  He concluded, therefore, that Heartland did not create a safe environment of adequate protections for children enrolled there (Pl. ex. 106).  He is not sure that a copy of a motion and order were attached to the fax.  All of the verified motions were prepared and were ready for signature and the orders were ready to be signed by 2:30 p.m.  There is a 12:59 p.m. stamp on the facsimile transmission to Mr. Melton, Mr. Sharpe, and Mr. Porter.  At 1:00 p.m., the buses were ready to proceed to Heartland.  At 2:44 p.m. on October 30, 2001, a facsimile message was received in Mr. Waddle's office from Mr. Melton (Pl. ex.  91).  Mr. Waddle has no recollection if he saw it on that date.  It certainly presents a contrasting view of the conversation that occurred on October 29, 2001, between Mr. Melton and Mr. Waddle.  There is no suggestion that Mr. Melton suspected a mass removal was being planned, and, in fact, being executed, so it seems clear that Mr. Waddle did not send a copy of any petition with his faxed letter.     When asked for the identity of an individual or individuals for whom Mr. Waddle had received information that indicated any person was abused at Heartland just before the mass removal, Mr. Waddle testified that all of the children were at risk of personal harm, their environment and associations were injurious, and the law says it is not necessary to wait until a child is injured before taking action.  He maintained this position, even though he admits that J.K. and O.M. both lived in the Boys' Dormitory which was located twelve miles from the Girls' Dormitory and the Group Homes.  Other than J.K. and O.M., he had no information that any particular child had been recently abused.  He did not recall, but, as indicated, records show that  Mr. Waddle did not file a motion to remove O.M. on October 30, 2001.

Mr. Waddle did not attempt to contact any parent before making his decision to execute a mass removal on October 30, 2001.  According to his testimony, nothing any parent would have said would have influenced him in the removal of the children.  Contacting them, he believed, would not have brought about the relief that was needed.  He assumed the parents' role in determining what was

in the best interest of these children.  He knew children came from many backgrounds and were burdened with many complex behavioral, physical, emotional, and social problems.  Many had prior confrontational problems with police officers and other people in authority.  If parents had been notified, some would have explained imprisonment was the only alternative for their child outside of Heartland.  Some parents would have explained that vast sums of money had been expended for medical diagnoses resulting in a strict medication regimen that was necessary to sustain the child.  Other parents would explain that the Heartland placement had resulted in the only successful educational experience their child had ever known.  Other parents would have explained that outside Heartland, there was no alternative placement.  If Mr. Waddle had issued summons rather than seeking *ex parte* orders, all of these issues would be subject to being decided by a judge in a pre-removal hearing upon notice to parents and Heartland.  It is no defense to Mr. Waddle that he did not know that most parents immediately returned their children to Heartland, irrespective of his threats that if they did so they faced possible criminal prosecution, because if he had done what he regarded as not significant and not indicated, he would have learned the folly of his narrowly focused, single-minded, uninformed serious abuse of power in the mass removal of these children.  It is clear that his decision to remove the children from Heartland, was first conceived in late June or early July, 2001.  Thereafter, his intention remains apparent on September 4, 2001, when he told Ms. Ayers that he might again be forced to seek court action, merely because he was having what he perceived to be difficulty in scheduling a meeting, which in reality was suggested by Heartland.  Finally, he put his plan in place on by at least October 23, 2001.  It was irreversible, not subject to being changed by any force of reason.

On the morning of October 30, 2001, Ms Ayers approached the Forty-First Circuit Juvenile Judge with a number of form petitions that moved for the removal of Shelby County children from Heartland.  She reported that there had been discussions between Heartland officials and Mr. Waddle, and that discussions had broken down and she could not assure the safety of Shelby County children at Heartland who were not in the custody of their parents.  The Judge advised her that upon presentation, he would sign orders for protective custody of all such Shelby County children (D.A. Ex. no. 7).

The search for the truth can end with one who prizes its worth over all things, who holds fast to it because it has no place for compromise, because it is to be lifted high, to protect the innocent,

the weak, the downtrodden, the outcast, and because where it is, but cannot be found, justice is but a word without meaning , a deception to those who place their lives on its alter, but when it can be seen, it lifts the human spirit, honoring those who embrace it, and convicting those who trample on it as filthy rags.  The Forty-First Judicial Circuit Juvenile Judge embraces the truth, which is apparent from his words and confirmed by overwhelming evidence, which Mr. Waddle, Mr. Hall, and to a lesser extent, Ms. Ayers attempt to conceal.  When asked, "All right. Had you had any discussion with Ms. Ayers about the possibility of a mass removal at Heartland prior to that discussion on the morning of October 30th?" she responded,

> A      Yes.

> Q.     When had you previously had discussions of mass removals?

> A.     I couldn't -- I couldn't give you a specific date, but  there in the days -- in the days before October 30th, I -- she  advised me that -- that Mr. Waddle was apparently considering  some sort of a removal.

The discussion of a mass removal did not come as a surprise to the Juvenile Court Judge, because of his prior discussions with Ms. Ayers. He knew that there had been ongoing discussion between Mr. Waddle  and Heartland officials before the mass removal which had been unsuccessful.

> Q.     Okay. Let me go through, at least according to my notes,  what you said on direct. You said that [Ms. Ayers] she informed you that there had been ongoing discussions between Waddle and  Heartland which had broken down. Do you recall that?

> A      Yes.

> Q.     Would that have been something you were told during the  first conversation on October 30th?

> A      It possibly could have been. It possibly could have been  something that was part of a conversation before October 30th.

Finally, the Court posited a question touching upon the issue of when Ms. Ayers and Mr. Waddle had discussions before October 30, 2001 about mass removal of the children.  The questions and answer follow:

> BY THE COURT:

Q.      In the -- on the morning the petitions were being prepared and the discussions were occurring with Ms. Ayers, I take from your testimony that there was no surprise by you that this was going to be done because there had been some discussion with her previously. Was this the kind of thing that it was sort of building up over a few days, if you remember how that -- the specifics of how that occurred?

A       Well, my recollection is that in the few days before the 30th, Ms. Ayers had said, you know, we -- essentially, that we've got a situation building up at Heartland that we may need to -- to take some action on.

Q.      Okay. And that was, I think you said earlier, that Mr. Waddle had -- and she had been in contact and that he was contemplating filing some actions or something like that, is that --

A       Yes, correct.

THE COURT:       All right. Okay. Thank you very much.

## VII.   THE MASS REMOVAL OF THE CHILDREN FROM HEARTLAND

Andrew Grimm has been Superintendent of Residential Facilities at the Bruce Normile Juvenile Justice Center since 2000. He has worked for the Second Judicial Circuit Juvenile Office since 1992, specializing in grant applications, development of the Facility and long-term planning. He has had over three hundred hours of education in child development, behavioral modification, dealing with difficult children, for example "child sexual victims." He had a significant role in the development of the Bruce Normile Juvenile Justice Center and its programs. He supervises all of the staff that implement the programs in the residential unit and the detention unit of the Bruce Normile Juvenile Justice Center which is a licensed facility inspected by the State Fire Marshal, the State Health department, and other State licensing agencies that require observance of certain staff to juvenile ratios.

Jeff Hall has been employed by the Second Judicial Circuit Juvenile Office since 1994. As Chief Deputy Juvenile Officer, he has received a lot of training. He has received state and national training in child abuse investigations. He has received training "on what to look for as far as injuries and abuse of children [is involved]." He has received training concerning sexual abuse investigations and interviewing of young children. He has received training on substance abuse and how it affects families and children. He has received training on peaceful intervention, treating offenders, and

working with domestic violence.  As with many of the personnel at the Second Judicial Circuit Juvenile Office, training has been a high priority.

Sheriff Parrish learned that the mass removal was going to take place on the morning of October 30, 2001.  Mr. Hall told him they had court orders to remove all the children, they would meet to take custody of the kids, and that he was just advising him because they would need assistance.  Sheriff Parrish was concerned for several reasons.  There was much that could go wrong.  He asked if there had been a discussion about Heartland bringing the children to them.  He was concerned about hostile gunfire.  Sheriff Parrish believed they needed to sit down and discuss it before they went to Heartland.  When he asked why the mass removal was necessary that day, Mr. Hall said because they had court orders.  Sheriff Parrish believes the first conversation he had with Mr. Hall occurred at 12:32 p.m., on October 30, 2001 (Pl. ex.15).  A television station had placed a call trying to reach him at 9:11 a.m.  Sheriff Parrish would like to have had substantially more notice.  He soon started getting calls from parents.  He may have given a directive that no one in his office was to answer any questions about the matter.  Anyone getting a call was to refer it to Mr. Waddle or Mr. Hall.

On October 30, 2001, Mr. Hall went to Newark, Missouri which is located a few miles from Heartland, as a staging area, in accordance with a pre-conceived plan, to meet with law enforcement from Knox County, members of the Missouri State Highway Patrol, personnel from the Division of Family Services, and officials from the Forty-First Judicial Circuit Juvenile Office.  Neither officials from the Forty-First Judicial Circuit Juvenile Office nor sheriff personnel from the Lewis County Sheriff's office appeared at Newark.  Those assembled discussed how they would proceed to Heartland to execute the mass removal of the children.  Mr. Hall claimed to have had security concerns because there were five defendants charged with "assaultive behavior towards children" (the Manure Pit Incident ), and he wanted to assure there was security present when they were there to carry-out orders.  When he arrived at Heartland, he saw Missouri State Highway Patrol vehicles, Shelby County sheriff cars, and vehicles from the Forty-First Judicial Circuit Juvenile Office.  Mr. Hall was met by a man with a video camera who asked if he was there to kidnap the children.  Mr. Hall met Larry Carmer from the Forty-First Judicial Circuit who had already directed children into the gymnasium.  On the videotape, Mr. Hall denied being in charge at the mass removal.  There is a noticeable "passing of the buck" in that regard on the videotape.  Mr. Hall now says he takes

responsibility for the personnel from the Second Judicial Circuit Juvenile Office. Any cursory review of the videotapes will readily explain why no one would volunteer to claim that appellation.

Mr. Hall told Mrs. Sharpe that he had applied for and received court orders to remove all of the children. There is no dispute that on every occasion, when presented with judicial process, Heartland officials and staff always obeyed every court order ever issued.

Mr. Hall asked for Mrs. Sharpe's lists of children residing in Knox and Lewis Counties. She was obedient in delivering that information to Mr. Hall. Mr. Hall went into the gymnasium where he was approached by Terry Bowen, a person of a height of six feet four inches and a weight of about two hundred fifty-five pounds. Mr. Bowen asked what Mr. Hall was doing. He delayed Mr. Hall's entry into the gymnasium.

Mr. Hall was in the gymnasium for five or ten minutes. He escorted some of the children to the buses. Children were getting upset, Mr. Hall believes, because adults were asking questions. He blames the adults for upsetting the children. Some were asking why they were taking the children and suggested they were kidnaping the children. Some were Heartland personnel and some were parents of non-program children who were there in the ordinary course of affairs to pick-up their children. Carin Patchin was visibly upset. Mr. Hall says she was screaming at him and others. He observed one of the children running from the site. Mike Peterson was there. He was questioning why they were removing the children. He was upset about the situation. Mr. Hall was intimidated by Mr. Peterson, who is a large man. He was posturing himself in such a manner to be offensive to Mr. Hall. He raised his voice in opposition to what Mr. Hall and others were doing. Mr. Peterson's behavior was offensive to him. Mr. Hall says that he asked a Highway Patrolman to come over and Mr. Peterson backed away. The videos do not show this claimed behavior by Mr. Peterson or Ms. Patchin. The video film, to the contrary, shows Heartland personnel consoling the children and encouraging them to be compliant. Mr. Hall does not recall seeing Mr. Peterson comforting the children in the gymnasium, nor does he recall seeing Mrs. Sharpe comforting the children. Mr. Hall admits he saw no one making intimidating statements on the videotapes. Some children were asking questions. Some children would not get on the bus. The videotape records a large policeman attempting to physically force a young girl through the door of a bus as she clung with a firm grip on a rail to prevent the use of force against her. Another young girl inside the building refused to leave. Heartland staff members gently and very carefully, in a conciliatory mood encouraged her to be

acquiescent, and finally she retreated from the building and departed from the school.

Mr. Hall heard children saying that the removal was not right and they did not want to go. The videotape shows some children screaming and crying, with other children and Heartland staff members consoling them. It took two hours to remove the children. Mr. Hall acknowledges that he could have videoed the entire operation, but that was not the policy of the Second Judicial Circuit Juvenile Office. Mr. Hall expressed the belief that the cooperative agreement between Heartland and the Juvenile authorities had been "torn to shreds." His belief was that Heartland was not working with them. Any review of this opinion should necessarily include a review of the videotapes introduced into evidence.

Ms. McCauley testified that on October 30, 2001, before the team left for Heartland, Mr. Hall called a meeting to explain that he had orders to take custody of the children at Heartland. Apparently, Mr. Hall did not explain that Mr. Waddle would not be in attendance at the removal of the children, because he had other duties. She was on the bus from Newark, Missouri to Heartland. She chose to stay on the bus and do "intake." She knows that some of the children were taken without court orders. She saw one girl, later identified as L.L., try to crawl out of a bus window, and she grabbed her leg. She could not hear what was being said outside, but she heard screaming outside and heard screaming inside. She says when the cameras were pointed at the bus, the screams became louder inside and outside the bus. Some of the juveniles, including L.L., left the bus without permission. Ms. McCauley was concerned for her safety, and the safety of children on the bus. When L.L. left, the noise got louder. She became "real" concerned for the safety of the children on the bus. People outside were knocking on the windows and the side of the bus. People were passing objects back and forth from the outside. She told the children to raise the windows. She closed some of the windows. She believed it was a near riot situation. Some children were banging on the windows. This went on for fifteen to twenty minutes. There were about ten people from the Division of Family Services present, three or four Missouri State Highway Petrolmen, four or five sheriff deputies from Knox and Shelby County, and several juvenile officers present at the scene. There were approximately thirty people there to assist with the removal. There were armed police present. Ms. McCauley gives conflicting testimony about the assistance Heartland staff provided. At one time she testified they were helpful and another time she says they were not cooperative. Ms. McCauley hollered up to the front of the bus, "[w]e need authorization to leave." She was concerned about the

safety of the bus drivers. After the buses departed and they had gotten to Newark, she testified that the children had "calmed-down."

Earlier, when asked if there was anything else that stuck in her mind about the mass removal, "[a]ny particular incidents or discussions that you had or observed in the course of the removal?" She answered, "No." She filed no report outlining the fifteen to twenty minutes where she expressed fear or that anyone was agitating the children. After the bus left Heartland, within a few minutes, Ms. McCauley testified that "[t]hey were passing around Bible verses, asking me about favorite Bible verses, and singing songs." Some of the children thanked her. She said that the kids told her that Heartland had known weeks before that the children would be taken into protective custody. This recitation is in sharp contrast with her deposition testimony, where she said that nothing significant occurred.

Mr. Waddle did not go to Heartland to take charge of the mass removal. He waited at the Bruce Normile Juvenile Justice Center in Kirksville for the juveniles. Ms. Ayers also did not initially go to Heartland to participate in the mass removal. Soon after her staff members arrived, however, she began to get calls that they needed help. Mr. Waddle had not appeared, contrary to her belief that he would be present and to take the lead in the removal of the children. Her staff members expressed surprise to her that he was not there. Ms. Sweet called for guidance and Mr. Carmer advised her of a need for another vehicle to transport children. No preliminary instructions had been given to her staff members and she was not aware of instructions given by Mr. Waddle to his staff members. She had conducted no investigation into the anticipated individual needs of any child being removed. She had advised no one at Heartland that the removal was planned.

Mr. Melton received a telephone call on October 30, 2001, from Jim Salter of the Associated Press who read one of the petitions to him over the telephone. This was Mr. Melton's notification that there would be a mass removal of the children. He went immediately to Heartland, but arrived after all of the children had been bused away. He described the campus as a very quiet place. He went into the various buildings, describing Heartland as a ghostly place. Personal belongings were scattered throughout the gymnasium and hallways. Television news media personnel had arrived. O.M., who was not removed, was being interviewed by a televison crew. Mr. Melton gave an emotional account of the events of the next couple of days. Many parents, some breaking into tears, came to him with documentation. Some were afraid to bring their children back to the Heartland

111

campus because of Mr. Hall's letter.  He heard complaints from distraught parents about the removal of their children.  There were medical issues to be addressed for some of the children.  Children, returning later in a steady stream, complained to him about the removal.  Of the one hundred and thirteen children removed, thirty-two did not return.  Mr. Melton described the mission of Heartland as having been affected in that the opportunity to provide for those troubled kids was lost.

On October 30, 2001, one hundred thirteen kids were brought to the Bruce Normile Juvenile Justice Center.  On October 29, 2001, Mr. Grimm was asked by Mr. Waddle if he could handle up to one hundred fifty Heartland children.  Mr. Waddle told him that "this will be short-term care," that most would leave within twenty-four to forty-eight hours.  There was no discussion with Mr. Waddle about involvement with the Forty-First Judicial Circuit.  Mr. Grimm asked his staff to "figure out the hurdles."  He believed that there was plenty of space in the 26,000 square feet of the Facility, concerning bed space, adequate bathroom facilities and appropriate food services.  There are thirty individual rooms in the Bruce Normile Juvenile Justice Center including the sixteen rooms in the Assessment Unit.  He was not called-in on either October 27th or 28th to consult on the feasibility of providing for the Heartland children.  He was told on October 30, 2001, to go forward with the "plan."  He was told to remove the children that were already in protective custody at the Bruce Normile Juvenile Justice Center and to find placements elsewhere for them.  Of the approximate ten in custody at the time, some were taken to Jefferson City, some were taken to Camdenton, and some were given extended leave passes.  Mr. Grimm disabled all of the electronically controlled doors, opened all doors, used the gymnasium for placement of cots, consulted the American Red Cross for needed supplies,  and secured beds from a hospital.  The sixteen room Assessment Unit was opened to a large dining area, equipped with couches, some recliners, and a large screen television set.  A classroom was attached.  The Preferred Family Health Care Center building in Kirksville was used to house females.  To achieve continuity of care, efforts were made to keep males and females separated, because they had been separated at Heartland.  Arrangements were made with Dr. Arthur Freeland to supply a nurse practitioner and two nurses to provide medical services.  Preferred Family Health Care Center had a nurse on staff for the females.  Each child was given a care package including a tooth brush, comb, and other hygiene supplies.  Clothing, including underwear, was made available. Laundry services were provided at night.  Mr. Grimm had forty-one of his staff members available to provide services, and he "used all of them."  Additionally, the Division of Family Services

and the Division of Youth Services provided personnel to assist.  The licensing mandate for staff to child ratio is one to ten during working hours and one to twenty during sleeping hours.  Mental health accommodations were made through the Mark Twain Counseling Services.  Dr. Bumby of the Division of Youth Services and C.J. Davis, a psychologist, were also available to provide mental health services.

Mr. Grimm was present when the children were bused in.  The males were first taken to the gymnasium in a single-file line.  They were talking loudly.  The orientation process began.  All of the children sat in the gymnasium.  They were told that their cooperation was needed.  Amenities of the Bruce Normile Juvenile Justice Center were explained.  He described the children as "cooperative," and eager to get on with what was attempting to be accomplished.  He wanted the younger males placed in the more home-like environment of the Assessment Unit, rather than the Detention Unit. He asked for volunteers to be housed in the Detention Unit.  They were divided into smaller groups for counseling.  He asked questions if there were siblings to be kept together.  Some of the boys were playing basketball.  Some questioned why they had been removed.  He recalls that some were less than respectful to him.  Some wanted to see Mr. Waddle.  Mr. Grimm told them that Mr. Waddle would likely be back to see them.  They were told that there was a physician on staff to address any physical complaints.  They were advised that they would be breaking into smaller groups for sleeping purposes.  Group counseling and psychological services were acknowledged as being available. Volunteers agreed to sleep in the fourteen room Detention Unit.  A conscious effort was made to keep siblings, relatives, and those mutually dependent together.  Mr. Grimm reported that no problems were encountered in meeting the needs of the children.  None of the male juveniles appeared to be crying or upset.  All cooperated with his staff.  There was "excellent interaction between staff and the children."

According to Ms. McCauley, at the Bruce Normile Juvenile Justice Center, some of the girls asked why Mr. Waddle had taken the action of removing them.  They seemed satisfied with her answers.  Some of the girls were apprehensive about going home.  Some of the girls were upset. Some wanted to go home, but had not been home for awhile and did not know "if things were going to be the same or different."  Some were showing emotion, but they were not out of control.  None expressed to her that they were upset because they would not be going back to Heartland.  None of the children complained to her about being released to a particular parent.  Most of the girls were

compliant.  Some were anxious; some wanted to go home; and some were nervous about going home.

Over the three-day period at the Preferred Family Health Care Center, Ms. McCauley dealt with ten parents when children were being discharged from Heartland.  One of the children who ran away expressed pleasure at being out of Heartland.  Some expressed concern because they might have no place to go.  Some of the parents were angry because their children were removed.  "Most of the parents I talked to were somewhat confused and had concerns about their children, and there were some who were just flat out very angry that their child had been removed."  She said, "I don't recall any that expressed pleasure."

Of the one hundred thirteen children taken from Heartland on October 31, 2001, sixty-six were males and forty-seven were females.  Thirty-three children were released to parents on October 30, 2001.  Forty-nine males were kept at the Bruce Normile Juvenile Justice Center and thirty-one females were housed at the Preferred Family Health Care Center (W-ex. no. 283).  Children remaining overnight slept in street clothes.  By November 1, 2001, only nine males and five females remained.  By November 2, 2001, only four males remained in protective custody.  Only S.L. complained about being released.  He had a telephone conversation with his father and he became upset.  He was placed on heightened observation and recovered quickly.  Dr. Bumby's recommendation was adopted to form "goodbye groups" to say goodbye to the individual children as they departed with parents was adopted.  It was not Mr. Grimm's staff business to decide if it was appropriate to release a child or children to the person picking them up.  When S.L.'s father appeared to take S.L., his father was very unhappy.  He was irate, difficult to understand, and very threatening in general.

Mr. Grimm had informal conversations with Jennifer Fredman who was the supervising juvenile officer at Preferred Family Health Care Center where the females were detained.  By all accounts, the females were less restrained in their acceptance of their proffered accommodations (Pl. ex. 24).  Juvenile Officers Sandy Richardson and Tiffany LaBeth were assisting at the Preferred Family Health Care Center.  Girls were combining their skills to make a rope to escape.  Juvenile Officer Sandy Richardson exclaimed to Ms. Fredman, "the girls have ran."  Ms. Fredman saw L. assisting M. "to the top of the roof."  L. yelled "run" and "at this time M. jumped off the roof to the other side of the facility."  L. then ran towards Ms. Richardson, at which time, to restrain her, Ms.

114

Richardson "administered the least restrictive alternative, the single upper torso assist, to control L." Mr. Grimm understands that this is a form of physical restraint.   "L. began spitting, hitting and screaming 'bitch' at officer Richardson.   This officer [Fredman] then began to assist officer Richardson in the double upper torso assist."   Mr. Grimm assumes this is a physical restraint tactic. "Officer Richardson and this officer then administered the kneeling seated upper torso assist in [*sic*] which placed all of us on the ground."   Mr. Grimm was not willing to admit that three separate physical restraint techniques were employed, but he confesses that efforts were being made to restrain L.   " L. continued to violently bite, scratch, hit and scream 'you fucking bitches.'  Officer Richardson was positioned at L.'s legs and this officer [Fredman] was positioned toward L.'s upper torso and arms.   At this point, L. continued to successfully scratch, hit, bite and spit on both officers, [*sic*] Officer Richardson and this officer [Fredman] re-evaluated the situation and administered the prone bridge assist."  This was acknowledged as another restraint technique.  As the officers attempted to de-escalate the situation,  by saying, "L., you need to calm down."  L. declined the suggestion.  The officer asked L., "[w]hat  grade are you in?"  L. replied, "it's none of your fucking business."  L. was invited to stop biting, hitting, and spitting.  L. said, "[i]f you are going to get me for assault, I might as well hurt you."  Ms. Fredman instructed Van Vleck who had arrived to use a cell phone to call 911 and to report M. as a run-a-way.   "L. cotinued to scratch, hit, and spit on this officer and Officer Richardson, [*sic*] L. also continued to yell 'you fucking bitches.'"   Thereafter, "[o]fficer Tiffany LaBeth arrived on the scene to assist in the prone bridge assist of L's arms, hands and upper torso, while [this] Officer remained on her legs and feet." At this time, "[a]ll officers continued to administer the least restrictive alternatives to controlling L. and make sure L.'s airway was not restricted." At this point three officers are holding L. to the ground.  When Ms. LaBeth attempted to calm L., "L. continued to struggle in rage hitting Officer LaBeth in the face.  The Kirksville police Department arrived to the scene, cuffed and escorted L. out of the courtyard area to the officer's vehicle.  L. continued to struggle and kick the officer while being escorted to the officer's vehicle.  L. was transported to the Bruce Normile Juvenile Justice Center.  This officer received two bites, one to the right forearm and one to the left elbow area.  This officer also received scratches on the upper portion of the left arm and scratches on the left leg just above the ankle." (Pl. ex. 24).  Mr. Grimm reports that he does not know what happened to her.  She did not report back to the residential side of the Bruce Normile Juvenile Justice Center.  He was not aware that she sustained scratches.  Mr. Grimm

said "no, absolutely" when asked if it would have been appropriate to make a hotline call, because he was the one who arranged for the training program for techniques of physical restraint. Mr. Grimm acknowledges that even with a trained staff there can be a situation where a juvenile gets out of control. There is no record that anyone at the Bruce Normile Juvenile Justice Center or any juvenile officer or any Division of Family Services person called in a hotline report on L.

Mr. Grimm said M., who ran away, was lost. He did not know what happened to her. He thinks she was eventually found, but he has no personal knowledge of whether she was found. To his credit, Mr. Grimm admits that he was ultimately responsible for all of the children removed, both the males and females. It turns out that she was at a hospital emergency room being treated for a broken ankle received when jumping from the Preferred Family Health Care Center in an escape attempt. No one from the Second Judicial Circuit Juvenile Office or the Division of Family Services called in a hotline regarding M. who was clearly in the custody of the Second Judicial Juvenile Office when she was injured.

Lylia Jean "Suzzie" Poland, a nurse practitioner with Crown Family Medicine, formerly Marino, Earle and Phillips in Kirksville, Missouri, went to the Bruce Normile Juvenile Justice Center on October 30, 2001, to perform physical examinations on male juveniles removed from Heartland. She was to determine if the children had physical complaints or health issues. Other health care providers assisting from her clinic were Jane Hayden, a Certified Medical Assistant who assisted Ms. Poland and Arthur Freeland, M. D. Mr. Hayden completed the medical forms at Ms. Poland's direction, and Ms. Poland checked them to assure accuracy. She performed physical examinations on J.W., D.P., J.B., J.C., William N.G., R S., J.F., N.D., a second J.F., T.W., and T D. W-116 is a medical assessment form which lists complaints and medications. J.B. related that there had been Sequelae from swats he had received. He complained of buttock bruises and a cut from a credit card. C.C. had a bruise 6 inches by 1/2 inch on the chin and bruises on both arms claimed to be caused by Heartland staff members. J.M.C. complained of a broken clavicle received when playing football in October. J.F. (four letters in his name) said he had right hand stiffness from hitting a wall. J.F. (eight letters in his name) complained of a jammed third toe injured while playing football. None of these boys reported receiving medical attention. She described the boys as happy, joking, engaging in "horseplay," just teenage boys having a good time. She fielded no complaints of emotional distress. None appeared distraught. No records from Heartland were made available to her by the

116

juvenile Office.  She asked some of the students why they were at Heartland.  A review of reports of Dr. Freeland reveals that all children examined by him were asked if they had eaten Heartland Stew.  None of the students were treated for institutional injuries.  The Hospital Pharmacy was the resource for required medications, because the other pharmacies were closed. N.E.D. reported to her that he "[s]tates he's glad he's out of there, but states Center is not a real bad place to be."  T.D.B. "[s]tates he likes the work on the farm and likes the Center."  T.S.B. reported "[g]ood grades at Heartland; liked Heartland; loved it at Grandma's but would rather go back to Heartland."  She learned that C.C. had been abused by a family friend and was suicidal.  All of the collected information concerning discipline at Heartland remained at the Bruce Normile Juvenile Justice Center after Ms. Poland departed.

Garla Mills is a case manager in the assessment unit of the Bruce Normile Juvenile Justice Center.  She began working there in 2000.   On October 29, 2001, she arranged for provision of bedding to accommodate up to one hundred fifty juveniles.  At about 5:00 p.m., the girls were brought into the Day Room at the Bruce Normile Juvenile Justice Center.  They were advised that they would be transported to the Preferred Family Health Care Center.  Mr. Waddle came in and talked to the girls.  Ms. Mills reports that they seemed relaxed and accepting.  At first, some were nervous.  Someone said are you the Waddle we have heard about.  We have been told you are the devil.  Pizza was brought in and the children could call their parents.  She said it was like a big bunking party.  The children watched television.  Counselors were on site.  She believed that everyone had a good time.  She called it "very positive.  Everybody had a good time."  By noon Wednesday, they were "down to half."  Some of the girls were afraid their parents would not come and get them.  Some had a poor relationship with their parents and were afraid of going home.

Ms. Mills observed that L.L. (a/k/a "L.") was wearing an orange jump suit.  She understood that meant that she was a flight risk.  The circumstances that followed her observation suggest that her understanding was correct and that L.L. was appropriately attired.  When leaving the Bruce Normile Juvenile Justice Center for the Preferred Family Health Care Center, L L. threw herself on the ground and refused to get on the bus until she spoke to her brother.  On cross examination, Ms. Mills confessed knowing that L.L. tried to run away and was brought back, and that M. did in fact run away.  She knows that M. was apprehended because Ms. Mills personally knows that she was treated at a hospital emergency room for injuries received while escaping from the Preferred Family

Health Care Center.  Ms. Mills is familiar with the Ann Hutton letter to Mr. Waddle on November 5, 2001, where she states that the girls tried to take out a wall heater, tried to start a fire, and someone tried to steal a phone.  These revelations were excluded from the account that the "bunking experience" was very positive.

Matthew Holt has been a juvenile officer for a little more than three years.  He currently serves as the Programs and Services Coordinator of the Residential Unit of the Bruce Normile Juvenile Justice Center.  He supervises staff, performs scheduling, does training and supervision of care managers.  In October 2001, he was a case manager in the Residential Unit.  He currently instructs on methods of S.A.F.E. crisis management.  He teaches how to de-escalate while not becoming counter-aggressive, in order to avoid a juvenile from further escalating the violence.  He received fundamental skills training (W-284).  He has also received advanced training.  He has a Bachelor's Degree in Criminal Justice and Political Science with a minor in Psychology.  He was previously a deputy sheriff of Keokuk County, Iowa.  He works nights and weekends, carrying a phone twenty-four hours each day.  He was called as a witness to testify that all of the procedures used by the Second Circuit Juvenile officers in restraining L.L. were appropriate.  He has read incident reports in the case (W- 110-112).  Of course, he was not present for the incident.  When the L.L. matter came to his attention, he did not contact anyone outside the Second Judicial Circuit Juvenile Office to make an investigation.  He did not call the Division of Family Services to make an investigation.  He did not contact L.L. to determine if she was injured.  He did not know if she had bruising.  He did not report the matter to the Division of Family Services hotline.  Mr. Holt was notified of plans for the mass removal on October 29, 2001, by Mr. Grimm.

Julie Ann Nixon, a registered nurse with a B.S. Degree in nursing, is employed at the Northeast Regional Medical Center, Kirksville, Missouri.  She began working for Preferred Family Health Care Center in August 2001.  She made assessments of female juveniles taken into protective custody from Heartland on October 30, 2001.  She observed the demeanor of some of the juveniles.  She said no one showed signs of anger or belligerency.  She describes them as being calm.  She was not aware of a November 5, 2001 letter of Ann Hutton to Mr. Waddle reporting, "[o]nce again, I am happy that my agency can assist you during this time.  Other than kids trying to take out the wall heater, attempt to start a fire, escape from the facility and steal a phone, I think all went well.  It was an interesting week to say the least."  She performed health assessments and non-emergent care for

seven of the females on October 30, 2001 at the Preferred Family Health Care Center (W- 275).  She examined more females on November 1, 2001.  All behaved similarly.  She asked them about their sexual proclivities, their psychiatric histories, their drug and alcohol abuse, their history of prior physical abuse, and suicide attempts.  She inquired about medication regimens and referred some of the girls to her supervisor for further considerations.

Mr. Waddle testified that some parents arrived at the Bruce Normile Juvenile Justice Center in a short time to take custody of their children.  Juvenile Office staff members required the parents to give copies of their driver's licenses.  He acknowledged that some parents were from out of state as far away as Texas, Minnesota, and California.  He was aware that it was difficult and expensive for some parents to get their children.  Upon arrival, parents or guardians met with staff members and then were asked to sign a letter (Pl. ex. 25).  By November 5, 2001, only one child remained in custody.  Mr. Waddle admitted in his sworn testimony that it was his intention to deter parents from returning their children to Heartland.

When parents came to the Bruce Normile Juvenile Justice Center for their children, they were required to sign a letter prepared by Mr. Waddle.  The assigned reason for removal in the letter includes reckless conduct of Heartland staff members resulting in injuries to two juveniles, Heartland's refusal to cooperate with the investigation, and its declination to remove the personnel under investigation from child care responsibilities which would ensure "your child's safety."  The letter ended, "[a] return of your child to Heartland Christian Academy could result in the Court entering its order to take your child into emergency protective custody for your failure to provide a safe and appropriate environment for your child or referral to other agencies including law enforcement for further review and action if any."  Any interpretation of the letters given to all parents must conclude that children should not be returned to Heartland, and if children are returned to Heartland, the children might be taken from them and put in protective custody or the parents themselves may be subjected to criminal prosecutions.  There is no suggestion by the messages Mr. Waddle set on paper and by his action that at some time in the future, if Heartland became acquiescent to the expectations of these juvenile officers, that they would welcome the facility back into the acceptable category of child care providers.  Rather, the ubiquitous messages were, do not take your children back there, and if you do, be prepared to suffer undesirable consequences for your behavior.

119

By his admission, Mr. Waddle executed a plan which can have no other purpose than to close Heartland.   Mr. Waddle demonstrates on several occasions a lack of respect for the courts and the rule of law.  In his letter that parent's were required to sign before obtaining custody of their children, he specifically tells parents that the court has taken certain action, and if they do not behave as he expects, the court may take further action.  He purports to be speaking for the court, at a time when he misinformed the court and parents about probable cause findings, but more significantly, failed to inform the court of his work and intention to accomplish the mass removal  before any failure to cooperate by Heartland officials was suspected.  His view of Plaintiff's Exhibit 25 is illustrative.  In response to a question as to what he wanted to convey in the letter, he answered:

> I wanted them to clearly understand that the Court had made a probable cause finding that Heartland was an injurious environment and that they were responsible for ensuring that their child was in a safe placement and that if they failed to do that, that they could be held accountable for that through additional juvenile court action.

Mr. Melton appeared in the Lewis County Juvenile Court to represent parents and children on November 2, 2001, when hearings on the filed petitions had been scheduled.  Before the juvenile court hearings in Knox and Lewis Counties on November 2, 2001, some parents had voiced their objections about the mass removal to Mr. Waddle.  Although demands for hearings by parents and Heartland officials were made, no hearings were actually held on that date.  Some parents wanted a hearing on the issue of why their children were removed from Heartland.  Heartland attorneys asked to be heard.  No evidence was allowed to be presented or received by the court.  Mr. Waddle told them that if parents had appeared at the Bruce Normile Juvenile Justice Center to take their children before the scheduled hearings on November 2, 2001, those petitions were dismissed.  Thus, those parents wanting to be heard that had been united with their children were not given an opportunity for a hearing, because the petitions were dismissed by the Juvenile Office.  For those children whose parents did not appear to claim them, no hearings were held on that date, but instead, hearings were scheduled after November 2, 2001.  To get a hearing on November 2, 2001, Mr. Waddle testified that the parents would have had to agree to allow their children to remain in protective custody.  Presumably, another hearing would then have been conducted at some time in the future.  The same procedure was followed in Knox County.  Of the "couple" of children remaining in protective custody, the question arose as to why their cases were not heard.  Mr. Waddle believed it was

probably because their parents did not appear.

Due process is more than a manipulation of the system by an aggressive juvenile officer. Parents and Heartland were given a Hobson's Choice by Mr. Waddle on November 2, 2001, instead of due process. Parents could either receive due process and leave their child in protective custody, or forgo the right to present evidence in opposition to the mass removal tactic and take custody of their child. A pre-removal hearing upon notice to parents, guardians and Heartland would have assured the opportunity to be heard before children were removed. Time to allow interested parties to be heard interfered with the plan of Mr. Waddle. Closing Heartland, over the care of children, the Court concludes, was his clear priority. When asked if he or any member of his staff bore any ill-will to Heartland, Mr. Waddle answered "No!" The Court believes Mr. Waddle was not being truthful.

On November 6, 2001, Mr. Waddle called a press conference for the purpose of providing the general public information about the mass removal of children from Heartland (Pl. ex. 77). Only members of the press were invited, and people without a press pass requesting admittance were turned away. The press conference was called and conducted by Mr. Waddle, because he believed there was significant false information circulating and the matter was of significant public interest. He said that Mr. Sharpe was paying for "infomercials" which Mr. Waddle believed contained misinformation, the details of which he could not recall specifically when testifying, but he believed they cited to the Division of Family Services and the Juvenile Office "raiding" Heartland, making an "unlawful" seizure, stating that no child had been harmed or abused at Heartland, and claiming that the Manure Pit Incident had been exaggerated.

Mr. Waddle also issued a press release. In the press release, Mr. Waddle first explained that the Juvenile Office ordinarily does not release information to the public, but because of misinformation and misrepresentations publically disseminated, exceptional circumstances warrant a public statement by the Juvenile Officer. Mr. Waddle outlined what he regarded as six factual statements justifying action of the Juvenile Office. In his press release, Mr. Waddle included this message, "PLEASE make no mistake, the Juvenile Office will not be intimidated or bullied by their public relations schemes or their media statements, nor will their filing of federal lawsuits deter this office from carrying out the mission of the Juvenile Justice System, which is to protect children from abuse, neglect and injurious environments." This is not language from one who claims to have borne no ill-will to Heartland. Mr. Waddle believed that he did not unlawfully disclose information

121

prohibited by statute at the press conference.  When asked if it occurred to him that one way to avoid misinformation would be to hold a court hearing, Mr. Waddle said he did not see that as relevant. The press release also stated the "[l]etters will be sent to all parents who had children at Heartland by certified mail, giving further notice that the Juvenile Office continues to view Heartland as an unsafe environment for children.  They will also be advised that if they have returned their children to Heartland, further Juvenile Officer actions may be forthcoming."   The only reasonable interpretation of this clause from the press release is that Mr. Waddle intended to take action to assure Heartland had no children for which care would be given, and, consequently, the residential care facility would cease to exist.  Mr. Waddle and Ms. Ayers confessed that these letters were never mailed, in part, because of this Court's temporary restraining order on November 6, 2001.

Mr. Waddle claimed no recall when asked if he told an Associated Press reporter about Mr. Sharpe paddling a juvenile.  He released information that a senior staff person at Heartland had struck a female juvenile thirty-five times.  He admits this information came strictly from Division of Family Services' records.   After acknowledging that over one hundred juveniles were removed from Heartland without notice and an opportunity to be heard, and that some were held in protective custody for days with no hearings conducted to determine if the protective custody was proper, Mr. Waddle agreed that a Juvenile Officer exercising authority should be fair, impartial, and unbiased in every aspect of his job.

## VIII.   EVENTS AFTER MASS REMOVAL

Since the mass removal on October 30, 2001, enrollment of children at Heartland of staff members has increased, but only slightly for "Program Students" which is approximately one hundred thirty. That pattern does not reflect the intent of Heartland to increase its enrollment.  Enrollment of "staff" children has increased.  The goal is to enroll more program students.

Deanna Nobis describes the individual substantiated and unsubstantiated hotline reports she has investigated at Heartland after the mass removal on October 30, 2001; however, her testimony is only received for very limited purpose of considering the credibility of Heartland officials.  Ms. Nobis has been an Out-of-Home Investigator with the Missouri Division of Family Services since June 2002, after Tim Carter was replaced.  She has a Masters degree in social work. She has conducted about 155 out-of-home investigations.  None of what Ms. Nobis concluded could possibly have any relevance as to what Mr. Waddle was considering when he decided to remove all of the

children from Heartland. Her testimony is limited first to the single issue of the cooperation of Heartland officials since June 2002, seven months after the Mass Removal of children from Heartland. This evidence is limited to the issue of impeachment of the testimony of Heartland officials, who have claimed cooperation with the Division of Family Services. She was called upon to prove, in her experience, that such officials did not cooperate. Secondly, the Court will determine if, under all of the circumstances, there has been a lack of cooperation by Heartland, and how, if at all, that will be relevant in fashioning any future order for injunctive relief. Ms. Nobis confesses that she has had no experiences with any organization like Heartland. All of her other out-of-home investigations have involved licensed facilities, and a condition of licensure is that the organization cooperate with the investigator. No safety check has ever been denied at Heartland with one exception, and that report was "unsubstantiated." Police officers have appeared there at midnight to do safety checks and officers have talked to the children. When she has made conclusions of "probable cause" for child abuse, her decisions are subject to review by her supervisor, by another office, and by judicial review. None of her cases at Heartland have gone before a judge. Currently, three of her cases are contested.

Mr. Melton brought to her attention a change in the law that became effective in the Fall of 2002. Missouri Revised Statute § 210.145[23] requires her to give notice to parents before interviewing a child. Pursuant to 42 U.S.C. § 290dd-2,[24] Mr. Melton advised her that because Heartland has an alcohol treatment component, Heartland must have parental consent before releasing information. Ms. Nobis takes the position that she is bound only by the state regulations. She understands Heartland's position to be that it may be subject to being sued if it releases information without

---

[23] Section 210.145.4 provides, in part, "[i]f the parents of the child are not the alleged abusers, the parents of the child must be notified prior to the child being interviewed by the division[.]"

[24] 42 U.S.C. § 290dd-2 provides:

Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section.

statutory compliance.  She understands that a number of parents are hostile to the Division of Family Services  because of the existence of historical events.  There have been times when attorneys were present for interviews, and she was able to complete her work.  In every case, when she gets notification of alleged abuse or neglect in a residential care facility, Ms. Nobis contacts law enforcement "[b]ecause any investigation that O.H.I. gets is coded an investigation, which by law means we have to contact law enforcement."  Law enforcement is asked if they would like to co-investigate.  She has received cooperation from all other facilities she has investigated, because cooperation is a condition of licensure.  She has no experience with faith-based residential care facilities.  As mentioned, all of her investigations were conducted after the mass removal of the children.  Her reports are included for reference, but are not particularly persuasive for the limited purposes for which they were received in evidence.[25]

---

[25]  She has completed eleven investigations at Heartland.  Two investigations are pending, no. 022-06-142 from a hotline dated July 25, 2002, and no. 022-77-099 on October 4, 2002.  In case 099, concerning C. G., Ms. Nobis sent a letter asking to meet with  Mr.and Mrs. Sharpe.  C. G. had left Heartland in February, 2001.  Mr. Melton responded that Heartland was not under the jurisdiction of the Division of Family Services and declined to provide a roster of the children.  He advised that the Sharpes were not perpetrators and they would not be available to meet with her.  The alleged perpetrator was a Heartland staff person, and Mr. Melton told her that person would not be made available.  She recognizes that the juvenile who is the subject of this report left the Heartland program in 2001; that he had serious mental problems; and that he was placed in a State mental hospital in May, 2001.  The juvenile did not make the allegation that is the source of the investigation for over one year after the incident is alleged to have occurred.  He claimed that someone at Heartland had paddled him too hard.  The male alleged perpetrator is no longer at Heartland and Heartland has no known address for him.  Heartland officials have explained that they have nothing further to supply to the investigation.  At the time of the requested interview, Mr. and Mrs. Sharpe had criminal charges pending against them, the only criminal charges ever made against them, which were subsequently dismissed.  Any questioning, according to the Sharpes' counsel, might have implicated the earlier criminal charges.  She acknowledges that she and Mr. Johnson, counsel for the Sharpes, have talked and she is aware of an unresolved dispute between her and Mr. Johnson concerning limitation of the scope of any interrogation.  Mr. Melton also explained that many of the children are under alcohol and drug abuse treatment, and according to federal law, that information must be kept confidential.  He further explained that parents, under state law, must be notified before they can be questioned.  He further said that there were no written incident reports to disclose.  The report of abuse was determined to be "unsubstantiated."

The next out-of-home investigative report is no. 023-06-031 with a hotline date of November 2, 2002.  This report was "unsubstantiated."

The next report was no. 023-09-149 with a hotline date of November 5, 2002.  The allegations were that two boys barricaded themselves in a room and refused to allow entrance. The issue was what Heartland staff might have done differently to achieve a more desirable resolution of the matter. Ms. Nobis sent a letter to  Mr. Sharpe asking for an interview.  She was told by Mr. Melton that efforts were being made to contact staff members and determine if parents would consent, that the alleged perpetrators had been contacted and would not agree to interviews, and that the requested disciplinary policy shared with parents would not be made available because it was already possessed by the Division of Family Services.  She agrees that Mr. Melton offered some cooperation.  One of the alleged victims is no longer at Heartland. Heartland personnel did produce the one boy who was still at Heartland for an interview.  No substance was found to exist as to the allegations of abuse.

Going out of sequence, report no. 023-13-027 bears a hotline report of November 9, 2002.  Some boys who ran away from Heartland reported that another boy had been physically abused or paddled.  There was one alleged perpetrator.  A request to interview the alleged perpetrator as denied.  Ms. Nobis was allowed to interview the child who was alleged to be the victim.  The child reported that nothing had happened.  It was unclear as to the identity of any potential perpetrator.  Here, the logic of the Out-of-Home investigative process falters.  Ms. Nobis asseverates that her investigation could not be complete until she talked to the perpetrator, because she could make a stronger case that nothing happened.  If nothing happened, as the child reported, there would be no perpetrator.  The report was "unsubstantiated."  Ms. Nobis was unwilling to confess that this insistence on production of Heartland staff members to do obviously meaningless acts was not disruptive to the Heartland program.

Report no. 023-18-077, dated November 7, 2002, pertains to victim K.W.  The ground for the report was that some children had run away and thereafter a child was paddled too hard. One perpetrator was alleged to be involved.  Ms. Nobis was permitted to interview that child who reported that nothing improper had occurred.  The identity of the alleged perpetrator was unclear after the interview.  Heartland officials believe that there is a recurrent theme to Ms. Nobis' interviewing process, i.e., when there is evidence that nothing objectionable occurred, there is no need for further disruption of Heartland activities by more interviews.  She is aware that Heartland officials maintain that alleged perpetrators must have legal counsel and that questioning should be limited.  Ms. Nobis' view is that she must interview alleged perpetrators to do a complete investigation to lend strength to her case.  An interview was requested.  No reason was supplied for not producing that person.  This report was "unsubstantiated."

Report 023-22-058, involving H.L., is dated November 18, 2002.  The allegation from this juvenile made three weeks after leaving Heartland is that she had a small bruise.  The ombudsperson supplied the incident report to Ms. Nobis.  The ombudsperson interviewed H.L. two or three days after she was swatted and requested to see her buttocks, but H.L. refused the request.  Ms. Abbott, the ombudsperson insisted to view the area where the swats were applied, and no sign of bruising was noted.  Two and one-half weeks later when she went home, her mother reported that H.L. had a bruise.  She saw a physician in Kansas City who reported a small bruise on her left buttock.  Ms. Nobis agrees that Heartland officials cooperated in this investigation except for supplying the name of the alleged perpetrator.  The request made for an

interview addressed to  Mr. Sharpe and Mr. Melton was denied without explanation.  A "probable cause" finding of physical abuse was made.  This case is under appeal.

Report 031-07-220, dated April 17, 2003, lists three potential perpetrators and four alleged victims. "Probable cause" findings for child abuse concerning three of the four were made. For M.H., the probable cause finding was for physical abuse.  For J.D.O., a female, and T.E., the probable cause finding was for physical abuse.  After making her findings, Ms. Nobis was advised by her supervisor that two of the perpetrators would like to talk to her, but one made no contact for an interview.  She learned that the third person did not choose to be interviewed.  She did speak to Mr. Sharpe during this process.

Report 031-21-096, with a hotline date of May 1, 2003, alleges first that O.S., received swats from two alleged perpetrators resulting in purple bruises that turned dark brown, and secondly, that one swat was applied to a leg.  This investigation was bifurcated into two separate cases.  The second report is 031-07-220.  Requested documentation from Heartland was not produced.  The two perpetrators were not produced during the investigation. After the investigation was concluded, legal counsel for one of the perpetrators contacted Ms. Nobis. There was a meeting on June 16, 2003 between Ms. Nobis; the legal counsel for the Division of Family Services; Ms. Nobis' supervisor, Mr. Boyer; and Mr. Johnson from Heartland.  Two alleged perpetrators were produced.  A non-custodial parent had made a hotline report.  She had employed counsel in a child custody dispute action in Minnesota. The hotline call was made between 9:00 and 9:30 p.m.  After midnight, Deputy Sheriff Becker from Knox County was called, and he responded by making a safety check.  There was an allegation that one girl was denied an inhaler.  Deputy Becker, accompanied by a dog, was allowed into the dormitory and access to girls who were interviewed behind closed doors.  No injuries were claimed and none were noted.  None of the girls wanted to leave after Deputy Becker offered twenty-four hour protective custody.  There was a follow-up investigation the next day.  Mrs. Sharpe attempted to get releases from parents the next day and she interviewed two of the four girls. Ms. Nobis admits the Heartland officials were cooperative, except for producing the alleged perpetrators who had criminal charges pending against them at the time.  All three alleged perpetrators said they did not want to be interviewed. The girls gave the same account of no injuries in a subsequent ombudsperson interview.  Notwithstanding all of the evidence of no abuse, no injuries, and corroborating statements from separate interviewers, Ms. Nobis made a  "probable cause" finding of child abuse.  She was very critical in her report of Heartland for not producing the staff members for interviews.  This is another case of relying on form over substance.  Later, Mr. Johnson made an agreement for two of the alleged perpetrators to be interviewed in a fashion that limited the questions to the facts of the particular case.  Some questions beyond the relevant facts were permitted.  Ms. Nobis admits that a concern of Mr. Johnson is that in the past, information produced has been promptly turned over to Mr. Waddle, and in some cases it has been published in a newspaper or has been the subject of a press conference.  Ms. Nobis admits sharing some information with Mr. Waddle.  Ms. Nobis confesses talking to the non-custodial mother in Minnesota and to the guardian ad litem about facts she had concerning the case.

Report no. 031-29-109 bearing a hotline date of May 9, 2003 concerns N.F. and alleges that the juvenile had scratches.  Ms. Nobis requested documents from Lori Sharpe.  She sent a

## IX.    THE REMEDY

There is substantial evidence in the record of a vindictiveness by some officials in the Second Judicial Circuit Juvenile Office towards Heartland, and a pernicious mean-spirited attitude, particularly by Mr. Waddle and Mr. Hall.  Mr. Waddle on several occasions complained that he could not get Heartland officials to sit down with him and try to amicably resolve issues between the two groups.  He repeatedly complained that Heartland officials were uncooperative with him.  Yet, in reality, his own documents reveal that the Second Judicial Circuit Juvenile Office was predisposed to impede, not facilitate cooperation between Heartland and his Office and that lack of cooperation by Heartland played no role in the mass removal of children from Heartland.

Mr. Waddle admits that the current Federal injunction has not prevented him from filing petitions.  Mr. Waddle's words are condemning of any future operations of Heartland.  Mr. Waddle stated his beliefs about Heartland as follows:

A.     In their -- their current form and fashion, that it is dangerous for them to continue to have responsibility of children in their care and custody because I believe

_____

second request to CNS Ministries.  No response was received.  She asked to speak to four staff members identified by the victim.  They were not made available.  Ms. Nobis talked to the "victim" and the child's mother and found that the child had been self-mutilating .  Mr. Johnson objected to producing alleged perpetrators because the child reported that nothing happened.  Ms. Nobis believed that the child might have been coerced by Heartland officials.  The investigation was delayed because Heartland officials were attempting to get parental consent to do interviews.  This report was "unsubstantiated."

Report no. 031-44-056 with a hotline date of May 24, 2003, is a pending investigation report.  She made a request to interview alleged perpetrators.  Heartland has agreed to produce them.  Requested documents have not been produced. Heartland's failure to produce documents and alleged perpetrators for interviews has compromised her ability to complete her investigations.

In report no. 321-29-101, N.F.,  a boy had been away from Heartland for a year before making an allegation.  He said he could not remember the identity of the boys who allegedly beat him up, in a vague allegation.   Ms. Nobis requested to interview some students and wanted to actually interview a sample of students, claiming compliance with Division of Family Services policy.  She wanted to interview 10% of the student body to see if any had information.  The case was eventually "unsubstantiated."

With one exception, Ms. Nobis acknowledges that she has never been denied the right to interview an alleged victim.  That was a case where she could not get parental consent to interview the child.  That report of abuse was unsubstantiated.  There are three cases where she has made "substantiated" findings.  All are currently under appeal.

127

they are -- they are not trained and I believe that they have a number of staff who have abused children that continue to have access to children, continue to have control and supervision and discipline over them, and it -- it bothers me. I believe it is not safe. I don't think it's wise. I think that they need to do a much better job managing those things. I would like to see them continue to operate. I think they have tremendous potential to do good things. I think they have the right intent and mission, but I think they don't have the level of understanding, education, and training that allows them to provide safe care to children.

Q.    And so if I understood your testimony on direct, as a consequence, you think it's irresponsible for them to take the kids that they do?

A.    I think it's irresponsible when you take in children that you don't have staff -- and not just one or two staff, but all of your staff that have the right maturity, the right experience, the right training, the right ability to do proper assessments and proper interventions. I think it's irresponsible to have 19 -- roughly 19 people on your staff that have probable cause findings by the Division of Family Services employed on your staff. I think all of those things are -- are problematic and present significant and serious risks to the safety and development of children. Those are concerns to me.

Q.    And I think you're aware that virtually all of those probable cause determinations, certainly, the vast majority, are under appeal in the system?

A.    I understand that, yes.

## ANALYSIS

**I.    PLAINTIFFS' COMPLAINT**

The complaint at issue in this case is Heartland Academy Community Church and CNS International Ministries, Inc.'s Third Amended Complaint, filed on January 14, 2003.  It was brought pursuant to 42 U.S.C. § 1983 against Mr. Waddle, Sheriff Parrish, Lewis County, Missouri, and Ms. Ayers,[26] all in their individual and official capacities and under color of state law, and seeks declaratory and injunctive relief.  Plaintiffs seek "redress against defendants, who individually and in concert with each other have, in bad faith, engaged in a systematic, persistent and continuous campaign of harassment and intimidation against Heartland, its students and their families, faculty and staff . . . to damage the Heartland community, in violation of the constitutional rights of Heartland,

---

[26]  Deputy Sheriff Patricia McAfee was also named as a defendant in the Third Amended Complaint; however, she was terminated from this suit on July 9, 2003.

its students and their families, faculty and staff."  These constitutional rights are the right to be free from unreasonable seizures and detentions under the Fourth Amendment, the right to family integrity pursuant to the due process clause, and the First Amendment rights to religious liberty, free speech, and freedom of association.

In their prayer for relief, Plaintiffs seek declaratory relief that Defendants actions have violated their constitutional rights.  They also seek a permanent injunction prohibiting Defendants from causing or attempting to cause, by court order or otherwise, the pre-notice or pre-hearing protective custody or removal of any children from Heartland unless "there is reasonable cause to believe that each child as to whom the protective custody and/or removal is sought is in imminent danger of suffering serious physical harm, threat to life, or sexual abuse as a result of abuse or neglect."

## II.   DEFENDANTS' JURISDICTIONAL ARGUMENTS

### A.   <u>Rooker-Feldman</u> Doctrine

Mr. Waddle asserts that the Court lacks jurisdiction to issue a permanent injunction under the <u>Rooker- Feldman</u> doctrine.  <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983); <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923).  The <u>Rooker-Feldman</u> doctrine prohibits district court review of judgments issued by state courts except by the United States Supreme Court.  <u>Fielder v. Credit Acceptance Corp.</u>, 188 F.3d 1031, 1034 (8th Cir. 1999).  "The doctrine also deprives lower federal courts of jurisdiction over claims that are 'inextricably intertwined' with claims adjudicated in state court."  <u>Id.</u> (citing <u>Feldman</u>, 460 U.S. at 482 n. 16).  A claim is considered intertwined, and, thus, not subject to lower federal court jurisdiction, only if success on the claim "'would effectively reverse the state court decision or void its ruling.'"  <u>Id.</u> (quoting <u>Charchenko v. City of Stillwater</u>, 47 F.3d 981, 983 (8th Cir. 1995)).

The Court previously found, in its preliminary injunction order, that the <u>Rooker-Feldman</u> doctrine did not prevent the Court from exercising jurisdiction because Plaintiffs, here, are not seeking a review of the merits of a state court decision.  Instead, their claims focus on the motive and basis upon which Defendant Waddle sought the Orders, the lack of orders or accurate orders for many of the children removed, and the alleged unreasonable method of removal of the entire boarding population of Heartland.  Thus, the Court concluded that success by Plaintiffs in this action would not void any state court order or ruling.  This holding was upheld by the Eighth Circuit.  <u>See</u> <u>Heartland Acad. Cmty. Church v. Waddle</u>, 335 F.3d 684, 689 (8th Cir. 2003).  In affirming this

Court's decision, the Eighth Circuit stated:

> Heartland's motion for injunctive relief does not interfere with a state-court judgment – there is no state-court order permitting juvenile authorities in the future to round up all Heartland boarding students, without a hearing, and take them into protective custody. And so, in hearing Heartland's motion for a preliminary injunction, the District Court did not need to take on any issue actually litigated in the state courts or any claim 'inextricably intertwined' with such an issue. The injunction here is forward-looking, directed to any contemplated wholesale pre-hearing removal of boarding students from the Heartland complex.

Id.

As in their motion for preliminary injunction, Plaintiffs, here, are not asking the Court to review the merits of any state court orders. Rather, Plaintiffs focus on Defendants' motives in obtaining the orders, the accuracy of the orders, and the method of removing the students. Further, Plaintiffs are continuing to seek only prospective injunctive relief, and, as noted by the Eighth Circuit, there is no state-court order presently in place that permits juvenile authorities in the future to remove boarding students from Heartland and take them into protective custody without a hearing. Thus, the Court finds that Rooker-Feldman is not a bar to jurisdiction in Plaintiffs' request for a permanent injunction.[27]

### B.    Standing

Mr. Waddle and Ms. Ayers argue that Plaintiffs lack standing to pursue claims on behalf of other parties not before the Court such as students, faculty, and employees of Heartland. Mr. Waddle and Ms. Ayers maintain that Plaintiffs cannot vicariously assert the Fourth Amendment rights of others and Plaintiffs do not have associational standing because they do not have members or shareholders whose interest they represent.

---

[27] Defendant Waddle states in his conclusions of law that the Rooker-Feldman doctrine is applicable to prevent the Court from exercising jurisdiction over this motion for permanent injunction because "a decision in plaintiffs' favor may have collateral consequences in the event those affiliated with plaintiffs, some of whom were previously parties to this suit, were to pursue damage actions against the defendants before this Court." Contrary to Defendant Waddle's argument, the Court finds that this possibility does not justify a finding that it cannot exercise jurisdiction under the Rooker-Feldman doctrine. The Rooker-Feldman doctrine prohibits district court review of existing state court judgments. Fielder, 188 F.3d at 1034. The fact that the Court's decision could cause other people to file suits in federal court does not invoke the Rooker-Feldman doctrine.

Standing is a constitutional doctrine based upon the case and controversy requirements of Article III of the United States Constitution.  The doctrine ensures that "the plaintiff before the court is the proper party to request adjudication of a particular issue."  United Food & Commercial Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 426 (8th Cir. 1988) (citing Flast v. Cohen, 392 U.S. 83, 99-100 (1968)).  That "'[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines."'"  Int'l Ass'n of Fire Fighters v. City of Clayton, 320 F.3d 849, 850 (8th Cir. 2003) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990) (alteration in original)).  To establish standing, the party asserting federal court jurisdiction must show that (1) the plaintiff suffered injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury is likely redressable by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

In addition to the constitutional standing requirement, certain prudential requirements further limit standing to bring suit.  "[U]nder the prudential limits of the standing doctrine, 'even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement, [the Supreme Court] has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  Potthoff v. Morin, 245 F.3d 710 (8th Cir. 2001) (quoting Warth v. Selden, 422 U.S. 490, 499 (1975)).

Although traditional third party standing is generally prohibited by the prudential limits, the courts have recognized organizational standing.  "'Even in the absence of injury to itself, an association may have standing solely as the representative of its members.'"  Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 342 (1977) (citation omitted).  To establish organizational standing, a party must show that (1) the organization's members would otherwise have standing to sue in their own right; (2) the interests of the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested required the individual members to participate in the lawsuit.  Nat'l Fed. of Blind of Missouri v. Cross, 184 F.3d 973, 981 (8th Cir. 1999) (citing Hunt, 432 U.S. at 343).  See also Minnesota Fed. of Teachers v. Randall, 891 F.2d 1354, 1359 (8th Cir. 1989) (concluding that the interest to be protected was not germane to the purpose of the organization); Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc., 772 F.2d 467, 471 (8th Cir. 1985) (stating that the third element is not to be read so narrowly that mere

testimony in the case negates standing).

This Court has already discussed at length the standing issue in its January 11, 2002 Order denying Defendants Parrish, McAfee, and Lewis County's Motion to Dismiss; its February 7, 2002 Order granting in part Plaintiffs' request for preliminary injunction; and its July 9, 2003 Order denying Mr. Waddle and Ms. Ayers' Motions for Summary Judgment.  In the January 11 and February 7 orders, the Court held that Plaintiffs have standing to sue on their own behalf because they alleged that Defendants' actions interfered with their ability to attract students and fulfill their purpose of providing residential and educational programs for troubled youth.  The Court also found that Plaintiffs could seek recovery for wrongs suffered by Heartland students because Plaintiffs satisfied the requirements for organizational standing.[28]  Likewise, in the Court's July 9 Order, it concluded that the students, families, and staff of Heartland sufficiently constitute "members," and that Plaintiffs had demonstrated all of the elements for organizational standing.

Neither Mr. Waddle nor Ms. Ayers point to any evidence from trial that persuades the Court that it should overturn its earlier ruling on the issue of Plaintiffs' standing.  Mr. Waddle raises the new argument that the "[c]hildren do not have interests identical to the interests of their parents, abusers, or guardians," but he does not elaborate the reasons for why their interests are not identical or put forth any evidence to show that the interests are different.  Therefore, the Court again finds that Plaintiffs have standing on its own and as the representative of its members to seek permanent injunctive relief.

### C.    Absolute Immunity

Mr. Waddle maintains that he is entitled to absolute quasi-judicial immunity from suit. "'Absolute quasi-judicial immunity derives from absolute judicial immunity.'"  Martin v. Hendren, 127 F.3d 720, 721 (8th Cir. 1997) (citation omitted).  "Judges performing judicial functions enjoy absolute immunity from § 1983 liability."  Robinson v. Freeze, 15 F.3d 107, 108 (8th Cir. 1994). Absolute immunity can be extended to officials other than judges when "'their judgments are

---

[28]  On appeal from the preliminary injunction, the Eighth Circuit affirmed the Court's decision, and stated that "on the face of the complaint, the corporate plaintiffs alleged injury to themselves (imminent shutdown of HCA)," so "Heartland has standing to bring its claim."  Since the Eighth Circuit found that Plaintiffs had standings in their own right, the Eighth Circuit did not address organizational standing.

functionally comparable to those of judges – that is, because they, too, exercise a discretionary judgement as a part of their function.'" Id. (quoting Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 436 (1993)).  In determining whether an official other than a judge is entitled to absolute immunity, rather than merely qualified immunity, the court "must begin by noting the Supreme Court's presumption that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties." Id. "Accordingly, 'the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.'" Id. (quoting Burns v. Reed, 500 U.S. 478, 486 (1991)).

Mr. Waddle asserts that he is entitled to absolute quasi-judicial immunity from suit because he was acting at the direction of and pursuant to the order of the Juvenile Court judge when he took custody of the children at Heartland on October 30, 2001.  On the other occasions when he took children into custody, he claims "he was extending to those children the protective cloak of the juvenile court pursuant to Missouri state law."  The Court previously addressed Mr. Waddle's absolute immunity argument in its July 9, 2003 Order denying his motion for summary judgment.  In that order, the Court found that while Mr. Waddle was acting, at least in part, pursuant to court orders on October 30, 2001, the Third Amended Complaint was much broader in that it includes allegations that juveniles were removed without orders, that juvenile officers conducted oppressive interviews with juveniles and staff, that juvenile officers sent threatening letters to parents, and the Defendants participated in other instances of harassing behavior.  See Anderson v. Larson, 327 F.3d 762, 768-69 (8th Cir. 2003) (holding that while a prosecutor is entitled to absolute immunity for "conduct that is intimately associated with the judicial process," a prosecutor is not entitled to absolute immunity for investigatory or administrative functions).  Thus, the Court restates its finding that Mr. Waddle is not entitled to absolute quasi-judicial immunity.

### D.    Eleventh Amendment

Mr. Waddle contends that this Court is prohibited from entering an order in this case by the Eleventh Amendment of the United States Constitution.  Mr. Waddle states that Plaintiffs "seek an order from this Court requiring the defendants to conform their conduct to a particular interpretation of State law that plaintiffs argue is correct" and "[t]he Eleventh Amendment precludes this Court from entering an order requiring defendants to conform their conduct to state law."  Contrary to Mr.

Waddle's contention, Plaintiffs, in their Third Amended Complaint, are not seeking an order requiring Defendants to conform to their conduct to this Court's interpretation of state law. Plaintiffs are not even asking the Court to provide an interpretation of Missouri state law. Instead, as previously noted, Plaintiffs are seeking a declaration that Defendants' conduct violated their constitutional rights, and a permanent injunction preventing them from causing or attempting to cause, by court order or otherwise, the pre-notice or pre-hearing protective custody or removal of any children from Heartland unless "there is reasonable cause to believe that each child as to whom the protective custody and/or removal is sought is in imminent danger of suffering serious physical harm, threat to life, or sexual abuse as a result of abuse or neglect." Consequently, Plaintiffs argue, the Eleventh Amendment does not prohibit the Court from entering an order in this case.

However, the Eleventh Amendment could bar Plaintiffs' suit against Defendants because Plaintiffs bring their claims against them in their official and individual capacities. Usually, the Eleventh Amendment "immunity extends to actions against state officials sued in their official capacities." Thomas v. Gunter, 32 F.3d 1258, 1261 (8th Cir. 1994). "Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant." Papasan v. Allain, 478 U.S. 265, 278 (1986). Nevertheless, "the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." Green v. Mansour, 474 U.S. 64, 68 (1985) (citing Ex parte Young, 209 U.S. 123, 155-56, 159 (1908)). "[R]elief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment" when brought against a state official acting in her official capacity. Papasan, 478 U.S. at 278. Therefore, since Plaintiffs in this action are seeking a prospective permanent injunction, their suit against Defendants in their official capacity is not barred by the Eleventh Amendment. In addition, "[t]he Eleventh Amendment does not otherwise affect suits against public officials in their individual capacities[.]" Thomas, 32 F.3d at 1261. Accordingly, Plaintiffs' claims against Defendants in their official as well as their individual capacity for injunctive relief will not be dismissed under the Eleventh Amendment.

## III.   PLAINTIFFS' SUBSTANTIVE CLAIMS – CONSTITUTIONAL VIOLATIONS

At the outset, the Court notes that Plaintiffs bring all of their claims for violations of their

constitutional rights under 42 U.S.C. § 1983. Pursuant to § 1983

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

"'[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 claim are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" DuBose v. Kelly, 187 F.3d 999, 1002 (8th cir. 1999) (quoting Parratt v. Taylor, 451 U.S. 527, 532 (1986)). The parties do not dispute that the conduct Plaintiffs complain of was committed by Defendants in their official capacity. However, the parties do vehemently dispute over whether Defendants conduct deprived Plaintiffs of their rights under the United States Constitution.

### A.    Fourth Amendment Claim (Count I)

In Count I of their Third Amended Complaint, Plaintiffs allege that Defendants' actions violated their constitutional right to be free from unreasonable seizures and detentions. Specifically, Plaintiffs state that Defendants, acting individually and in conspiracy with each other, "have violated and continue to violate the federal constitutional rights of individuals in the Heartland community, including, but not limited to its students, to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the U.S. Constitution, and their rights not to be deprived of their liberty without due process of law and the equal protections of the law under the Fifth and Fourteenth Amendments to the U.S. Constitution."

Plaintiffs' claims arise under the Fourth Amendment, which provides that persons have the "right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."[29] In deciding whether a situation implicates the Fourth Amendment, the court must first determine whether a seizure occurred. United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003). To determine if a seizure under the Fourth Amendment occurred, the Court must decide if,

---

[29] Fourth Amendment protections apply to unreasonable searches and seizures by state and local governments through incorporation by the Fourteenth Amendment's Due Process Clause. See Mapp v. Ohio, 367 U.S. 643, 655 (1961).

"in view of the totality of the circumstances surrounding the incident, a reasonable person would have believed he was free to leave." Id.  If not, the court must conclude that a seizure under the Fourth Amendment occurred.  Id.  In deciding whether there has been a violation of the Fourth Amendment, however, a court must also determine whether the seizure was unreasonable, both in its inception and in the manner in which the seizure occurred.  See Brokaw v. Mercer County, 235 F.3d 1000, 1011-12 (7th Cir. 2000) (finding that seizure of child was unreasonable under the Fourth Amendment).  "[T]he strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees."  Doe v. Heck, 327 F.3d 492, 509 (7th Cir. 2003).

Plaintiffs argue that the seizure of one hundred and thirteen children en masse on October 30, 2001 without prior notice or a hearing, and in the absence of an emergency, was unreasonable.  To address this claim, the Court shall look at each of the Defendants separately to determine whether they individually violated the Fourth Amendment by seizing the juveniles on October 30, 2001, and then at whether Defendants conspired to violate their Fourth Amendment right.

1.    Individual Defendants

a. Mr. Waddle

Plaintiffs assert that Mr. Waddle violated their Fourth Amendment right to be free from unreasonable seizures and detentions when he conducted a mass removal of children from Heartland on October 30, 2001.

"In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers '"have reason to believe that life or limb is in immediate jeopardy."'  Brokaw, 235 F.3d at 1010 (quoting Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999) (citation omitted)).  The same standard for reasonableness applies when a child is seized from a private school where she has been placed by her parents.  See Doe, 327 F.3d at 512 (holding "[i]n our view, there is no basis for concluding that when a minor child is entrusted to the care of a private school in loco parentis his reasonable expectation of privacy, vis-a-vis government officials, differs in any material respect from that which he would otherwise expect to receive at home.").

In light of these general principles, the Court will consider the reasonableness of Mr. Waddle's

taking of the children on October 30, 2001.[30]  Mr. Waddle argues that the seizure was reasonable because the children were taken pursuant to the Juvenile Court's order.  However, the evidence shows that out of the eighty-five juveniles seized by Mr. Waddle on October 30, only fifty of them were taken with court orders and thirty-five were taken without court orders.  Thus, the Court shall consider separately the reasonableness of the seizure of those taken with court orders and those taken without court orders.

For those taken with court orders, Mr. Waddle claims the seizures were reasonable and he cannot be found liable under the Fourth Amendment because he was merely executing court orders. "Courts have consistently held that officials acting pursuant to a facially valid court order have a quasi-judicial absolute immunity from damages for actions taken to execute that order." Patterson v. Von Riesen, 999 F.2d 1235, 1240 (8th Cir. 1993).  See also Robinson, 15 F.3d at 109 (holding "[c]onsistent with these common law precedents, we have extended absolute immunity to officials for '"acts they are specifically required to do under court order or at a judge's discretion."'" (citations omitted)); Rogers v. Bruntrager, 841 F.2d 853, 856 (8th Cir. 1988) (holding "[c]lerks of court 'have absolute immunity from actions for damages arising from acts they are specifically required to do under court order or at a judge's direction.'" (quoting McCaw v. Winter, 745 F.2d 533, 534 (8th Cir. 1984)).

Nevertheless, in this case, the evidence shows that Mr. Waddle did more than just execute court orders when he removed the children on October 30, 2001.  Instead, Mr. Waddle actually petitioned the Court for the removal of the children and created the orders for the Juvenile Judge to sign authorizing the removal.  "In determining whether particular acts of government officials are eligible for absolute immunity, we apply a 'functional approach . . . which looks to the nature of the function performed, not the identity of the actor who performed it.'" Malik v. Arapahoe County Dept. of Soc. Servs., 191 F.3d 1306, 1314 (10th Cir. 1999) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993)).  "'The more distant a function is from the judicial process, the less likely absolute immunity will attach.'" Id. (quoting Snell v. Tunnell, 920 F.2d 673, 687 (10th Cir. 1990)).  For example, the Supreme Court has held that "prosecutors are absolutely immune from liability

_____

[30]  There appears to be no dispute between the parties that the taking of the children on October 30, 2001 was a seizure under the Fourth Amendment.

under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' . . . insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" Burns v. Reed, 500 U.S. 478, 486 (1991) (quoting Imbler v. Pachtman, 424 U.S. 409, 431 (1976)). The Supreme Court has also held that "[w]e do not believe, however, that advising the police in the investigative phase of a criminal case is so 'intimately associated with the judicial phase of the criminal process,' . . . that it qualifies for absolute immunity." Id. at 493 (internal citation omitted). This "functional approach" to absolute immunity has been adopted by the circuit courts. In a case where a social worker applied for the ex parte order to take custody of a child from her mother's home, the Seventh Circuit held that "[t]he application for the initial order was much like a police officer's affidavit seeking a search warrant, which we know from Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), falls outside the scope of absolute immunity." Millspaugh v. County Dep't of Pub. Welfare of Wabash County, 937 F.2d 1172, 1176 (7th Cir. 1991). See also Ernst v. Child & Youth Servs. of Chester County, 108 F.3d 486, 497 n.7 (3d Cir. 1997) (agreeing with this holding from Millsbaugh that child welfare workers are not absolutely immune for investigative or administrative actions taken outside of the judicial process).

Furthermore, Plaintiffs allege in this case that Mr. Waddle procured the orders through misrepresentations and material omissions, actions which are not protected by absolute immunity. "[I]t [is] clearly established law that government officials' procurement 'through distortion, misrepresentation and omission,' . . . of a court order to seize a child is a violation of the Fourth Amendment." Malik, 191 F.3d at 1316 (internal citation omitted). See also Brokaw, 235 F.3d at 1012 (noting "to the extent the defendants [a social worker and other government officers] knew the allegations of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause, [the juvenile's] removal from his home, they violated the Fourth Amendment."). "The fact that the order was allegedly obtained by omissions, rather than affirmative misstatements, is irrelevant, so long as the 'omissions are so probative they would vitiate probable cause.'" Malik, 191 F.3d at 1316 (quoting DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990)). Thus, because Mr. Waddle did not merely execute the Juvenile Court's orders to seize the children from Heartland, but instead actually petitioned the court for such orders, as well as misstating material facts to the Juvenile Court Judge and omitting known material facts from his papers presented to the Juvenile

Judge, the Court finds that his actions are not protected by the absolute immunity doctrine.  As such, the Court will now address the issue of whether he violated the Plaintiffs' Fourth Amendment rights in procuring the orders for removal.

As noted earlier in the opinion, Mr. Waddle raised eight allegations in his petitions for removal of the children purporting to show how Heartland was not providing a safe living environment.  However, as previously pointed out, some of the allegations were false, i.e., his claim that Heartland refused to produce employees who abused children or who were witnesses to the abuse; his claim that Heartland was concealing Mr. Flood during the O.M. investigation; his claim that Heartland was concealing Mr. Mayes during the J.K. matter; and his claim that Heartland was concealing Mr. Jerry Parrish and that Mr. Parrish had lost his E.M.T. license.  The evidence in this case clearly establishes that Heartland offered to produce the employees for questioning who allegedly abused children on several occasions to the Division of Family Services' personnel and that Mr. Waddle was aware of its offer.  In addition, there is no evidence showing that Heartland "concealed" any employees from anyone involved in the child abuse investigations.  It is also clear from the evidence presented in this case that Mr. Jerry Parrish had not lost his E.M.T. license as alleged by Mr. Waddle in his papers.

The evidence also shows that Mr. Waddle omitted known material information from the petitions which the Juvenile Judge testified would have been relevant to his decision to issue the orders.  This omitted information includes the fact that the five criminally-charged defendants involved in the Manure Pit Incident were no longer participating in the administration of discipline; that the J.O. matter upon which Mr. Waddle relied in his petition had occurred in 2000 and was determined to be "unsubstantiated" by the Division of Family Services; that no staff member had been adjudicated guilty of child abuse or neglect; that he was not seeking the removal of O.M., about whom the most recent child abuse allegation had been brought; or that Heartland had taken extensive corrective action after the July 12 and September 26, 2001 meetings.  Mr. Waddle also failed to inform the Juvenile Judge of Heartland's belief that Mr. Waddle had "torn to shreds" their cooperative agreement of September 26, 2001 by his actions in removing children for questioning in violation of the agreement.  The Court finds that this evidence establishes that Mr. Waddle obtained the removal orders from the Juvenile Judge "'through distortion, misrepresentation and omission.'"  Id. (citation omitted).  Thus, the Court holds that, in this regard, Mr. Waddle violated the Fourth

Amendment.

For the thirty-five children taken without court orders, Mr. Waddle asserts that the seizures were reasonable because they were authorized under Missouri law. Seizures in the absence of a court order are considered reasonable under the Fourth Amendment only if they are based upon probable cause or if they are "justified by exigent circumstances, meaning that state officers '"have reason to believe that life or limb is in immediate jeopardy."'" Brokaw, 235 at 1010 (quoting Tenenbaum, 193 F.3d at 605) (citation omitted)). In addition, as Mr. Waddle argues, Missouri law provides that a juvenile officer may take a juvenile into judicial custody without a court order "if there is reasonable cause to believe that the juvenile is without proper care, custody, or support and that temporary protective custody is necessary to prevent personal harm to the juvenile." Mo. Sup. Ct. R. 111.01(4).

There is no evidence here, however, that Mr. Waddle had any probable cause to remove these thirty-five juveniles without a court order or any reason to believe they were in immediate jeopardy of harm to life or limb at the time of the removal. The evidence shows that Mr. Waddle was aware at the time that he removed the children from Heartland that the Manure Pit discipline had not occurred in approximately seven months; that the defendants involved in the Manure Pit Incident were no longer in disciplinary roles over the children; that no staff member had ever been adjudicated guilty of child abuse or neglect; and that there had been no substantiated allegations of child abuse or neglect for several months. There is also no indication from the evidence that any of the thirty-five children picked up without court orders had ever been involved in an abuse or neglect allegation. It is true in Missouri that "[a]buse of another child is prima facie evidence of imminent danger to a sibling in the same circumstances so as to justify intervention by a juvenile court for removal of the sibling from such environment." In re M R F C v. M H, 907 S.W.2d 787, 796 (Mo. App. 1995). This case holds that abuse of a child is prima facie evidence of imminent danger to *a sibling from such environment.* Id. at 796. This is not authority for the proposition that if there is evidence of abuse of one child in an institutional setting, there is prima facie evidence of abuse to all. In addition, Mr. Waddle knew that none of the most recent allegations of abuse, involving O.M. and J.K., had been substantiated by the Division of Family Services before October 30, 2001. The alleged abuse investigations concerning O.M. and J.K. were ongoing. Certainly, Mr. Waddle was not concerned about O.M., because O.M. was not included in the orders obtained from the Juvenile Court Judge.

Mr. Waddle also does not specifically allege that harm caused to J.K. by Nathan Mayes was sufficient to take custody of thirty-five male and female juveniles.   Thus, the allegations of abuse regarding those juveniles could not serve as a basis to justify removing the thirty-five other juveniles without a court order.   This is especially true for any of those thirty-five who were females, as the two instances of abuse towards O.M. and J.K. were said to have occurred in the Boys' Dormitory, which is twelve miles away from the Girls' Dormitory.

Moreover, Mr. Waddle testified at trial that the reason he decided to remove the children without prior notice and a hearing was because he believed that if he had followed that procedure, there would have been an opportunity for a request for a change of judge to be filed and he was concerned that the case would "drag out."  He also said that he did not believe that Heartland would cooperate with him, given their past behavior of non-cooperation.  However, the evidence clearly shows that Mr. Waddle was aware that Heartland had attempted to cooperate with him, the Division of Family Services, and Sheriff Parrish in the past, but that he did not approve of their form of cooperation (i.e., he did not think the criminally-charged defendants should be allowed to self-surrender, he did not think that students should be interviewed at Heartland, and he did not think that attorneys should be allowed to be present at questionings).   It appears from this testimony that Mr. Waddle removed the children without court orders not because he was immediately concerned about their safety, but because of his animosity towards Heartland.   The Court has already determined and noted that Mr. Waddle's reliance on lack of cooperation of Heartland officials based on conversations with Mr. Melton on October 26 and October 29, 2001, is fabricated and pretensive.  This is especially true given the evidence that Mr. Waddle had been planning to remove the children from Heartland by at least October 23, 2001.  Consequently, the Court finds that Mr. Waddle violated the Fourth Amendment when he seized the thirty-five juveniles from Heartland without a court order.

b. Ms. Ayers

Plaintiffs claim that Ms. Ayers violated the students' right to be free from unreasonable seizures and detentions when she seized juveniles from Heartland on October 30, 2001.  Ms. Ayers does not dispute that on that date she seized twenty-eight juveniles.  However, Ms. Ayers argues that the seizures did not violate the Fourth Amendment because they were reasonable, in that she had court orders to remove twenty-four juveniles and had reasonable cause to believe that the four

141

children she removed without orders were in risk of imminent injury if they remained at Heartland.

The petitions Ms. Ayers provided to the Juvenile Judge in seeking orders to remove the juveniles from Heartland were identical to those prepared by Mr. Waddle because he supplied the forms to her.  In addition, the evidence indicates that Mr. Waddle and Ms. Ayers had numerous conversations regarding the events occurring at Heartland before they sought removal petitions and executed the mass removal.  The evidence shows that Ms. Ayers was in much the same position as Mr. Waddle when she sought removal orders from the Juvenile Judge, and when she removed children from Heartland without court orders, and believes that its analysis and determination that Mr. Waddle's actions violated the Fourth Amendment is equally applicable to Ms. Ayers.  Ms. Ayers had no personal knowledge of many of the allegations in the petitions she presented to the Juvenile Court Judge.  She presented the same false and misleading information to the judge as Mr. Waddle.  She knew of no circumstances involving any juvenile in Shelby County to cause her to believe that any juvenile was in immediate jeopardy of harm to life or limb at the time of the removal.  As such, considering the same analysis as above, the Court finds that Ms. Ayers, like Mr. Waddle, violated the Fourth Amendment when she seized juveniles from Heartland on October 30, 2001.

### c.  Sheriff Parrish and Lewis County

Plaintiffs maintain that Sheriff Parrish and Lewis County violated the Fourth Amendment right to be free from unreasonable seizures and detentions when Sheriff Parrish removed children from Heartland on October 30, 2001.  However, the evidence at trial established that neither Sheriff Parrish nor any sheriff personnel from Lewis County were present at the mass removal.  In addition, the evidence shows that Sheriff Parrish was not involved in obtaining the court orders to seek the removal of the children on October 30.  Rather, Sheriff Parrish did not learn about the mass removal until the morning on October 30, after the courts orders had been issued.  Therefore, the Court finds that Sheriff Parrish cannot be found to have, individually, violated the Fourth Amendment in removing children from Heartland on October 30, 2001.

As to Plaintiffs' claim against Lewis County, "[a] municipality can be sued for 'constitutional deprivations visited pursuant to governmental custom.'"  Mabe v. San Bernardino County, Dep't of Pub. Soc. Serv., 237 F.3d 1101, 1110 (9th Cir. 2001) (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978)).  "In order to establish the liability of a municipality in an

action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy." Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989)). The establish liability, plaintiffs must show that "(1) [they were] deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to [their] constitutional right; and (4) the policy was the 'moving force behind the constitutional violation.'" Mabe, 237 F.3d at 1110-1111 (quoting Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996)).

As noted previously, there is no evidence in this case that anyone from the Lewis County sheriff's department was present at the mass removal on October 30, 2001. Thus, there is no evidence that Lewis County, through its employees, violated the students' Fourth Amendment right on that day. Further, there is no evidence that Lewis County had a policy that amounted to "deliberate indifference" to Heartland's Fourth Amendment right and was the "moving force" behind the mass removal of students at Heartland on October 30, 2001. Therefore, the requirements for finding a county liable under § 1983 have not been met with regard to this claim.

2.     Conspiracy

In addition to claiming that Defendants violated their Fourth Amendment right to be free from unreasonable seizure and detention by their individual actions, Plaintiffs also assert that Defendants conspired to violate their Fourth Amendment right.

A plaintiff may bring a claim of conspiracy under 42 U.S.C. § 1983. To prevail on a § 1983 conspiracy claim, "the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999). "[T]he plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." Id. "'The charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible for any overt act or acts.'" Putnam v. Gerloff, 701 F.2d 63, 65 n. 4 (8th Cir. 1983) (quoting Hostrop v. Bd. of Junior Coll. Dist. No. 515, 523 F.2d 569, 576 (7th Cir. 1975)).

With regards to Mr. Waddle and Ms. Ayers, the Court has already determined that they, through their individual actions, violated the students' Fourth Amendment right to be free from unreasonable seizure.  The Court also concludes that the record in this case shows that Mr. Waddle and Ms. Ayers acted jointly to deprive students of the Fourth Amendment right.  The record reveals that there were various meetings, correspondences, and discussions between Mr. Waddle and Ms. Ayers in which they discussed removal of the children from Heartland and methods to discourage parents or guardians from returning their children to Heartland.   Included among these was a discussion on October 23, 2001, where, as memorialized by Ms. Ayers, the two judicial circuits "met and agreed that the removal of children without parental custody from the Heartland Facility was indicated." More significantly, there also is evidence that Mr. Waddle specifically discussed his plans to remove all of the children and the manner in which he was going to conduct the removal, that is, by obtaining ex parte orders of protection, with Ms. Ayers on October 29, 2001.  Although the evidence shows that Ms. Ayers initially did not concur with his decision to remove the children and expressed concern over the availability of adequate resources, she eventually agreed with him to also seek protective custody orders on October 30, 2001, and used Mr. Waddle's false and misleading petitions to do so.  Thus, the Court finds that a conspiracy existed between Mr. Waddle and Ms. Ayers to deprive students of their Fourth Amendment right.

The more difficult question is whether the record supports a finding that Sheriff Parrish and, through him, Lewis County acted in concert with Mr. Waddle and Ms. Ayers to deprive students of their Fourth Amendment right on October 30, 2001.  The record establishes that Sheriff Parrish participated in several meetings with Mr. Waddle and Ms. Ayers where the fate of Heartland was discussed.  Additionally, Sheriff Parrish testified that while he was having lunch with Mr. Waddle, along with Mr. Hall and Mr. Roberts, earlier in October at Primos, the issue of removing "all of the kids" was mentioned.

Sheriff Parrish had constituents who wanted Lewis County cleansed of Heartland.  Sheriff Parrish intensely dislikes Mr. Sharpe.  The Court concludes that he would be most pleased if Heartland either had never appeared in Lewis County or would disappear, and remain only an unpleasant memory.  While this record clearly shows that Sheriff Parrish met with Mr. Waddle and Ms. Ayers and was present during discussions about removing all of the children from Heartland, it

does not clearly reveal that Sheriff Parrish conspired with them to deprive students of their Fourth Amendment right to be free from unreasonable seizures. Rather, the evidence shows that Sheriff Parrish was not consulted before Mr. Waddle and Ms. Ayers petitioned the Court for the removal of the children. Mr. Waddle swore he had no conversations with law enforcement personnel before he conferred with the Juvenile Court Judge. There is no indication from the evidence that Sheriff Parrish conspired with Mr. Waddle to create the false and misleading petitions which violated the students' Fourth Amendment rights. Moreover, the evidence does not show that Sheriff Parrish conspired with Mr. Waddle and Ms. Ayers to remove children without court orders on October 30. Instead, the evidence is that when Sheriff Parrish learned of how the mass removal was going to take place on October 30, 2001, he had concerns about it and asked why it had to occur on that date. Therefore, the Court concludes that there is insufficient evidence to support a finding that Sheriff Parrish and, through him, Lewis County, conspired with Mr. Waddle and Ms. Ayers to deprive the students of their Fourth Amendment rights on October 30, 2001.

B.     **Right to Family Integrity (Count II)**

Count II raises a claim for violation of the right to family integrity. Plaintiffs allege that "Defendants have violated and continue to violate the federal constitutional rights of the Heartland community, including its students and their parents, to be free from interference with the rights of parents, guardians and families to direct the upbringing and education of their children, under the U.S. Constitution." In doing so, Plaintiffs contend that Defendants have acted individually and in conspiracy with each other and under color of state law.

"'The interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution.'" Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 91 (1st Cir. 2002) (citation omitted). See also Manzano v. South Dakota Dep't of Soc. Servs., 60 F.3d 505, 509 (8th Cir. 1995) (noting "[o]ur court has recognized the liberty interest which parents have in the care, custody, and management of their children."). "This liberty interest is protected both by the substantive component of the Due Process Clause, which constrains governmental interference with certain fundamental rights and liberty interests, and by the procedural component of the Due Process Clause, which guarantees 'fair process.'" Suboh, 298 F.3d at 91 (citing Washington v. Glucksberg, 521 U.S. 702, 720 (1997)). See also Brokaw, 235

145

F.3d at 1018 ("The Supreme Court has long recognized as a component of substantive due process the right to familial relations." (citing Prince v. Massachusetts, 321 U.S. 158, 166 (1944)); Batten v. Gomez, 324 F.3d 288, 295 (4th Cir. 2003) (holding that a seizure of a child from a mother constituted an interference with the mother's right in the companionship, care, custody, and control of her child, thereby "trigger[ing] the procedural protections of the Due Process Clause of the Fourteenth Amendment." (citing Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27 (1981)).  Not only can the claims of interference with familial relations be brought by parents and children, but "the Supreme Court [has also] held that private schools have the right to bring claims against the state for arbitrarily interfering with their patrons' (i.e., parents' and students') liberty interest in familial relations." Doe, 327 F.3d at 518 (citing Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-36 (1925)).

Before reaching the merits of this claim, the Court notes that the family integrity claims made by Heartland students based upon their seizure on October 30, 2001 are not redressable under the substantive due process clause of the Fourteenth Amendment because they are covered by the Fourth Amendment.  The Supreme Court has held that "substantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon." Brokaw, 235 F.3d at 1017 (citing United States v. Lanier, 520 U.S. 259, 272 n. 7 (1997)).  "'Substantive due process analysis is therefore inappropriate in this case . . . if [the] claim is "covered by" the Fourth Amendment.'" Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)).  However, to the extent their "familial relations claim specifically alleges  that the government's physical seizure coincided with other conduct amounting to an inference with the parent-child relationship (e.g., custodial interview of child by government officials without the consent of his parents and without reasonable suspicion that parents were abusing the child or that the child was in imminent danger of abuse), that allegation of harm constitutes a separate and distinct violation of a separate fundamental constitutional right and both claims may therefore be maintained." Doe, 327 F.3d at 518 n. 23.

To address Plaintiffs' claim of interference with rights to familial relations, the Court will look at each of the Defendants separately to determine if they violated their right to familial relations and then whether they conspired to violate any such right.

1.    *Individual Defendants*

146

a. Mr. Waddle

Plaintiffs claim that Mr. Waddle, through his actions towards Heartland, violated their right to familial relations. Mr. Waddle argues that he did not violate this right because "the right to family integrity is not absolute and must give way to the State's compelling interest in protecting children" and "Heartland's delegation of parental rights forms could not lawfully constitute a delegation of parental authority to plaintiffs." As to the latter argument, the Court has already noted that the Supreme Court has held that private schools have the right to bring a claim against the state for interfering with their patrons' liberty interest in familial relations. See Doe, 327 F.3d at 518 (citing Pierce, 268 U.S. at 534-36).

As to Mr. Waddle's first argument, he is correct that parents' liberty interest in the care, custody, and management of their child is not absolute. Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997). "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents." Id. Furthermore, "'[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations.'" Manzano, 60 F.3d at 510 (quoting Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993)).

Because parents have a liberty interest in family integrity and the state has a compelling interest in protecting children, the substantive due process clause of the Fourteenth Amendment requires that "a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes." Brokaw, 235 F.3d at 1019. "In balancing these competing interests, courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. Thus, "[w]here . . . there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody at least pending investigation." Gottlieb, 84 F.3d at 518.

While substantive due process requires that a balance be made between a parent's right to family integrity and the state's interest in protecting children, procedural due process "guarantees that

147

parents will not be separated from their children without due process of law except in emergencies." Mabe, 237 F.3d at 1107. "To meet the requirements of due process, the state must afford notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Batten, 324 F.3d at 295 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). This is true even if the state is removing a child temporarily from the home. Ram v. Rubin, 118 F.3d 1306, 1311 (9th Cir. 1997). Yet, "officials may temporarily deprive a parent of custody in 'emergency' circumstances 'without parental consent or a *prior* court order'" without violating the requirements of procedural due process. Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (quoting Duchesne v. Sugarman, 566 F.2d 817, 826 (2d Cir. 1977)). In such circumstances, an official "must have no less than a reasonable suspicion of child abuse (or imminent danger of abuse) before taking a child into custody prior to a hearing." Hatch v. Dep't of Children, Youth & Their Families, 274 F.3d 12, 23 (1st Cir. 2001). "It is not necessary, for emergency circumstances to exist, that the child be harmed in the presence of the officials or that the alleged abuser be present at the time of the taking. Rather, it is sufficient if the officials have been presented with evidence of serious ongoing abuse and therefore have reason to fear imminent harm." Robinson, 821 F.2d at 922. "An indictment or serious allegations of abuse which are investigated and corroborated usually give rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody." Ram, 118 F.3d 1311. Even in a case where a child is removed in an emergency situation prior to a hearing, due process still "requires that some sort of process be provided promptly after an emergency removal." Suboh, 298 F.3d at 92. "'"[I]n those 'extra-ordinary situations' where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed."'" Id. (citations omitted).

It is evident from the record in this case that Mr. Waddle did not have a reasonable belief that the children at Heartland were in imminent danger of abuse on October 30, 2001, such that they could be removed without notice or an opportunity to be heard. Instead, the evidence shows that Mr. Waddle was aware at the time that he removed the children from Heartland that the Manure Pit discipline had not occurred in approximately seven months; that the criminally-charged defendants involved in the Manure Pit Incident were no longer in disciplinary roles over the children; that no staff member had ever been adjudicated guilty of child abuse or neglect; and that there were no

148

substantiated allegations of child abuse for months before the petitions were filed. There is also no indication from the evidence that any of the thirty-five children picked up without court orders had ever been involved in an abuse or neglect allegation. Further, Mr. Waddle knew that neither of the most recent allegations of abuse, involving O.M. and J.K., had been substantiated by the Division of Family Services before October 30, 2001. O.M. was not a concern because Mr. Waddle did not seek removal of O.M. by filing a petition. He does not plead that harm to J.K., where there was no substantiated abuse in his case, would justify removal of thirty-five children, including females. As such, the allegations of abuse regarding those juveniles could not serve as a basis to justify removing the thirty-five other juveniles without a court order. This is especially true for any of those thirty-five who were females, as the two instances of abuse towards O.M. and J.K. were said to have occurred in the Boys' Dormitory, which is twelve miles away from the Girls' Dormitory.

Also undermining any claim by Mr. Waddle that he had to remove the children on October 30, 2001 without a prior hearing because of exigent circumstances, is that he was planning the mass removal of children at least by October 23, 2001. This pre-planning is evidenced by the five incriminating documents submitted in this case. Thus, Mr. Waddle cannot assert that this was a situation where he had to make a split-second decision to remove the children for their own safety without notice or hearing. The fact that Mr. Waddle took at least seven days to plan the removal defies his argument that there were exigent circumstances necessitating the removal of the children without notice or a hearing. This determination is reinforced by Mr. Waddle's testimony that the reason he did not seek a hearing before removing the children is because he did not want things to "drag out," not because he was concerned about the immediate safety of the children.

Moreover, even if the Court were to find that Mr. Waddle reasonably believed that there was an immediate threat to the children's safety requiring their pre-notice and pre-hearing removal on October 30, 2001, which it does not, Mr. Waddle still acted to violate Plaintiffs' procedural due process rights when he failed to give them any sort of requested due process after the removal. The evidence shows that while a hearing on the removal was scheduled for November 2, 2001, at which Plaintiffs and their counsel appeared, Plaintiffs were not given an opportunity to be heard because Mr. Waddle dismissed the petitions before a hearing could be held. Because the petitions were dismissed, the Juvenile Court Judge refused to allow Plaintiffs to present any evidence or voice their objections

to the removal on the record.  The Court finds the Plaintiffs were deprived of procedural due process because of the removal of children where no emergency circumstances existed to justify their removal without prior notice and an opportunity to be heard in advance of the removal, and because Mr. Waddle effectively prevented Plaintiffs from ever receiving any due process related to the removal of the children before and after their removal.

Therefore, the Court concludes that Mr. Waddle violated Plaintiffs' right to family integrity when he removed the children on October 30, 2001, without notice or an opportunity to be heard and in the absence of exigent circumstances.

### b. Ms. Ayers

Plaintiffs assert that Ms. Ayers violated their right to family integrity when she removed the children en masse on October 30, 2001.  Ms. Ayers argues that she did not violate Plaintiffs' right to family integrity because she had a compelling interest in investigating and eliminating child abuse and because she did not act with deliberate indifference to their right to family integrity.

Because Ms. Ayers was relying on the petitions and information provided by Mr. Waddle when she removed the children on October 30, the Court finds that her actions, like those of Mr. Waddle, violated Plaintiffs' right to family integrity.  There is evidence that Ms. Ayers was aware that there were no current, ongoing, and substantiated allegations of child abuse at Heartland on October 30, and the only substantiated allegations had occurred several months earlier.  In addition, the procedures employed by Ms. Ayers to remove the children were identical to those used by Mr. Waddle.  Furthermore, Ms. Ayers did not present any information at trial that would support a finding that she had a reasonable belief that if she did not remove the children from Heartland without prior notice or hearing on October 30, they would be in imminent danger of bodily harm.  Therefore, the Court concludes that Ms. Ayers violated Plaintiffs' right to familial relations when she removed twenty-eight children on October 30, 2001, without notice or an opportunity to be heard and in the absence of exigent circumstances.

### c. Sheriff Parrish and Lewis County

Plaintiffs maintain that the actions of Sheriff Parrish and Lewis County violated their right to family integrity.  However, as noted earlier, there is no evidence that Sheriff Parrish or anyone from the Lewis County sheriff's office participated in the mass removal of children on October 30, 2001.

150

Moreover, there was no evidence presented at trial that Lewis County had a policy in place that amounted to "deliberate indifference" to Plaintiffs' right familial relations, which was the "moving force" behind the mass removal of students at Heartland on October 30, 2001. See Mabe, 237 F.3d at 1110-1111. Consequently, they cannot be held to have individually violated Plaintiffs' right to familial relations when the students were removed from Heartland.

      2.    *Conspiracy*

Along with alleging that Defendants individually violated Plaintiffs' right to familial relations, Plaintiffs also claim that Defendants conspired to violate such rights. To prevail on a § 1983 conspiracy claim, "the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." Askew, 191 F.3d at 957. "[T]he plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." Id. "'The charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible for any overt act or acts.'" Putnam, 701 F.2d at 65 n. 4 (quoting Hostrop, 523 F.2d at 576).

With regards to Mr. Waddle and Ms. Ayers, the Court has already determined that they, through their individual actions, violated Plaintiffs' right to family integrity. The Court also concludes that the record in this case establishes that Mr. Waddle and Ms. Ayers acted jointly to deprive Plaintiffs of this right. The record shows that there were various meetings, correspondences, and discussions between Mr. Waddle and Ms. Ayers in which they discussed removal of the children from Heartland and how to discourage parents from returning their children to Heartland by threatening, among other things, criminal prosecution, if children were returned. Included among these was a discussion on October 23, 2001, where, as memorialized by Ms. Ayers, the two judicial circuits "met and agreed that the removal of children without parental custody from the Heartland Facility was indicated." There also is evidence that Mr. Waddle specifically discussed with Ms. Ayers his plans to remove all of the children and the manner in which he was going to conduct the removal, that is, by obtaining ex parte orders of protection without prior notification to Plaintiffs on October 29, 2001. Although the evidence shows that Ms. Ayers initially did not concur with his decision to remove the

children and expressed concern over the availability of adequate resources, she eventually agreed with him to also seek pre-hearing and pre-notice protective custody orders on October 30, 2001. Thus, the Court finds that a conspiracy existed between Mr. Waddle and Ms. Ayers to deprive Plaintiffs of their right to family integrity.

As to Sheriff Parrish and, through him, Lewis County, the Court has concluded that they did not individually violate Plaintiffs' right to familial integrity. However, that holding does not require a finding that they did not act in concert with Mr. Waddle and Ms. Ayers to deprive Plaintiffs' of their right on October 30, 2001, since it only takes one co-conspirator to perform an overt act in furtherance of the conspiracy for all of the conspirators to be held liable. See Askew, 191 F.3d at 957. The record establishes that Sheriff Parrish participated in several meetings with Mr. Waddle and Ms. Ayers where the fate of Heartland was discussed. Additionally, Sheriff Parrish testified that while he was having lunch with Mr. Waddle, along with Mr. Hall and Mr. Roberts, at Primos, the issue of removing "all of the kids" was discussed.

The evidence also shows that Sheriff Parrish was not consulted before Mr. Waddle and Ms. Ayers petitioned the Court for the removal of the children. Mr. Waddle swore he had no conversations with law enforcement personnel before he conferred with the Juvenile Court Judge. There is no indication from the evidence that Sheriff Parrish talked with Mr. Waddle and Ms. Ayers before they removed the children without prior notice and opportunity to be heard on October 30. Instead, the evidence is that when he learned of how the mass removal was going to take place on October 30, 2001, he had concerns about it and asked why it had to occur on that date. Furthermore, there is no indication that he ever agreed they should be removed without giving Plaintiffs notice and opportunity to be heard even in absence of emergency circumstances. The Court finds that Plaintiffs fail in their burden of proof to show Sheriff Parrish, and consequently, Lewis County, conspired with Mr. Waddle and Ms. Ayers to violate Plaintiffs' right to familial integrity.

### C.   First Amendment Claims (Counts III and IV)

Counts III and IV allege violations of First Amendment rights to religious liberty, free speech, and freedom of association. In Count III, Plaintiffs state that Heartland is an openly faith-based institution and Defendants have unconstitutionally discriminated against the students, family, and staff at Heartland in that Defendants have demonstrated hostility toward the sincerely-held religious beliefs

and practices of Heartland.  Plaintiffs contend that Defendants have criticized Heartland as being a "cult" and a "little Waco."  Plaintiffs also claim that Defendants have accused Plaintiffs of engaging in "religious indoctrination."  In Count IV, Plaintiffs assert that Defendants took actions to disrupt and destroy the association between Plaintiffs, and the students, families, and staff at Heartland by attempting to close the school.

### 1.   Religious Liberty

In Count III, Plaintiffs claim that defendants Mr. Waddle, Sheriff Parrish, and, through him, Lewis County, violated their right to religious liberty and free speech.[31]  "The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, . . . , provides that 'Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*[.]'"  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) (internal citation omitted).  "[T]he principle of the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general."  Id. at 532. "'[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'"  Id. at 531 (quoting Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 714 (1981)).  To determine if the object of an official's act which interferes with the Free Exercise Clause is neutral or discriminatory, the Court may consider both direct and circumstantial evidence.  See id. at 540.

In this case, there is evidence demonstrating that Mr. Waddle and Sheriff Parrish voiced critical attitudes towards Heartland's religious beliefs.  Mr. Waddle testified that did not believe that Heartland should be able to run an unlicensed, faith-based school, notwithstanding the fact that Missouri law allows such schools. Mr. Waddle's words express a bias against Faith-based institutions that the Court finds particularly troubling.  The government of this State has expressed in its prevailing law that faith-based residential care organizations have the right to exist without a license. There is a belief that those organizations serve a public interest that is not met by other licensed organizations.  Those organizations, under the law, have the legal right to expect the government's protection, not its unbridled wrath.

---

[31]  In its Memorandum and Order dated July 9, 2003, the Court granted Ms. Ayers' motion for summary judgment as to Count III.

Sheriff Parrish admitted at trial that he had previously expressed his concern that Heartland had "potential to be a cult."  Sheriff Parrish testified that although many people in his community went to Heartland when it first opened, most eventually returned to their old churches because they did not like the teachings at Heartland.  Sheriff Parrish testified that he was concerned that the "word of Charlie" was being taught at Heartland, rather than "the word of the Lord."  He said he was concerned about the "mentality of the people and what kind of things were being said with respect to religious doctrine."  He questioned the legitimacy of their teachings, such as teaching classes on "speaking in tongues," which his church did not believe could be taught.  Sheriff Parrish received encouragement in his actions toward Heartland from his own pastor, Bill Nigus.

This evidence clearly shows that Mr. Waddle and Sheriff Parrish had negative feelings towards the religious teachings and practices at Heartland.  More importantly, it also appears from the record that the concerns Sheriff Parrish and Mr. Waddle had regarding the religious teachings and practices at Heartland impacted their investigation into Heartland.  For example, the evidence shows that when they questioned students about the Manure Pit Incident, they specifically asked them questions about the religious teachings at Heartland.  They spoke to the children about suspicions that there might be cult activities at Heartland.  Additionally, Mr. Waddle stated in an email he sent to Ms. Ayers concerning a meeting that was going to be held on the issue of Heartland that he wished "someone would ask for one of the agenda items to be Faith Based Programs," but he did not want it to be him, as he did not want to be "on the record, at least at this point, as leading a charge against the Christians."  This evidence suggests that the actions of both Sheriff Parrish and Mr. Waddle with respect to Heartland were motivated, in part, by their hostility towards Heartland's religious beliefs.

As noted by the Supreme Court,

> The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures.  Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and regulation are secular.

Id. at 547.  There are suggestions here that Mr. Waddle and Sheriff Parrish have not followed these constitutional principles.  They have deep prejudices against Heartland.  However, the Court is not persuaded that either acted against Heartland, children at Heartland, Heartland staff members, or

parents at Heartland because of their religious practices, or more specifically, that either "propos[ed] state intervention stem[ing] from animosity to religion or distrust of [Heartland] practices." The Court is clearly convinced that Mr. Waddle acted to close Heartland, but not because of its religious practices. Sheriff Parrish would be pleased if Heartland ceased to exists, but the Court is not convinced that he acted to close Heartland or that he took any of his pervasive investigatory actions against Heartland with the purpose of extinguishing or interfering in religious practices at Heartland. Mr. Waddle and Sheriff Parrish believed that Heartland either was or had the potential to be a cult, and gathered information in an effort to support that thesis, even though it is without any objective basis. Sheriff Parrish contacted the Federal Bureau of Investigation to get a definition of "cult." Their suspicions were misplaced, but the Court finds that neither Mr. Waddle, Sheriff Parrish, nor Lewis County acting through Sheriff Parrish, violated Plaintiffs' First Amendment right to the free exercise of religion.

### 2.     *Freedom of Association*

In Count IV, Plaintiffs allege that the actions of Defendants, individually and in conspiracy, violated their right to freedom of association. "There is no doubt that 'the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments.'" Hanten v. School Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999) (quoting Abood v. Detroit Bd. of Educ., 431 U.S. 209, 233 (1977)). This includes the "right to associate with others in pursuit of a wide variety of political, social, economic, *educational*, *religious*, and cultural ends." Roberts v. United States Jaycees, 468 U.S. 609, 622-23 (1984) (emphasis added). "Government actions that may unconstitutionally infringe upon this freedom can take a number of forms," including "interfer[ing] with the internal organization or affairs of the group." Id. at 623.

Nevertheless, "[t]he right to associate for expressive purposes is not, . . . , absolute." Id. at 623. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Id.

After considering all of the facts and evidence in this case, the Court concludes that the only defendant who acted to violate Plaintiffs' right to freedom of association was Mr. Waddle. Mr. Waddle repeatedly stated at trial that the purpose of his actions with regard to Heartland was to

protect the children at Heartland.  Protection of children is a compelling state interest.  However, the Court believes that Mr. Waddle's actual intent in his interactions with Heartland, notwithstanding his claim that he was only looking out for the best interest of the children, was to close Heartland.  This intent can be seen through his expressed bias against Faith-based institutions and his belief that non-licensed schools should not be allowed in Missouri.  This intent can be seen in the way he handled the investigation into the Manure Pit Incident.  This intent can be seen in his refusal to meet or talk with Heartland officials on numerous occasions, notwithstanding Heartland's willingness to talk with him and meet his demands.  This intent can be seen in his words to Ms. Ayers and Sheriff Parrish.  This intent can be seen in the way he, in the words of Mr. Melton, "tore to shreds" the cooperative agreement that was finally reached between his judicial district and Heartland.  This intent can be seen in the way he conducted the mass removal of the children on October 30, 2001, without notice or opportunity to Heartland and without adequate preparation that created a day of chaos and confusion.  This intent can be seen in his actions following the mass removal, when he required parents to sign a letter which stated that if they returned their children to Heartland, they could have their children taken away from them.  This intent can be seen in the language of his press release, where he said that the juvenile office would not be "bullied" or "intimated" by Heartland's "public relations schemes" or "federal lawsuits."  Finally, this intent can be seen in Mr. Waddle's repeated assurances at trial that he is still concerned about the conditions at Heartland and would remove all of the children from Heartland should the "same" circumstances that existed on October 30, 2001 arise again.  The Court finds that all of this evidence, as well as additional evidence set forth in the statement of facts, negates Mr. Waddle's stated purpose for his actions towards Heartland, i.e., to protect the children, and reveals his true intent, which was to close Heartland.  Thus, the Court finds that Mr. Waddle's actions infringed upon Plaintiffs' right to associate in pursuit of educational and religious ends.

As for the other defendants, the Court believes that the evidence does not show that they acted to violate Plaintiffs' right to associate.  Although it is clear from Sheriff Parrish's honest testimony that he did not like Heartland or agree with their religious practices, his actions do not appear to the Court to have been motivated by a desire to close Heartland, or to interfere with their right to associate.  In addition, there was no evidence presented at trial that Ms. Ayers wanted to close Heartland or to interfere with their right to associate.  Therefore, the Court finds that Sheriff

Parrish, and through him, Lewis County, and Ms. Ayers did not violate Plaintiffs' First Amendment right to association.  As Mr. Waddle is the only defendant who acted to violate Plaintiffs' right to associate, the Court also finds that there was no conspiracy between Defendants to violate Plaintiffs' right.

### D.    Summary

In sum, the Court holds that the actions of Mr. Waddle violated the students' Fourth Amendment right; violated Plaintiffs' right to family integrity under the due process clause; and violated Plaintiffs' right to freely associate under the First Amendment.  The Court holds that the actions of Ms. Ayers violated the students' Fourth Amendment right and violated Plaintiffs' right to familial relations under the due process clause.  The Court also holds that Mr. Waddle and Ms. Ayers conspired to violate the students' Fourth Amendment right and Plaintiffs' right to family integrity.

However, the Court further finds that Sheriff Parrish and Lewis County acting through Sheriff Parrish did not violate any of Plaintiffs' constitutional rights.  Plaintiffs have not succeeded on the merits of their claims against Sheriff Parrish and Lewis County, and, consequently, are not entitled to relief against them.  Therefore, the Court shall not include Sheriff Parrish and Lewis County in its discussion of Plaintiffs' request for relief.

## IV.    REQUEST FOR RELIEF

### A.    Permanent Injunction

As relief, Plaintiffs seek a permanent injunction prohibiting the pre-notice or pre-hearing protective custody or removal of any children unless "there is reasonable cause to believe that each child as to whom the protective custody [or] removal is sought is in imminent danger of suffering serious physical harm, threat to life, or sexual abuse as a result of abuse or neglect."  Specifically, Plaintiffs ask the Court to enter the following permanent injunction against Defendants:

> That Defendants, their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order shall not cause or attempt to cause, by court order or otherwise, the pre-notice and/or pre-hearing protective custody and/or removal of any children from the Heartland Academy Christian Church and/or CNS International Ministries, Inc., unless there is reasonable cause to believe that each child as to whom the protective custody and/or removal is sought is in imminent danger of suffering serious physical harm, threat to life, or sexual abuse as a result of abuse or neglect.

A permanent injunction is appropriate when a party has no adequate remedy at law and justice

157

so requires the granting of equitable relief.  The Court must (1) consider the threat of irreparable harm to the plaintiff; (2) balance the irreparable harm to the plaintiff with the harm to the defendant if the injunction is issued; (3) determine the plaintiff's success on the merits; and (4) consider the public interest.  See Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981); Bank One, Utah v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999) (stating that the standard for permanent injunctive relief is the same as for preliminary relief except the plaintiff must show an actual, as opposed to likelihood of, success on the merits).  No one factor is dispositive of the request for injunction; the Court considers all of the factors and decides whether "on balance, they weigh in towards granting the injunction."  Dataphase, 640 F.2d at 113.  Ths issuance of a permanent injunction is within the sound discretion of the Court.  See First Bank v. First Bank Sys., Inc., 84 F.3d 1040, 1044 (8th Cir. 1996).

"An injunction must be tailored to remedy a specific harm show."  Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982).  For an injunction to issue, "[t]he court must determine that a cognizable danger of future violation exists and that danger must be more than a mere possibility."  Id.  "'The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law.'"  Id. (quoting Holiday Inns of America, Inc. v. B & B Corp., 409 F.2d 614, 618 (3d Cir. 1969)).

"In the context of a suit in which plaintiff seeks permanent injunctive relief from a constitutional violation, the court should first consider whether plaintiff has established the fact of a violation."  Morris, 69 F.Supp.2d at 881(citing Rizzo v. Goode, 423 U.S. 362 (1976)).  "If plaintiff has proved a constitutional violation, the court should consider whether plaintiff has demonstrated both the presence of a continuing irreparable injury and the lack of an adequate remedy at law."  Id. Here, the Court has determined that Plaintiffs have shown violations of several constitutional rights from the actions of Mr. Waddle and Ms. Ayers.  Thus, the Court shall turn to the next considerations.

As to the issue of irreparable injury, the Court first notes that when a violation of constitutionally protected rights is shown, some courts require no further showing of irreparable harm.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976); Iowa Right to Life Comm., Inc. v.

Williams, 187 F.3d 963, 970 (8th Cir. 1999) (stating "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting Elroy, 427 U.S. at 373)).

In addition, the Court finds that Plaintiffs suffered other irreparable harm from Mr. Waddle and Ms. Ayers' actions.[32]  It is clear to the Court that the mass removal of children from Heartland on October 30, 2001 greatly traumatized the children and caused serious harm to Heartland parents and staff.  The Court also believes that the mass removal substantially interfered with Heartland's ability to provide its unique and specialized services to troubled children from all around the world.  There has only been a slight increase in the enrollment of "Program Students" since the mass removal, although Plaintiffs would like to enroll more such students.  Plaintiff's opportunity to attract program students and staff and continue its mission has been damaged by the actions of Mr. Waddle and Ms. Ayers.  These are not harms that can be compensable by legal relief, as the emotional damage to the children is not measurable and any damages to Plaintiffs' business opportunities and ability to care for troubled children cannot be measured in dollars.

The Court further believes that the threat of future harm is real and imminent.  From April 2001, when the investigations into the Manure Pit Incident began, until the request for injunctive relief was filed in November 2001, the parties' relationship has grown increasingly strained.  On occasion, attempts to work together and efforts to satisfy the concerns of all parties occurred.  At trial, the Court perceived deep feelings of resentment by Mr. Waddle towards Heartland.  Moreover, Mr. Waddle made it abundantly clear at trial that his concerns about Heartland have not lessened, and, should the events surrounding the October 30, 2001 removal, as he saw them, occur again, he would not hesitate to remove all of the children from Heartland.  In fact, Mr. Waddle testified that he continues to believe that Heartland is hiding incidents of abuse from the Department of Family Services and that he still needs to "vigilantly" oversee the actions at Heartland.  Thus, the Court concludes that the threat of irreparable harm, which is not compensable by legal relief, exists.

Next, the Court must balance the harm to Plaintiffs if no relief is granted with the potential

---

[32]  Although the Court does not believe it is required to address these additional reasons in light of the fact that Plaintiffs have shown violations of their constitutional rights, the Court will nevertheless address them.

harm to Mr. Waddle and Ms. Ayers if an injunction is issued.  See Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 489-90 (8th Cir. 1993) (affirming the district court's determination that the balance of harms weighed in favor of denying injunctive relief).  Mr. Waddle and Ms. Ayers argue that a permanent injunction will "chill" their abilities to effectively and efficiently exercise their duties to protect children from injurious environments.  The Court recognizes the very important areas of concern afforded juvenile authorities and law enforcement in protecting juveniles from harm.  The Court respects their efforts and has no intent to hinder their efforts to conduct lawful, prudent investigations into child abuse allegations and take lawful appropriate action. Nonetheless, the Court also believes that Mr. Waddle and Ms. Ayers have abused their power with respect to their actions at Heartland, and have shown a willingness to continue to abuse this power. Additionally, the Court believes that injunctive relief can be narrowly and unambiguously drawn to minimize the harm to Mr. Waddle and Ms. Ayers in legitimately exercising their power.  Thus, the great harm to Plaintiffs if an injunction does not issue far outweighs any harm to Mr. Waddle and Ms. Ayers, and the Court concludes that equity favors the granting of permanent injunctive relief.

Finally, the Court believes that the granting of a permanent injunction will benefit the public interest.  The public has a great interest in providing for the safe care and custody of children.  As noted by the Court in its Memorandum and Order granting Plaintiffs' motion for preliminary injunction, the Court has no intention of altering the juvenile laws or the authority to interfere with the discretion of the state court system.  In addition, the Court will not preclude Mr. Waddle and Ms. Ayers from validly investigating child abuse allegations and removing children from the custody of injurious environments when such removal is made in the spirit and to the letter of the juvenile code.

However, the Court also believes that the public has an interest in protecting the right to familial relations and preventing the abuse of power demonstrated by the actions of Mr. Waddle and Ms. Ayers on October 30, 2001.  The Court is still convinced, after hearing all of the evidence at trial, that Heartland is providing a unique and worthwhile alternative for children who have failed in public and other private school environments.  For as long as Heartland continues to provide care for children with serious emotional conditions, it must continue to be able to provide for the needs of those in its care.  It has no expectation to be immune from the exercise of lawful representatives of governmental agencies fulfilling their mandates for the protection of children.  However, it does have

160

the expectation and the right to be free from conspiratorial governmental predators that scheme and act to cause its cessation of operations.  It is lawfully entitled to operate, and it has demonstrated, until this time, that it provides safe care for children.  The Court concludes that the public has an interest in the continuation of such a program for troubled children.  Therefore, the Court determines that it is in the public interest for limited injunctive relief, that does not prevent Mr. Waddle and Ms. Ayers from lawfully exercising their duties under Missouri law, to be granted to Plaintiffs.

Consequently, after careful consideration of the four <u>Dataphase</u> factors, the Court concludes that permeant injunctive relief is proper in this case as against Mr. Waddle.  Irrespective of the findings that Ms. Ayers, individually and in conspiracy with Mr. Waddle, violated Heartland students' Fourth Amendment right to be free from unreasonable searches and seizures and Plaintiffs' right to family integrity, the Court is not persuaded that injunctive relief against her or the Juvenile Office of the Forty-First Judicial Circuit is indicated.  Ms. Ayers repeatedly demonstrated restraint when Mr. Waddle tried to persuade her to seek a search warrant to get records at Heartland.  Instead, she acted upon reliable legal advice and acquired information by less intrusive subpoenas.  She resisted the use of injunctive relief to close Heartland when Mr. Waddle sought that remedy.  She, at first, was resistant to the remedy of the mass removal of the children from Heartland, before acquiescing and actively participating in the mass removal.  However, she expresses no intention of engaging in such behavior in the future and provides the view that she would not do so.

Contrary to Mr. Ayers' approach, Mr. Waddle appears ready and willing to once again remove the children from Heartland, if the circumstances were the same as they were at the time of the mass removal on October 30, 2001.  It is now known that Mr. Waddle violated the Fourth Amendment right of students at Heartland to be free from unreasonable searches and seizures, violated Plaintiffs' right to family integrity, and violated Plaintiffs' First Amendment right to freely associate through his actions on October 30, 2001.  Therefore, injunctive relief against him and anyone acting at his direction in the Second Judicial Juvenile Office is required.

Accordingly, the Court enters the following permanent injunction against Mr. Waddle and any Second Judicial Circuit Juvenile Officer acting on his direction:

> Hereafter, Mike Waddle, or any juvenile officer acting at his direction, shall not cause or attempt to cause the pre-notice or pre-hearing removal of or take into protective custody any child or children from Heartland Academy or CNS International

Industries, Inc., without reasonable cause to believe that each child for whom protective custody or removal is sought is in imminent danger of suffering serious physical harm, threat to life from abuse or neglect, or has been sexually abused or is in imminent danger of sexual abuse.

## B.    Declaratory Relief

Plaintiffs also ask the Court to grant them declaratory relief.  They want the Court to enter the following declaratory judgment:

It is unlawful to cause or attempt to cause, by court order or otherwise, the pre-notice and/or pre-hearing protective custody and/or removal of any children from the Heartland Academy Community Church and/or CNS International Ministries, Inc., unless there is reasonable cause to believe that each child as to whom the protective custody and/or removal is sought is in imminent danger of suffering serious physical harm, threat to life, or sexual abuse as a result of abuse or neglect.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (inapplicable exceptions omitted). "The Declaratory Judgment Act expands the scope of available remedies and permits persons to seek a declaration of the constitutionality of a disputed governmental action."  Morris v. Dearborne, 69 F.Supp.2d 868, 880 (E.D. Tex. 1999) (citing Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59 (1978)).  "The purpose of the Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side."  BP Chem. Ltd. v. Union Carbide Corp., 4 F.3d 975, 977 (Fed. Cir. 1993).  "The Eighth Circuit [has] held that the declaratory judgment statute 'does not expand the District Courts' jurisdiction, but merely authorizes them to declare the legal rights of parties in cases over which they would otherwise have jurisdiction."  Conway Sch. Dist. v. Wilhoit, 854 F.Supp. 1430, 1435 (E.D. Ark. 1994) (quoting Pulido v. Bennett, 848 F.2d 880, 887 (8th Cir. 1988)).

The Declaratory Judgment Act "requires that the case be one of 'actual controversy,' with an emphasis on the immediacy of the threatened injury."  Id.  "The Supreme Court has held that 'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and

162

reality to warrant the issuance of a declaratory judgment.'"  Id. (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937)).  "Plaintiffs must show that they are in immediate danger of sustaining a direct injury as a result of defendants' conduct: a threat that is real and immediate, not conjectural or hypothetical."  Morris, 69 F.Supp.2d at 881.  The Declaratory Judgment Act also provides an exception to the actual case or controversy requirement.  "When there is a reasonable possibility that the same controversy will recur, an exception exists to the case or controversy requirement."  Id. (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).  Where "plaintiffs have shown the existence of an immediate and definite governmental action or policy that has adversely affected their interests in the past and continues to affect a present interest, there is a reasonable expectation that the same complaining party would be subjected to the same action again."  Id. (citing Weinstein, 423 U.S. at 149).

Plaintiffs have satisfied their burden and are entitled to declaratory relief against Mr. Waddle.  The Court does not believe that declaratory relief is required as against Ms. Ayers, for the reasons set forth fully in the previous section.  Therefore, the Court enters the following order against Mr. Waddle and any Second Judicial Circuit Juvenile Officer acting on his direction:

> Hereafter, Mike Waddle, or any juvenile officer acting at his direction, shall not cause or attempt to cause the pre-notice or pre-hearing removal of or take into protective custody any child or children from Heartland Academy or CNS International Industries, Inc., without reasonable cause to believe that each child for whom protective custody or removal is sought is in imminent danger of suffering serious physical harm, threat to life from abuse or neglect, or has been sexually abused or is in imminent danger of sexual abuse.

**SO ORDERED** this 11th day of May, 2004.


_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE